# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DIANA F. TRACY, DAVID E. BAGENSTOSE, JASON L. RICHARD and STACY M. MOXLEY, individually and on behalf of all others similarly situated, | ) ) ) ) ) | **CIVIL ACTION NO.:** |
|  | ) |  |
| Plaintiffs, | ) ) | |
|  | ) | |
| v. | ) | **CLASS ACTION COMPLAINT** |
|  | ) | |
| THE AMERICAN NATIONAL RED CROSS, THE BOARD OF GOVERNORS OF THE AMERICAN NATIONAL RED CROSS, THE BENEFIT ADMINISTRATION COMMITTEE OF THE AMERICAN NATIONAL RED CROSS and JOHN DOES 1-30. | ) ) ) ) ) ) ) | |

Defendants.

## COMPLAINT

Plaintiffs, Diana F. Tracy, David E. Bagenstose, Jason L. Richard and Stacy M. Moxley ("Plaintiffs"), by and through their attorneys, on behalf of the American Red Cross Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.   INTRODUCTION

1.   This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include the American National Red Cross (the "Red Cross" or "Company"), the Board of Governors of the American National Red Cross and its members during

---

[1]   The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

the Class Period[2] ("Board") and the Benefit Plan Administration Committee of the American National Red Cross and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Chao v. Trust Fund Advisors*, No. Civ.A. 02-559(GK), 2004 WL 444029 at *2 (D.C. 2004).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See, "A Look at 401(k) Plan Fees," supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

---

[2] The Class Period, as will be discussed in more detail below, is defined as March 2, 2015 through the date of judgment.

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      Most participants in defined contribution plans like 401(k) plans expect that their accounts will be their principal source of income after retirement.  Although at all times plan accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8.      Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their retirement plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

9.      At all times during the Class Period (March 2, 2015 through the date of judgment) the Plan had at least 894 million dollars in assets under management.  At the end of 2019 and 2018, the Plan had over 1.2 billion dollars and 1 billion dollars, respectively, in assets under management

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 3, 2021) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

that were/are entrusted to the care of the Plan's fiduciaries.  The Plan also had no less than 22,000 participants with account balances at any point during the Class Period.

10.     The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.  In fact, according to data studied by BrightScope, an industry analyst, the Plan fell in the category of plans with the ***highest*** total plan cost for plans above $500 million in assets.[4]

11.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's recordkeeping costs.

12.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty,  in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

---

[4] https://www.brightscope.com/401k-rating/257115/American-National-Red-Cross/261254/The-American-Red-Cross-Savings-Plan/ last accessed on February 11, 2021.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

15.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     PARTIES

**Plaintiffs**

17.     Plaintiff, Diana F. Tracy ("Tracy"), resides in Frederick, Maryland. During her employment, Plaintiff Tracy participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

18.     Plaintiff, David E. Bagenstose ("Bagenstose"), resides in Midlothian, Virginia. During his employment, Plaintiff Bagenstose participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

19.     Plaintiff, Jason L. Richard ("Richard"), resides in Litchfield, Arizona. During his employment, Plaintiff Richard participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

20.     Plaintiff, Stacy M. Moxley ("Moxley"), resides in Savannah, Georgia. During her employment, Plaintiff Moxley participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

21.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

22.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

23.     The Red Cross is the Plan sponsor and a named fiduciary with a principal place of business being 430 17th Street NW, District of Columbia.  The December 31, 2019 Form 5500

filed with the United States Department of Labor ("2019 Form 5500") at 1. The Red Cross carries out its mission through the hard work of "19,000 paid employees."[5]

24.     The Red Cross appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. The December 31, 2019 Report of the Independent Auditor of the American Red Cross Savings Plan ("2019 Auditor Report") at 1. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

25.     Accordingly, the Red Cross, during the putative Class Period, is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

26.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

27.      The Red Cross, acting through its Board of Directors, appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. 2019 Auditor Report at 1. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

28.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority to appoint and/or

---

[5] https://www.redcross.org/about-us/careers.html

monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

29. The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

### Committee Defendants

30. As discussed above, the Committee, among other things, ensures that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. 2019 Auditor Report at 1.

31. The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

32. The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

33. To the extent that there are additional officers, employees and/or contractors of the Red Cross who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, the Red Cross officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

### IV.   CLASS ACTION ALLEGATIONS

8

34.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family
> members, who were participants in or beneficiaries of the
> Plan, at any time between March 2, 2015 through the date
> of judgment (the "Class Period").

35.     The members of the Class are so numerous that joinder of all members is impractical.  The 2019 Form 5500 lists 22,455 Plan "participants with account balances as of the end of the plan year."  2019 Form 5500 at 2.

36.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

37.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are/were fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.     The proper form of equitable and injunctive relief; and

D.     The proper measure of monetary relief.

---

[6] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

38.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

39.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

40.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

41.     The Red Cross established the Plan for "the purpose of providing a source of retirement funds to participating employees or their beneficiaries." The December 2019 Summary Plan Description of the American Red Cross Savings Plan ("2019 SPD") at 1. As will be discussed below, the Plan has been hindered in fulfilling its purpose by the fiduciary breaches of the Committee, the Red Cross and the Board.

42.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts

for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. 2019 Auditor Report at 6.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id.*

### *Eligibility*

43.     In general, the Plan is "offered to all American Red Cross employees paid on The American National Red Cross (Plan Sponsor) payroll … ." 2019 Auditor Report at 5.

### *Contributions*

44.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions.  *Id.*

45.     With regard to employee contributions: "[e]ach year, participants may contribute, on a pre-tax basis, to the Plan from 1% to 50% of their annual compensation … ." *Id*. With regard to matching contributions made by the Red Cross: "[a]n employee who makes regular salary reduction or after-tax contributions is eligible to receive an employer match equal to 100% of his/her contributions, provided that the matching contributions do not exceed 4% of compensation." *Id.*

46.     Like other companies that sponsor 401(k) plans for their employees, the Red Cross enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

11

47.     The Red Cross also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

48.     Given the size of the Plan, the Red Cross likely enjoyed a significant tax and cost savings from offering a match.

*Vesting*

49.     With regard to contributions made by participants to the Plan: "[a]ll participants are immediately vested in their own contributions and actual earnings thereon." 2019 Auditor Report at 6. Matching contributions made by the Red Cross are subject to a 3 year vesting schedule based on years of continuous service. *Id.*

*The Plan's Investments*

50.     In theory, the Red Cross determines the appropriateness of the Plan's investment offerings and monitors investment performance. 2019 Auditor Report at 1. As will be discussed in more detail below, the Red Cross, the Board and/or the Committee fell well short of these fiduciary goals.

51.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

52.     The Plan's assets under management for all funds as of December 31, 2019 was $1,222,264,000.  2019 Auditor Report at 4.

*Payment of Plan Expenses*

53.     During the Class Period, administrative expenses were paid for using Plan assets. As described in the 2019 Auditor Report: "[t]he Plan is responsible for paying recordkeeping, trustee, administrative and other operational costs." 2019 Auditor Report at 7.

## VI.   THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A.   The Totality of the Circumstances Demonstrates that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

54.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

55.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

56.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

57.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon the numerous factors set forth below.

58.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in  *inter alia*, the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the assets of the Plan and the assets of participants because of unnecessary costs.  Defendants also failed to monitor and curtail the unreasonable costs incurred by the Plan.

**(1)**     **The Plan's Total Plan Costs Were the Highest in Its Peer Group**

59.     "Many types of services are required to operate a [defined contribution] plan, including administrative services (*e.g.*, recordkeeping and transaction processing), participant-focused services (*e.g.*, participant communication, education, or advice), regulatory and compliance services (*e.g.*, plan document services; consulting, accounting, and audit services; and legal advice), and investment management." [7]

60.     "In order to better understand the impact of fees," BrightScope, a leading plan retirement industry analyst, "developed a total plan cost measure that includes all fees on the audited Form 5500 reports as well as fees paid through investment expense ratios." ICI Study at 55.

61.     Costs are of course important because "[t]he lower your costs, the greater your share of an investment's return." Vanguard's Principles for Investing Success, at 17.[8]

62.     One indication that the Plan was poorly run is its dismal ranking among peers when comparing total plan costs. As of 2019, the Plan is ranked by BrightScope, a leading 401(k) cost watchdog, as having one of the highest overall plan costs of any Plan with over 500 million dollars in assets under management.[9] In fact, BrightScope finds that the average participant would have to work an additional 18 years and will have lost at least $45,000 as a result of the Plan's high costs. *Id.*

**(2) Defendants Failed to Adequately Monitor the Plan's Recordkeeping Expenses**

---

[7] *See* BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2017* at 55 (August 2020) (hereafter, "ICI Study") available at https://www.ici.org/pdf/20_ppr_dcplan_profile_401k.pdf

[8] Available at https://about.vanguard.com/what-sets-vanguard-apart/principles-for-investing-success/

[9] https://www.brightscope.com/401k-rating/257115/American-National-Red-Cross/261254/The-American-Red-Cross-Savings-Plan/ last accessed on February 11, 2021.

63.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

64.     Although utilizing a revenue sharing approach is not per se imprudent, unchecked, it is devastating for Plan participants (*e.g., see* allegations *infra*).  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at  http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited February 18, 2021).

65.     In this matter, using revenue sharing to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees.

66.     As demonstrated in the chart below, the Plan's per participant administrative and recordkeeping fees were astronomical when benchmarked against similar plans.

| Year | Participants | Recordkeeper [10] | Northern Trust | The Red Cross | Total | Per Participant |
|------|------|------|------|------|------|------|
| 2015 | 25136 | $2,600,405 | $350,119 | $239,046 | $3,189,570 | $126.89 |
| 2016 | 23689 | $2,616,174 | $350,332 | $263,193 | $3,229,699 | $136.34 |
| 2017 | 24133 | $5,107,750 | $253,965 | $241,107 | $5,602,822 | $232.16 |

[10] The recordkeeper from 2015 to 2016 was Aon Hewitt or one of its subsidiaries and the recordkeeper from 2017 to 2019 was Alight Solutions or one of its subsidiaries.

| 2018 | 23127 | $4,153,032 | $196,097 | $238,909 | $4,588,038 | $198.38 |
| 2019 | 22455 | $4,203,721 | $198,914 | $260,619 | $4,663,254 | $207.67 |

67.     By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.

68.     During the entire Class Period, the Plan had over twenty-two thousand participants making it eligible for some of the lowest fees on the market.

69.     NEPC, a consulting group, recently conducted its 14th Annual Survey titled the NEPC 2019 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees.[11]   The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other.  The median plan had $512 million in assets and 5,440 participants.  *See* Report at 1.

70.     NEPC's survey found that the majority of plans with over 15,000 participants paid slightly more than $40 per participant recordkeeping, trust and custody fees.  Report at 10.  **No plan** with over 15,000 participants paid more than $68 per participant.  *Id.*

71.     Another data source, the *401k Averages Book* (20th ed. 2020)[12] studies plan fees for much smaller plans, those under $200 million in assets.  Although it studies much smaller plans than the Plan, it is nonetheless a useful resource because we can extrapolate from the data what a slightly bigger plan like the Plan should be paying for recordkeeping.   That is because recordkeeping and administrative fees should *decrease* as a plan increases in size.  For example, a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant.  *401k Averages Book* at p. 95.  A plan with 2,000 participants and $200 million in assets has an average recordkeeping and

---

[11] Available at https://www.nepc.com/insights/2019-dc-plan-and-fee-survey.

[12] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information."  *401k Averages Book* at p. 2.

administration cost (through direct compensation) of $5 per participant.  *Id.*, at p. 108.  Thus, the Plan, with over $1.2 billion dollars in assets and over 22,000 participants in 2019, should have had direct recordkeeping costs below the $5 average, which it clearly did not.

72.     The Plan's total recordkeeping costs are clearly unreasonable as some authorities have recognized that reasonable rates for large plans typically average around $35 per participant, with costs coming down every day.[13]

73.     In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

74.     Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP

---

[13] Case law is in accord that large plans can bargain for low recordkeeping fees.  *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015); *see also* NEPC 2019 Defined Contribution Progress Report at 10 ("Best Practice is to compare fees and services through a record keeping vendor search Request for Proposal process).

75.     In fact, although the Plan changed its recordkeeper in 2016, recordkeeping costs actually were higher after the change. This strongly suggests that Defendants failed to conduct a proper and effective RFP at any time prior to 2015 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

76.     Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

### (3)     Several of the Plan's Funds with Substantial Assets had Identical Lower Cost Alternatives

77.     Defendants failed to timely consider available lower cost identical collective investment trusts ("CITs") to the funds offered by the Plan. The alternative funds are identical in every respect except that they don't bear the Red Cross name. The Plan engages in a rebranding process whereby it contracts with providers of CITs to offer each provider's CIT bearing the Red Cross name with the only difference being additional cost.

78.     In its March 2020 fee disclosure, the Plan details how its rebranding process works: the Plan "adds basis points to the expense ratio of funds to cover administrative fees." Important Information About Your Investment Options, Fees, and Other Expenses for the American Red Cross Savings Plan 401(k) Annual Fee Disclosure Statement as of March 2020 ("2020 Fee Disclosure") at 5. The 2020 Fee Disclosure further provides that "[f]ifteen (15) basis points (0.15%) have been included in the expense ratio of each listed investment for administrative expenses." *Id.*

79.     There is no difference between the underlying CITs and the rebranded Red Cross product. The funds hold identical investments, have the same managers, risk return profiles and investment strategy.  Because the underlying funds are otherwise *identical* to the Red Cross version, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.  *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

80.     Generally, products permitted to be rebranded by a provider of underlying funds are targeted at smaller investors with less bargaining power, while the underlying investments are targeted at institutional investors with more assets. While the underlying investments may have an investment minimum, qualifying for them usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for large plans like the Plan.  *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24).

81.     During 2019, all the funds available for investment by participants needlessly bore the Red Cross name at great expense and detriment to Plan participants. In 2019, these funds harbored over 1.1 billion dollars which would easily allow the Plan to invest in the underlying unbranded funds. The following chart provides detail on these funds:

| Current Fund | Current ER | Underlying ER | Excess Expense | 2019 AUM |
|---|---|---|---|---|
| ARC-NTAM Focus Target Income | 0.22% | 0.07% | 214% | $24,115,259 |
| ARC-NTAM Focus Target 2020 | 0.22% | 0.07% | 214% | $41,376,808 |
| ARC-NTAM Focus Target 2025 | 0.22% | 0.07% | 214% | $56,892,306 |
| ARC-NTAM Focus Target 2030 | 0.22% | 0.07% | 214% | $59,051,195 |
| ARC-NTAM Focus Target 2035 | 0.22% | 0.07% | 214% | $57,758,723 |
| ARC-NTAM Focus Target 2040 | 0.22% | 0.07% | 214% | $50,355,879 |
| ARC-NTAM Focus Target 2045 | 0.22% | 0.07% | 214% | $44,855,020 |
| ARC-NTAM Focus Target 2050 | 0.22% | 0.07% | 214% | $35,918,293 |
| ARC-NTAM Focus Target 2055 | 0.22% | 0.07% | 214% | $17,202,125 |
| ARC-NTAM Focus Target 2060 | 0.22% | 0.07% | 214% | $4,858,591 |
| STATE STREET S&P 500 FLAGSHIP FUND SERIES A | 0.16% | 0.01% | 1500% | $287,901,984 |
| ARC-NTAM BNY Mellon Small Mid Cap Stk Mid/Small Cap | 0.19% | 0.04% | 375% | $168,905,475 |
| ARC-NTAM Infl Sensitive Real Return | 0.28% | 0.13% | 115% | $5,807,572 |
| ARC-BNY Mellon ACWI Ex-US Intl Equity | 0.22% | 0.07% | 214% | $143,126,856 |
| ARC-NTAM Agg Bond Fixed Income | 0.18% | 0.03% | 500% | $132,078,854 |
| | | | **Total:** | $1,130,204,940 |

82.     The above is for illustrative purposes only. At all times during the Class Period, Defendants knew or should have known of the existence of the identical underlying unbranded products and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

83.     There is no good-faith explanation for utilizing branded funds when lower-cost unbranded products are available for the exact same investment.  Because the branded products chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive branded funds ***could not have*** (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility.  In short, the Plan did not receive any additional services or benefits based on its use of more expensive branded funds; the only consequence was higher costs for Plan participants.

84.     Defendants made investments with higher costs (higher expense ratios) available to participants while the same unbranded investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received.  This reduces the likelihood that participants achieve their preferred lifestyle in retirement.

85.     Simply put, a fiduciary to a jumbo defined contribution plan such as the Plan can use its asset size and negotiating power to invest in unbranded products.  For this reason, prudent retirement plan fiduciaries will search for and select unbranded products at the lowest-priced share class available.

86.     Here, had the Plan's fiduciaries prudently undertook their fiduciary responsibility for "oversight of the Plan, determin[ing] the appropriateness of the Plan's investment strategy, and monitor[ing] investment performance" the Plan would have moved to the unbranded versions of the identical fund. 2018 Auditor Report at 7.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against the Committee)**

87.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

88.     At all relevant times, the Committee and its members during the Class Period ("Prudence/Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

89.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent

person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

90.     The Prudence/Loyalty Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants. Instead, the Prudence/Loyalty Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence/Loyalty Defendants also failed to investigate the availability of lower-cost unbranded versions of the funds in the Plan.

91.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

92.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence/Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

93.     The Prudence/Loyalty Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**

**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against the Red Cross and the Board)**

94.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

95.     The Red Cross and the Board Defendants (the "Monitoring Defendants") had the authority and obligation to monitor the Committee and was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

96.     In light of this authority, the Monitoring Defendants had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

97.     The Monitoring Defendants also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

98.     The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)     Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

(b)     failing to monitor the processes by which the Plan's investments were evaluated and the Committee's failure to investigate the availability of identical lower-cost funds; and

(c)      failing to remove the Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

99.      As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

100.      Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties,

24

including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.     Such other and further relief as the Court deems equitable and just.

Date: March 2, 2021                          **LAW OFFICES OF**
                                             **CHRISTOPER M. BATTISTA**

/s/ Christopher M. Battista_____.
Christopher M. Battista, Esquire
D.C. Bar Number: 497209
4224 Jefferson Oaks Circle, Suite E
Fairfax, VA 22033
chris@cmblegalanswers.com
(202) 360-1016
Fax: (703) 562-9039

**CAPOZZI ADLER, P.C.**

/s/ Donald R. Reavey_____.
Donald R. Reavey, Esquire
PA Attorney ID #82498
(*Admission Pro Hac to be Requested*)
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

/s/ Mark K. Gyandoh_____.
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(*Admission Pro Hac to be Requested*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class