## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: THE AMERICAN NATIONAL RED CROSS ERISA LITIGATION | Civil Action |
| | Master File No. 1:21-cv-00541-EGS |
| This Document Relates To: All Actions | |

## <u>CONSOLIDATED CLASS ACTION COMPLAINT</u>

1.      Plaintiffs David E. Bagenstose, Nitza Juarbe, Stacy M. Moxley, Jason L. Richard, Diana F. Tracy, and Lisa Scaramuzzo (collectively "Plaintiffs"), individually and as representatives of a class of participants in and beneficiaries of the American Red Cross Savings Plan (the "Plan"), bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (a)(3) on behalf of the Plan against defendants the American National Red Cross ("Red Cross"), the Benefit Plan Committee of the American National Red Cross ("Benefit Plan Committee"), and Does 1–20 (collectively "Defendants") for breaches of fiduciary duty under the Employee Retirement Income Security Act ("ERISA").[1]

2.      This case arises from Defendants' failure to control the recordkeeping, administrative, and other fees imposed on the Plan and passed on to all Plan participants, including Plaintiffs.

3.      This case also arises from Defendants' imprudent selection and retention of poorly performing target date investment funds, called the Northern Trust Focus Funds ("Focus Funds"), for inclusion in the Plan. Performance of the Focus Funds was consistently materially worse than benchmark indexes and comparable target date funds, both before and after

---

[1]  ERISA is codified at 29 U.S.C. §§ 1001–1461.

Defendants added them to the Plan's lineup of investments in 2017. The Focus Fund target date funds were and are the default investment selection for Red Cross employees who participate in the Plan and do not affirmatively select other investment choices for their 401(k) accounts. At the end of 2019 (the most recent year for which data is available), the Plan invested over $368 million in the Focus Funds, representing 30% of the Plan's $1.2 billion overall assets under management.

4.      Defendants' breaches of fiduciary duty included failures to act prudently and loyally for the benefit of Plan participants. Plan participants lost tens of millions of dollars in their investment accounts during the class period due to the excessive fees imposed on the Plan and the underperforming Focus Funds. The losses will continue to compound over time because the Plan's reduced asset base will forego the benefit of compounded earnings.

5.      The marketplace for third party recordkeepers and other providers of administrative services is established and competitive with many entities available to provide services at reasonable rates for 401(k) plans like the Plan.

6.      Similarly, the marketplace for retirement plan investment options, including target date funds, is established and competitive with many target date funds available that offer a proven performance history at a reasonable cost.

7.      Billion-dollar "mega" or "jumbo" 401(k) plans like the Plan have tremendous bargaining power to obtain administrative services at a reasonable cost and to obtain high-quality investment products that provide consistent, stable, and strong performance.

8.      As fiduciaries of the Plan, Defendants are obligated to act prudently, diligently, loyally, and for the benefit of all Plan participants. Defendants' fiduciary duties require them to ensure that, among other things, the fees incurred by the Plan and passed on to its participants are

not excessive, and the Plan's investment choices are prudent options, and remain so, for Plan participants.

9.  Defendants' fiduciary duties are the "highest known to the law" and must be discharged with an "eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982).

10. Instead of acting prudently, Defendants imposed unreasonable recordkeeping and administrative costs on Plan participants, and they retained an underperforming suite of Focus Fund target date funds as core investment options in the Plan.

11. The Plan's fees were excessive when compared to comparable 401(k) plans offered by other plan sponsors that had similar numbers of plan participants and similar levels of assets under management. The excessive fees led to lower net returns than participants in comparable 401(k) plans enjoyed.

12. The Focus Funds suffered from ongoing deficiencies resulting in material underperformance relative to well-established, prudently managed, comparable target date funds that were equally available to Defendants to be added to the suite of investment options in the Plan. Given the deficiencies, a prudent fiduciary would have avoided adding the Focus Funds to the Plan in 2017, and/or would have removed them and replaced them with prudent investment alternatives thereafter. Doing so would have avoided millions of dollars in losses suffered by Plan participants who invested in the underperforming Focus Funds.

13. To remedy these breaches of fiduciary duty, Plaintiffs, individually and as representatives of a class of participants in and beneficiaries of the Plan, bring this action on behalf of the Plan. Plaintiffs bring this action under 29 U.S.C. § 1132(a)(2) and (a)(3) to enforce

Defendants' liability under 29 U.S.C. § 1109(a) to reimburse to the Plan all losses resulting from each breach of fiduciary duty.

## I.   JURISDICTION AND VENUE

14.   <u>Subject-Matter Jurisdiction</u>. This Court has exclusive jurisdiction over the subject matter of this action pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under a federal ERISA statute, 29 U.S.C. § 1132(a)(2).

15.   <u>Venue</u>. This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district where the Red Cross is headquartered and at least one of the alleged breaches of fiduciary duty took place.

16.   <u>Standing</u>. An action under 29 U.S.C. § 1132(a)(2) allows recovery for a plan only and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any breach of fiduciary duty and is the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any plan participant, fiduciary, or the U.S. Secretary of Labor to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2). As set forth below, the Plan suffered millions of dollars in losses resulting from Defendants' breaches of fiduciary duty, and those injuries may be redressed by a judgment in favor of Plaintiffs on behalf of the Plan.

17.   To the extent Plaintiffs must also show individual injuries even though 29 U.S.C. § 1132(a)(2) does not provide redress for individual injuries, Plaintiffs have suffered such injuries because they were charged excessive fees and/or earned unreasonably low investment returns.

## II.      PARTIES

### A.      Plaintiffs

18.      Plaintiff David E. Bagenstose ("Bagenstose") resides in Virginia. He is a participant in the Plan under 29 U.S.C. § 1002(7) because he contributed to the Plan and is eligible to receive benefits under the Plan. He invested in a Focus Fund target date fund during the Class Period and was harmed by the underperformance of the fund. He was also harmed by the excessive fees alleged herein.

19.      Plaintiff Nitza Juarbe ("Juarbe") resides in New Jersey. She is a participant in the Plan under 29 U.S.C. § 1002(7) because she contributed to the Plan and is eligible to receive benefits under the Plan. She invested in a Focus Fund target date fund during the Class Period and was harmed by the underperformance of the fund. She was also harmed by the excessive fees alleged herein.

20.      Plaintiff Stacy M. Moxley ("Moxley") resides in Georgia. She is a participant in the Plan under 29 U.S.C. § 1002(7) because she contributed to the Plan and is eligible to receive benefits under the Plan. She was harmed by the excessive fees alleged herein.

21.      Plaintiff Jason L. Richard ("Richard") resides in Arizona. He is a participant in the Plan under 29 U.S.C. § 1002(7) because he contributed to the Plan and is eligible to receive benefits under the Plan. He invested in a Focus Fund target date fund during the Class Period and was harmed by the underperformance of the fund. He was also harmed by the excessive fees alleged herein.

22.      Plaintiff Lisa Scaramuzzo ("Scaramuzzo") resides in Pennsylvania. She is a participant in the Plan under 29 U.S.C. § 1002(7) because she contributed to the Plan and is eligible to receive benefits under the Plan. She was harmed by the excessive fees alleged herein.

23.     Plaintiff Diana F. Tracy ("Tracy") resides in Maryland. She is a participant in the Plan under 29 U.S.C. § 1002(7) because she contributed to the Plan and is eligible to receive benefits under the Plan. She was harmed by the excessive fees alleged herein.

### B.     Defendants

#### 1.     American National Red Cross

24.     Defendant the American National Red Cross ("Red Cross") is a nonprofit, tax-exempt, charitable organization headquartered in Washington, DC. The Red Cross is the Plan Sponsor under 29 U.S.C. § 1002(16).[2] The Red Cross is the employer of the Plan's other fiduciaries named as Defendants herein.

25.     The Red Cross acts as a "named fiduciary" and "administrator" of the Plan for purposes of 29 U.S.C. § 1102.

26.     The Red Cross exercises discretionary authority or control regarding management of the Plan, exercises authority or control regarding disposition of Plan assets, and/or has discretionary authority or responsibility in the administration of the Plan. The Red Cross is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

#### 2.     The Benefit Plan Committee of the American National Red Cross

27.     The Benefit Plan Committee of the American National Red Cross ("Benefit Plan Committee") is the Plan Administrator.[3] The Benefit Plan Committee and its individual members are fiduciaries under 29 U.S.C. § 1102(a)(2). The individual members of the Benefit Plan

---

[2]  *See* American Red Cross Savings Plan Form 5500 ("Form 5500") for the year ended December 31, 2019 at pg. 1. Form 5500s are filed annually with the U.S. Department of Labor and are publicly available at https://www.efast.dol.gov/portal/app/disseminatePublic?execution=e1s1.

[3]  *See* Summary Plan Description, Nov. 2020, at pg. 18.

Committee, past and current, are not publicly identified by Defendants and are currently unknown to Plaintiffs.

28.     The Benefit Plan Committee and its individual members exercise discretionary authority or control regarding management of the Plan, exercise authority or control regarding disposition of Plan assets, and/or have discretionary authority or responsibility in the administration of the Plan. The Benefit Plan Committee and its members are fiduciaries under 29 U.S.C. § 1002(21)(A)(i) and (iii).

### 3.     Doe Defendants

29.     Plaintiffs are currently unaware of the identities of the individuals, including but not limited to members of the Benefit Plan Committee, who exercised discretionary authority or control over the management of the Plan. Those individuals are collectively included herein as Does 1−20. When such individuals are identified, Plaintiffs may substitute their names as individual named defendants.

### 4.     Non-Party the American Red Cross Savings Plan

30.     The American Red Cross Savings Plan is a legal entity that can sue and be sued. 29 U.S.C. § 1132(d)(1). In a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA and the law interpreting it, the relief requested is for the benefit of the Plan and its participants.

31.     The Plan is a defined contribution, individual account pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34), in which employees of the Red Cross may participate.

32.     The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a)(1). That document is not publicly available.

33.     Under the Plan, participants are responsible for investing in their individual

accounts, and they will receive the market value of their accounts in retirement. The account balances will depend on contributions made by each employee and/or the Red Cross (via matching contributions or otherwise) and on the performance of the chosen investments net of fees and expenses.

34.     Plan fiduciaries including Defendants control which fees are paid by the Plan and which third party recordkeepers and other service providers are retained by the Plan.

35.     Plan fiduciaries including Defendants also control which investment options are provided in the Plan and made available to employees. Employees must choose from the limited number of investment options made available in the Plan.

36.     As of December 31, 2019 (the most recent year for which data is available), the Plan had $1,221,643,972 in investment assets under management.[4] The Northern Trust Focus Funds comprised $368,268,940 of that total, or 30%.[5] As of December 31, 2019, the Plan had 22,455 participants with account balances.[6]

## III.     ERISA FIDUCIARY STANDARDS

37.     ERISA law imposes fiduciary duties of loyalty and prudence on Defendants as fiduciaries of the Plan. Specifically, 29 U.S.C. § 1104(a) states:

A fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

---

[4] *See* American Red Cross Savings Plan amended Form 5500 for the year ended December 31, 2019, at Financial Statements pg. 23.

[5] *Id.* at Financial Statements pg. 12.

[6] *Id.* at pg. 2.

(ii) defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

38.     Under ERISA law, fiduciaries who exercise authority or control over plan assets, including the selection and retention of plan investments and service providers, must act prudently and for the exclusive benefit of participants in the plan, and they must monitor the funds in the plan and remove imprudent or excessively expensive funds. *See* U.S. Dept. of Labor Advisory Opinions 97-15A and 97-16A; *see also* 29 U.S.C. § 1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

39.     Under ERISA law, a "trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). Prudence requires a review at "regular intervals." *Id*. When making investment decisions, an ERISA fiduciary is "duty-bound 'to make such investments and only such investments as a prudent [person] would make of his own property.'" *In re Unisys*, 74 F.3d 420, 434 (3d Cir. 1996) (quoting Restatement (Second) of Trusts § 227 (1959)). The duty to conduct an "independent investigation into the merits of a particular investment" is the "most basic of ERISA's investment fiduciary duties." *Id*. at 435.

40.     Fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); *see also* 29 C.F.R. § 2550.404a-1; Dept. of Labor Advisory Opinions 98-04A and 88-16A. Fiduciaries have a "continuing duty to monitor

investments and remove imprudent ones" within a reasonable time. *Tibble*, 135 S. Ct. at 1828–29.

41.     A fiduciary's process in performing these functions "must bear the marks of loyalty, skill, and diligence expected of an expert in the field." *Sweda v. Univ. of Penn et. al.*, 923 F.3d 320, 329 (3d Cir. 2019).

42.     ERISA law also imposes co-fiduciary liabilities on plan fiduciaries. Specifically, 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary or knowingly failing to cure a breach by another fiduciary:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
>> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>>
>> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>>
>> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

43.     Defendants have expressly acknowledged their obligation to comply with ERISA fiduciary duties, stating the following in the Summary Plan Description dated November 2020:

> ERISA . . . imposes obligations upon those persons responsible for the operation of the Savings Plan. Such persons are referred to as "fiduciaries" under the law. Fiduciaries must act solely in the interest of Savings Plan participants and beneficiaries, and they must act prudently in the performance of their Savings Plan duties. In the . . . event of violations of these rules, fiduciaries may be removed and required to make good any losses they have caused the Savings Plan.

## IV.    BACKGROUND FACTS

44.    The Plan is a "defined contribution plan." Defined contribution plans dominate the landscape of retirement plans today. In the private sector, these plans have largely replaced "defined benefit plans" that were often used in the past.

45.    A fundamental difference between defined contribution plans and defined benefit plans is that in defined benefit plans, the employer's assets are at risk. Because the employer is responsible for funding the pension plan to satisfy predetermined commitments to employees, the employer bears all investment risk. Conversely, in a defined contribution plan (like the Plan), the employees bear all investment risk. They are not guaranteed a specific amount at retirement. They receive the amount of their original contributions, plus or minus market fluctuations, and minus fees charged during the periods of their investments.

46.    Because employers do not bear investment risk in defined contribution plans, they have less incentive to closely monitor fees and fund performance. Thus, ERISA fiduciary duty obligations are an important tool to protect plan participants.

47.    Each participant in a defined contribution plan has an individual account, and each directs his or her monetary contributions into one or more investment alternatives from among a menu of choices selected by the plan's fiduciaries. The fiduciaries have exclusive control over the suite of investments to which participants may direct the savings in their accounts. The fiduciaries also have exclusive control over the fees incurred by the Plan.

### A.    Defendants Had a Duty to Reasonably Monitor and Control the Fees Incurred by the Plan and its Participants

48.    Under 29 U.S.C. § 1104(a)(1)(C), a plan fiduciary must ensure that the costs of the investments are reasonable. *See, e.g.,* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* (Sept.

2019), at pg. 2 ("You should know that your employer also must consider the fees and expenses paid by your plan.").[7]

49.     This is because, as described by the Department of Labor, *a one percent difference in fees and expenses can reduce a participant's retirement account balance by 28 percent over 35 years*. *Id.* at 2.

50.     The Department of Labor has explicitly stated that employers must "ensure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided." *Id.* at 2.

51.     Indeed, the Plan's Annual Fee Disclosure Statement dated February 2021 noted that "[f]ees and expenses are important because they can substantially reduce the growth of your account."

52.     The duty to evaluate and monitor fees includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio, or a percentage of assets under management within a particular investment.

53.     Plan fiduciaries have a responsibility to take into account the reasonableness of any expense ratio when selecting a mutual fund or other investment option for the plan.

54.     On average, lower expense ratios are available to 401(k) participants relative to expense ratios for other types of investors. ERISA-mandated monitoring of investments has led prudent plan sponsors to continually evaluate fees and investment performance, which has resulted in fierce competition among mutual funds in the marketplace. Also, the large account balances of 401(k) plans, especially the largest plans with over $1 billion in assets managed (like

---

[7] *Available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited May 18, 2021).

the Plan), have resulted in economies of scale and special pricing with respect to investments in mutual funds.

55.     This has led to falling mutual fund expense ratios for 401(k) plan participants since at least 2000. For example, expense ratios have fallen 30% from 2000 to 2014 for equity funds, 24% for hybrid funds, and 28% for bond funds.[8]

56.     Large institutional investors such as the Plan are generally able to command low pricing due to the size of their investments. Often, they can receive low-cost funds with the same or similar strategies as higher priced funds due to economies of scale that come with the ability to invest tens of millions of dollars in a single fund.

57.     Prudent and reasonable plan sponsors therefore must monitor both the performance and cost of the investments selected for their 401(k) plans, leveraging the size of their plan to ensure that well-performing, lower cost investment options are available to plan participants.

58.     Plan fiduciaries including Defendants must be continually mindful of the performance and cost of plan investment options to avoid undue risk to plan participants' savings and to ensure that any fees paid are reasonable compensation for the services provided. This includes fees paid to third party recordkeepers and other service providers, as well as fees paid to the plan itself.

59.     Fiduciaries including Defendants must also be aware of the particular share class of the mutual fund available for investment to 401(k) plans because certain share classes can have lower fees than others. A lower fee is usually predicated on a larger investment, *e.g.*, the

---

[8] *See The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, ICI Research (Aug. 2015), at pg. 1, *available at* https://www.ici.org/pdf/per21-03.pdf (last visited May 25, 2021).

lower-fee class of shares is only available to those plans that invest more money in the mutual

fund. Thus, for the same investment with the same manager, the fee can vary by 50 basis points

or more between the highest-cost retail share class and lowest-cost institutional share class.

60.     Plan fiduciaries must also be wary of conflicts of interest that arise when plan

administrators select investment options for the plan that include a remittance of fees to the plan

sponsor or another party affiliated with the plan sponsor. The inherent conflict of interest in such

situations can cause investment funds to be selected and retained when they are not the most

prudent investment option such as when they demonstrate poor performance or carry high fees.

### 1.     Defendants Breached their Fiduciary Duty to Minimize Recordkeeping and Administrative Expenses

61.     One of the responsibilities of plan fiduciaries is to "avoid unwarranted costs" by

being aware of the "availability and continuing emergence" of alternative investments that may

have "significantly different costs." Restatement (Third) of Trusts chap. 17, Intro. note (2007);

*see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("cost-conscious management is

fundamental to prudence in the investment function").

62.     As the amount of assets under management approaches and exceeds $1 billion,

economies of scale dictate that lower-cost administrative services will be available to these large

plans. Here, Defendants were in a position to command highly competitive rates to secure third

party administrative services. Nevertheless, Defendants allowed the Plan to incur materially

higher fees than those charged elsewhere for similarly sized plans.

63.     Third-party service providers, known as "recordkeepers," provide recordkeeping

and administrative ("R&A") services on behalf of defined contribution plans.

64.     R&A services are necessary for all defined contribution plans. The term

"recordkeeping" is a catchall term for the suite of administrative services typically provided to a

defined contribution plan. Recordkeeping services typically include, among other things, maintaining plan records, tracking participant account balances and investment elections, transaction processing, call center support, participant communications, and trust and custody services.

65.     The Plan disclosed that its "[f]ees paid to the recordkeeper . . . cover expenses for things like keeping data on participants, communication materials, Internet services, and assisting participants with transactions."[9]

66.     The market for defined contribution recordkeeping services is highly competitive, particularly for a plan with a large number of participants and a high dollar amount of assets under management.

67.     Since at least the mid-2000s, the fees that R&A service providers have been willing to accept for providing recordkeeping and administrative services has decreased steadily.

68.     The underlying costs to a recordkeeper of providing R&A services to a defined contribution plan are primarily dependent upon the number of participant accounts in the plan rather than the value of assets under management in the plan.

69.     Recordkeepers for larger defined contribution plans like the Plan experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increases. This is because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans.

70.     When the number of participants with an account balance increases in a defined contribution plan, the recordkeeper is able to spread the cost of providing recordkeeping services

---

[9] *See* Annual Fee Disclosure Statement dated February 2021, at pg. 6.

over a larger participant base, thereby reducing the unit cost of delivering services on a per-participant basis.

71.     A plan with more participants can and will receive a lower per-participant fee relative to a smaller plan. This is well known among retirement plan professionals, including R&A service providers and 401(k) administrators.

72.     Prudent plan fiduciaries ensure that they are paying only reasonable fees for R&A services by soliciting competitive bids – *i.e*., a request for proposal ("RFP") – from other service providers to perform the same services being provided to the plan. This is not a complex process and is performed regularly by prudent plan fiduciaries. Fiduciaries commonly request periodic competitive bids from other service providers so they can determine if the current level of fees being charged for R&A services is reasonable.

73.     By soliciting bids from other providers, prudent plan fiduciaries can quickly and easily gain an understanding of the current market for similar R&A services and arrive at a starting point for fee negotiations. The most effective way to determine the true market price at any given time is to obtain competitive quotes through this bidding process. *See George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (failure to solicit bids, and paying higher-than-market recordkeeping fees, supported triable breach of fiduciary duty claim).

74.     By going through an RFP process every few years, prudent plan fiduciaries can review the level of service provided by the current recordkeeper and compare the fees to those being offered by other reputable recordkeepers. The bidding process can also give plan fiduciaries leverage to negotiate lower fees with their current R&A provider should they prefer to stay with their existing provider.

75.     In an asset-based pricing structure, the amount of compensation received by the

service provider is based on the total assets in the Plan. This structure creates situations in which the R&A services provided by the recordkeeper do not change, but because of market appreciation and additional contributions to the plan, the revenue received by the recordkeeper increases. This structure is often preferred by recordkeepers because it allows the recordkeeper to realize an increase in fee revenue without having to affirmatively ask the client to pay a higher fee.

76.     Regardless of the pricing structure negotiated by the plan fiduciary, the fiduciary must ensure that the fees paid for R&A services are reasonable for the level of services provided.

77.     Fiduciary best practices, based on Department of Labor guidelines and marketplace experience, were known or should have been known by Defendants. These practices dictate that plan fiduciaries should perform the following, among other things:

- Price administrative fees on a per-participant basis;

- Benchmark and negotiate recordkeeping and investment fees separately;

- Benchmark and negotiate recordkeeping and trustee fees at least every other year; and

- Review services annually to identify opportunities to reduce administrative costs.[10]

78.     Prudent fiduciaries should implement the following three related processes to reasonably manage and control a plan's recordkeeping and administrative costs. *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (holding that 401(k) plan administrators breach their fiduciary duties when they "fail[] to monitor and control recordkeeping fees"); *Kraft Foods*,

---

[10] *See DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance,* Mercer Investment Consulting (2013), *available at* https://www.mercer.pt/content/dam/ mercer/attachments/global/Retirement/DC%20Fee%20Management%20-%20Mitigating% 20Fiduciary%20Risk%20and%20Maximizing%20Plan%20Performance.pdf (last visited June 14, 2021).

641 F.3d at 800 (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

79.     First, a plan fiduciary must pay close attention to the recordkeeping fees being paid by the plan relative to the services provided. A prudent fiduciary closely tracks fee payment levels and the level of services being provided in exchange for the fees.

80.     Second, to make an informed evaluation as to whether a service provider is receiving no more than a reasonable fee for the services provided to the plan, a prudent fiduciary must identify all fees, including direct and indirect compensation being paid to the service provider.

81.     Third, a plan fiduciary must remain informed about overall trends in the marketplace regarding fees being paid by other plans, particularly comparably sized plans. This will include monitoring the fees paid by similar plans, and also conducting an RFP bid process at reasonable intervals to ensure the plan's fees remain reasonable. A bidding process should take place periodically as a matter of course, and more frequently if the plan experiences an increase in recordkeeping costs or if fee benchmarking reveals that the recordkeeper's compensation exceeds levels found in similar plans.

82.     During the class period, Defendants knew or should have known that they must regularly monitor the Plan's R&A fees. Defendants knew or should have known that they must regularly solicit competitive bids from service providers to avoid paying unreasonable fees for R&A services. Notably, the Plan switched recordkeepers in mid-2017, transitioning from Hewitt Associates to Alight Solutions. After doing so, the annual recordkeeping fees *increased* during the post-2017 years relative to pre-2017 years despite the number of participants decreasing, as noted in the chart below. This strongly suggests that Defendants failed to conduct a proper

bidding process at the time of the transition or else turned a blind eye to the resulting increase in fees that would occur after switching recordkeeping providers.

83.     During the class period, Defendants failed to properly monitor and minimize the Plan's R&A fees.

84.     During the class period, Defendants did not engage in objectively reasonable or prudent efforts to ensure that the Plan paid no more than competitive reasonable fees for R&A services.

85.     Because Defendants failed to properly monitor the Plan's R&A fees, the fees were materially higher than they would have been had Defendants engaged in a prudent process.

86.     The table below shows the Plan's annual R&A fees in the aggregate and on a per-participant basis for the years 2015 through 2019 (the most recent year for which data is available). The table illustrates that the Plan had on average 23,708 participants and paid total R&A fees of approximately $1,655,436 per year on average, which equates to **$69.83 per participant**. This amount is materially higher than the industry average as discussed more fully below.

| Recordkeeping and Administration (R&A) Fees | | | | | | |
|---|---|---|---|---|---|---|
| Year | Participants[11] | Recordkeeping Fees[12] | Trustee Fees Paid to Northern Trust[13] | Administrative Fees Paid to the Red Cross[14] | Total R&A Fees | R&A Fees Per Participant |
| **2015** | 25,136 | $1,078,614 | $350,119 | $239,046 | $1,667,779 | $66.35 |
| **2016** | 23,689 | $1,048,720 | $350,332 | $263,193 | $1,662,245 | $70.17 |
| **2017** | 24,133 | $1,276,714 | $253,965 | $241,107 | $1,771,786 | $73.42 |
| **2018** | 23,127 | $1,146,089 | $196,097 | $238,909 | $1,581,095 | $68.37 |
| **2019** | 22,455 | $1,134,742 | $198,914 | $260,619 | $1,594,275 | $71.00 |
| **Avg. of Above** | 23,708 | $1,136,976 | $269,885 | $248,575 | $1,655,436 | **$69.86** |

87.     Based upon publicly available information available to Defendants at all relevant times, it was possible for the Plan to negotiate materially lower R&A fees. The table below summarizes the R&A fees paid by plans of similar size and assets under management, and illustrates that the R&A fees paid by the Plan were materially higher in comparison.

---

[11] Per Red Cross amended Form 5500s at pg. 2.

[12] Per Red Cross amended Form 5500s, Schedule C. Figures in the chart reflect fees paid to service providers with service code "15" and/or "64," which signifies recordkeeping fees. *See* Instructions for Form 5500 (2019), at pg. 27 (defining each service code), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2019-instructions.pdf.

[13] Per Red Cross amended Form 5500s at Schedule C.

[14] Per Red Cross amended Form 5500s at Schedule C.

| Comparable Plans' R&A Fees Paid in 2019[15] | | | | |
|---|---|---|---|---|
| Plan Name | Number of Participants | Assets Under Management | Total R&A Costs | R&A Costs on Per-Participant Basis | Recordkeeper |
| Sutter Health Retirement Income Plan | 12,205 | $515,927,887 | $375,153 | $31 | Fidelity |
| Fortive Retirement Savings Plan | 14,375 | $1,885,682,190 | $552,129 | $38 | Fidelity |
| The Tax Sheltered Annuity Plan of Texas Children's Hospital | 14,676 | $1,271,086,311 | $547,910 | $37 | Fidelity |
| Dollar General Corp. 401(k) Savings and Retirement Plan | 22,663 | $458,410,345 | $864,158 | $38 | Voya |
| Sanofi U.S. Group Savings Plan | 24,122 | $6,456,237,683 | $1,078,568 | $45 | T. Rowe Price |
| Kindred 401(k) | 23,586 | $1,153,459,598 | $938,422 | $40 | T. Rowe Price |
| The Savings and Investment Plan [WPP Group] | 35,927 | $3,346,932,005 | $977,116 | $27 | Vanguard |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 46,943 | $3,793,690,575 | $1,526,401 | $33 | Vanguard |
| Sutter Health 403(B) Savings Plan | 77,490 | $4,707,348,683 | $2,430,701 | $31 | Fidelity |
| Google LLC 401(K) Savings Plan | 97,366 | $17,290,544,625 | $3,421,349 | $35 | Vanguard |
| Raytheon Savings and Investment Plan | 86,771 | $20,850,317,917 | $1,792,770 | $21 | Fidelity |
| **Average of All Plans Above** | 41,466 | $5,611,785,256 | $1,318,607 | **$34** | |

88.    As shown in the table above, for 2019, the average R&A fees paid by comparison funds in the sample was $34 per participant. By contrast, the Plan's R&A fees for 2019 were $71 per participant. Thus, in 2019, **the Plan's $71 per-participant R&A fees were approximately 109% higher than the $34 average for the comparison funds in the sample**.

---

[15] Calculations are based on Form 5500 information filed by the respective plans for the year 2019. Recordkeeping costs are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. Trustee fees and administrative fees paid to the plan sponsor/employer, if any, are derived from Schedule C of the Form 5500s and are added to the Total R&A Costs in the chart.

89.     This data illustrates that the Plan overpaid for R&A costs.

90.     The conclusions from the data above are consistent with conclusions reached by analyzing other industry-wide data. For example, consulting group NEPC conducted its 2019 Defined Contribution Progress Report, which surveyed various defined contribution plan fees.[16] The sample size and respondents in the survey included 121 defined contribution plans in the corporate, healthcare, and public/not-for-profit industries. The average plan had $1.1 billion in assets under management and 12,437 participants.[17] NEPC's survey found that plans with over 15,000 participants paid on average approximately $40 per participant in recordkeeping, trust, and custody fees.[18] By contrast, the Plan's per-participant R&A fees of $71 in 2019 were materially higher than that average.

91.     Another data source, the *401k Averages Book* (20th ed. 2020), studied plan fees for smaller plans, specifically those with under $200 million in assets.[19] According to the analysis, a plan with $200 million in assets and 2,000 participants has an average recordkeeping and administration cost (through direct compensation) of $5 per participant.[20] A plan with $20 million in assets and 200 participants has an average recordkeeping and administration cost

---

[16] *See* https://cdn2.hubspot.net/hubfs/2529352/2019%20DC%20Plan%20and%20Fee%20Survey%20(progress%20report)/2019%20NEPC%20DC%20Plan%20Progress%20Report.pdf (last visited May 24, 2021).

[17] *Id*. at 1.

[18] *Id*. at 10.

[19] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information." *401k Averages Book* at pg. 2.

[20] *Id*. at 108.

(through direct compensation) of \$12 per participant.[21] By contrast, the Plan's per-participant R&A costs of \$71 in 2019 greatly exceeded those averages.

92.     Other sources recognize that reasonable recordkeeping rates for large plans typically average around \$35 per participant, with costs decreasing in recent years. *See, e.g.*, *Spano v. Boeing*, No. 06-cv-00743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert "opined that a similarly sized plan should have paid no more than \$37-\$42 per participant per year," and defendant's consultant "confirmed a market benchmark range of \$30.42 - \$45.42 per participant"; also noting that defendant obtained a fee rate of \$32 after the class period); *Boeing*, Doc. 562-2, at 2 (Jan 29, 2016) (declaration stating that Boeing's 401(k) plan recordkeeping fees were \$18 per participant for 2015 and \$32 for each of several prior years); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798 (7th Cir. 2011) (plaintiffs' expert "opined that a reasonable fee for the kind of recordkeeping services the Plan needed would have been between \$20 and \$27 per participant per year, rather than the \$43 to \$65 the Plan paid"); *Gordon v. Mass Mutual*, No. 13-cv-30184, Doc. 107-2 at ¶ 10.4 (D. Mass. June 15, 2016) (401(k) fee settlement committing the plan to pay "no more than \$35 per participant for standard recordkeeping services").

93.     Had Defendants been acting in the exclusive best interests of the Plan, and employed a prudent process to gather comparative information to evaluate R&A fees, the Plan would have paid less in fees.

94.     If Defendants would have secured more reasonable pricing for R&A services, they would have saved the Plan and class members hundreds of thousands of dollars per year. Those savings would compound each year because they would lead to larger investment holdings in the Plan and larger gains on those investments over time.

---

[21] *Id*. at 95.

95.     In sum, Defendants breached their fiduciary duties by engaging in improper monitoring processes that allowed the Plan to overpay in R&A fees.

**B.     The Use of Target Date Funds in 401(k) Plans**

96.     Defendants caused the Plan to include in its menu of investment offerings materially underperforming Northern Trust Focus Fund target date funds.

97.     Target date funds are designed to provide a single diversified investment vehicle for plan participants. Target date funds are offered as a suite of funds, with each fund based on the participant's anticipated retirement date.

98.     The first target date funds in the industry were offered as early as 1994, and since then the market of target date funds has exploded with numerous investment managers offering a variety of different target date fund investments.

99.     By the mid-2000s, many target date funds with established performance histories were available to defined contribution plans. By 2009, several target date funds had performance histories of five years of more.

100.     Multiple types of assets are included in a target date fund portfolio, including equity (stock) and fixed income (bond) securities. Target date funds offer diversity and balanced exposure to a broad array of underlying securities included in the fund.

101.     An investment in a single target date fund can be attractive to plan participants who do not want to actively manage their retirement savings and periodically convert to more conservative holdings as their retirement date draws near. Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement.

102.     This rebalancing occurs based on the fund's "glide path." A glide path determines how the fund's target asset allocations across the underlying securities are expected to change over time and how they become more conservative as the target retirement date approaches.

103.     The target date refers to the participant's expected retirement year. For example, "target date 2030" funds are designed for individuals who intend to retire in 2030. As the year 2030 approaches, the fund's investment manager adjusts the underlying asset mix to become more conservative.

104.     Target date funds are commonly offered as mutual funds. Mutual funds are pooled investment vehicles, which are registered investment companies under the Investment Company Act of 1940. Mutual funds are offered to institutional and retail investors, and they are commonly provided as an investment option within defined contribution 401(k) plans.

105.     Target date funds are divided into two broad categories based on the fund's glide path: "To" and "Through" target date funds. A "To" target date fund is designed to allocate its underlying assets to the most conservative investments at the year of the expected retirement. In contrast, a "Through" target date fund continues its glidepath progression to reach its most conservative asset allocation past the expected retirement date. This method focuses on the life expectancy of the participant rather than the retirement date.

106.     The Northern Trust Focus Funds are "Through" funds.

107.     Regardless of the type of target date fund, the development of a target date fund's glide path and the corresponding asset allocations are important components of a target date fund. Constructing and maintaining a proper glide path and prudent asset allocation for target date funds is complex, time-consuming, and requires input from actuaries and other qualified investment professionals.

108.    Another broad classification of target date funds is "actively" or "passively" managed funds. With an actively managed fund, the portfolio manager attempts to select stocks or bonds to generate investment returns that exceed the relevant benchmark index return. With a passively managed fund, the portfolio manager attempts to mimic the performance of a relevant benchmark index. No discretion or research is needed for passive funds, in contrast to actively managed funds. Because of this, passive or index funds charge a much lower investment management fee and have a lower total "expense ratio" relative to active funds.[22]

109.    For all target date funds, diversions from a determined glide path or significant changes in the underlying assets or asset allocations can have an extremely negative impact on wealth aggregation for investors. This impact can be particularly profound for participants in a 401(k) plan. It is well known in the investment industry that 401(k) participants rarely make trades in their 401(k) accounts. A fiduciary, held to the standard of an investment professional, therefore must ensure that an investment option added to a 401(k) plan's suite of investments remains prudent and in the best interest of plan participants.

110.    A fiduciary's duty to ensure that a prudent target date fund is offered to plan participants is heightened when considering the circumstances in which these funds are used by participants. Given the structure of target date funds, participants are encouraged to invest all their retirement assets in a single target date fund that matches their retirement date. Some plans, like the Plan, make target date funds the default selection if plan participants do not select a specific fund within the 401(k) plan's lineup of investments. The use of a plan's target date funds

_____

[22] The fees of mutual funds and similar investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points ("bps"). One basis point is equal to 1/100th of one percent.

as the default investment option underscores the importance of a prudent and diligent process of monitoring target date funds by plan fiduciaries.

111.    A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. This process includes a requirement for the fiduciary to regularly evaluate the fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

112.    With respect to investment returns, a consistent performance history and investment strategy over a lengthy period demonstrates the ability of the investment manager to generate sustained long-term investment results. Diligent investment professionals monitor the performance of their selected target date funds using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

113.    The measurement of target date funds against prudently managed alternatives is critical given that these alternatives represent other target date funds available to the plan, which may be a more appropriate choice to meet participants' retirement needs.

114.    Given the construction and composition of target date funds, diligent investment professionals must perform ongoing analyses and monitoring to ensure that the selected target date funds remains prudent options after their initial selection and insertion into the plan's suite of investment choices. Diligent investment professionals assess not only the overall performance of the target date funds, but also the underlying investments and allocations in the target date funds. These are separately analyzed to assess any changes to those assets and to measure the performance of the underlying assets (*i.e.*, attribution analyses).

115.     During periods of underperformance, diligent investment professionals closely analyze the causes of the underperformance through attribution analyses. Causes or contributing factors are identified and analyzed.

116.     By 2010, multiple investment firms and banks offered target date funds with established and consistent performance histories, stable and experienced management, and discrete changes to the underlying assets and allocations.

117.     Established target date fund investment managers include Vanguard, American Funds, and Fidelity, among others. Vanguard, American Funds, and Fidelity have each offered target date funds for nearly 20 years, and those target date funds have provided stable investment returns to 401(k) plan participants.

      1.     **Defendants Breached Their Fiduciary Duties by Selecting and Retaining in the Plan's Lineup the Consistently Underperforming Northern Trust Focus Funds**

118.     At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's target date fund investment options.

119.     In 2009, Northern Trust Corporation launched a new suite of target date funds called the Northern Trust Focus Funds. The Focus Funds were collective investment trusts, not mutual funds, comprised primarily of passive or index strategies in the various asset classes utilized.[23] Over time, the Focus Funds were offered by Northern Trust in many different share

---

[23] Collective investment trusts are subject to either state or federal banking regulations but are exempt from regulation by the Securities and Exchange Commission and the securities regulations of any state or other jurisdiction. Accordingly, public information is not as readily available for collective investment trusts as it would be for mutual funds. For information to support the allegations in the Complaint, Plaintiffs have relied largely on Defendants' Department of Labor filings (Form 5500s) and Annual Fee Disclosure Statements gathered by Plaintiffs.

classes.[24]

120.    In 2017, Defendants selected the Northern Trust Focus Funds for inclusion in the

Plan. The Plan's Focus Fund balances were as follows as of December 31, 2017:[25]

| Northern Trust Focus Funds<br>in the Red Cross Plan | Balance at<br>Dec. 31, 2017 |
|---|---|
| ARC-NTAM Focus Target 2020 2231711 | $ 44,322,609 |
| ARC-NTAM Focus Target 2025 2231712 | $ 53,420,830 |
| ARC-NTAM Focus Target 2030 2231713 | $ 46,971,609 |
| ARC-NTAM Focus Target 2035 2231714 | $ 45,150,941 |
| ARC-NTAM Focus Target 2040 2231715 | $ 40,634,127 |
| ARC-NTAM Focus Target 2045 2231716 | $ 34,439,337 |
| ARC-NTAM Focus Target 2050 2231717 | $ 27,392,356 |
| ARC-NTAM Focus Target 2055 2231718 | $ 10,689,152 |
| ARC-NTAM Focus Target 2060 2231721 | $ 1,967,087 |
| **Total** | **$ 304,988,048** |

121.    The Focus Funds comprised 30.5% of the Fund's total assets under management

as of December 31, 2017.[26]

122.    The Focus Funds are the only target date investing options in the Plan.

Participants in the Plan who want to invest in a target date strategy have no choices other than

the Focus Funds.

123.    The Plan's Focus Fund balances grew in the next two years and were as follows at

December 31, 2019, the most recent year for which fund balances are publicly available:[27]

---

[24]  Mutual funds and collective investment trusts frequently offer multiple share classes. The only difference between share classes is fees. Therefore, selecting higher-fee share classes results in the plan paying wholly unnecessary fees with no underlying benefit in the performance of the shares. Absent a compelling reason to opt for the higher-fee share class, prudent fiduciaries will select the lowest-cost share class available to the plan. Based on publicly available information and other information available to Plaintiffs at this time, the precise share class of the Focus Funds utilized in the Plan is unknown.

[25]  *See* amended Form 5500 for the year ended December 31, 2017, at Financial Statements pg. 12.

[26]  *Id*. at Financial Statements pg. 12-24.

[27]  *See* amended Form 5500 for the year ended December 31, 2019, at Financial Statements pg. 12.

| Northern Trust Focus Funds in the Red Cross Plan | Balance at Dec. 31, 2019 |
|---|---|
| ARC-NTAM Focus Target 2020 2231711 | $ 41,376,808 |
| ARC-NTAM Focus Target 2025 2231712 | $ 56,892,306 |
| ARC-NTAM Focus Target 2030 2231713 | $ 59,051,195 |
| ARC-NTAM Focus Target 2035 2231714 | $ 57,758,723 |
| ARC-NTAM Focus Target 2040 2231715 | $ 50,355,879 |
| ARC-NTAM Focus Target 2045 2231716 | $ 44,855,020 |
| ARC-NTAM Focus Target 2050 2231717 | $ 35,918,293 |
| ARC-NTAM Focus Target 2055 2231718 | $ 17,202,125 |
| ARC-NTAM Focus Target 2060 2231721 | $ 4,858,591 |
| **Total** | **$ 368,268,940** |

124.    The Focus Funds comprised 30% of the Fund's $1.2 billion total assets under management as of December 31, 2019.[28]

125.    Defendants were under an obligation under ERISA to carefully vet the Focus Funds before selecting them for inclusion in the Plan. Defendants were also under a continuing obligation under ERISA to carefully monitor and scrutinize the performance of the Focus Funds thereafter.

126.    Both before and after Defendants added the Focus Funds to the Plan's lineup of investment options, the Focus Funds underperformed industry-accepted benchmarks for target date funds used by investment professionals.

127.    The Focus Funds can be compared to similar target date funds ("Comparator Funds") and relevant indexes ("Comparator Indexes") as benchmarks. Suitable comparators include the following:

a.    **Vanguard Target Date Funds**. Vanguard Target Date Funds pursue the same investment objectives as the Northern Trust Focus Funds, invest primarily in equity (stock) and fixed income (bond) securities, are managed by well-known investment

---

[28] *Id*. at Financial Statements pg. 12-23.

advisers, and are available to all large retirement plans including the Plan. Morningstar

placed the Vanguard Target Date Funds in the same Morningstar Category as the

Northern Trust Focus Funds, along with other funds pursuing similar target date

investment strategies.[29]

      b.    **American Funds Target Date Funds**. The American Funds Target Date

Funds pursue the same investment objectives as the Northern Trust Focus Funds, invest

primarily in equity (stock) and fixed income (bond) securities, are managed by well-

known investment advisers, and are available to all large retirement plans including the

Plan. Morningstar placed the American Funds Target Date Funds in the same

Morningstar Category as the Northern Trust Focus Funds.

      c.    **Fidelity's FIAM Blend Target Date Comingled Pool Funds**. The FIAM

Blend Target Date Comingled Pool funds are Fidelity funds that pursue the same

investment objectives as the Northern Trust Focus Funds, invest primarily in equity

(stock) and fixed income (bond) securities, are managed by well-known investment

advisers, and are available to all large retirement plans including the Plan. Morningstar

---

[29] "A Morningstar Category is assigned by placing funds [*e.g.*, the Northern Trust Focus Funds, Vanguard Target Date Funds, etc.] into peer groups based on their underlying holdings. The underlying securities in each portfolio are the primary factor in [Morningstar's] analysis . . . . Funds are placed in a category based on their portfolio statistics and compositions over the past three years. Analysis of performance and other indicative facts are also considered." *See* Morningstar's summary of the Northern Trust Focus 2045 Fund, filed in *Allegretti v. Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 43 ECF pg. 28 (N.D. Ill. Dec. 6, 2019). The Northern Trust Focus Funds are no longer included in the Morningstar Category for target date funds, but they were included during much of the Class Period.

placed the FIAM Blend Target Date Comingled Pool funds in the same Morningstar Category as the Northern Trust Focus Funds.[30]

        d.     **Morningstar Lifetime Moderate Index**. The Morningstar Lifetime Moderate Index represents a portfolio of global equities, bonds, and other securities with a moderate risk profile.[31] Morningstar uses the Morningstar Lifetime Moderate Index as the primary benchmark for the Northern Trust Focus Funds.[32]

        e.     **MSCI ACWI IMI Index**. The MSCI ACWI IMI Index captures large, mid, and small cap representation primarily by U.S. issuers and also across other developed and emerging markets.[33] At least one large holder of Northern Trust Focus Funds uses the MSCI ACWI IMI Index as the benchmark index for the Focus Funds held in its 401(k) plan.[34]

---

[30] *See, e.g.,* https://nb.fidelity.com/public/workplacefunds/performance-and-risk/5955 (noting the FIAM Blend Target Date 2045 Commingled Pool fund is placed in the "Target-Date 2045" Morningstar Category); Morningstar's summary of the Northern Trust Focus 2045 Fund, filed in *Allegretti v. Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 43 ECF pg. 24 (N.D. Ill. Dec. 6, 2019) (noting that the Northern Trust Focus 2045 Fund is placed in the "Target-Date 2045" Morningstar Category).

[31] *See* Morningstar's summary of the Northern Trust Focus 2045 Fund, filed in *Allegretti v. Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 43 ECF pg. 31 (N.D. Ill. Dec. 6, 2019).

[32] *Id*. at ECF pg. 24.

[33] *See* https://www.msci.com/documents/10199/b93d88ef-632f-4bdb-9069-d7c5aecd9d6d (last visited June 11, 2021). The MSCI ACWI IMI Index is an all-equity index. All-equity indexes are suitable benchmarks for target date funds. *See* https://www.msci.com/www/blog-posts/same-target-different/01550298685 ("Benchmark choice for TDFs [target date funds] is varied: peer-based, blended and even equity-only indexes are used.").

[34] *See Ford v. Takeda Pharmaceuticals USA, Inc. et al.,* No. 21-cv-10090 at Dkt. 27-2 to 27-5 (D. Mass. June 4, 2021) (Takeda Savings and Retirement Plan Disclosure Notice indicating that Takeda uses the MSCI ACWI IMI Index as the benchmark for its holdings of Northern Trust Focus Funds).

f. **S&P Target Date Index**. The S&P Target Date Index is a prominent and widely-accepted target date benchmark for "Through" target date funds. The S&P Target Date Index is used as the primary benchmark for many target date funds throughout the industry. At least one large holder of Northern Trust Focus Funds uses the S&P Target Date Index as the benchmark index for the Focus Funds held in its 401(k) plan.[35]

g. **Dow Jones U.S. Target Date Index**. The Dow Jones U.S. Target Date Index is a prominent industry-accepted target date benchmark widely used by, and specifically developed for, target date funds. It reflects exposure to a collection of stocks, bonds, and cash, and is commonly used for defined contribution retirement plans.[36]

128. A prudent fiduciary should have used these benchmarks, or substantially similar benchmarks, to continuously evaluate the performance of the Focus Funds.

129. The tables below demonstrate the consistent underperformance of the Northern Trust Focus Funds relative to the Comparator Funds and Comparator Indexes from 2014 to 2020.

130. The data presented below was available to Defendants throughout the relevant period in real-time.

---

[35] *See* Complaint in *Allegretti v. Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 1 ¶ 46 (N.D. Ill. Aug. 9, 2019) ("According to Plan documents, the [Walgreen 401(k)] Plan uses the S&P Target Date Index as the investment benchmark for each of the Northern Trust [Focus] Funds.").

[36] *See* https://www.spglobal.com/spdji/en/documents/methodologies/methodology-dj-target-date-indices.pdf at pg. 3 ("The Dow Jones Target Date Indices serve as market risk-sensitive benchmarks for target date, or 'lifecycle, funds.") (last visited June 14, 2021).

131.    Table 1 below illustrates the underperformance of the Northern Trust Focus 2015

Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through

December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|------|------|------|------|
| Vanguard Target Retirement 2015 Inv.[37] | 6.56% | -0.46% | 6.16% | 11.50% | -2.97% | 14.81% | 10.32% |
| American Funds 2015 Target Date Retirement Fund[38] | 6.64% | -0.62% | 7.55% | 11.19% | -2.72% | 14.94% | 9.96% |
| FIAM Blend Target Date 2015 Commingled Pool[39] | 6.32% | 0.00% | 7.27% | 13.55% | -4.02% | 17.06% | 12.42% |
| Morningstar Lifetime Moderate 2015 Index[40] | 5.55% | -1.73% | 7.10% | 11.39% | -3.54% | Unavail. | Unavail. |
| MSCI ACWI IMI Index[41] | 3.84% | -2.19% | 8.36% | 23.95% | -10.08% | 26.35% | 16.25% |
| S&P Target Date 2015 Index[42] | 5.49% | -0.16% | 6.56% | 11.39% | -3.67% | 15.40% | 10.28% |
| Dow Jones U.S. Target 2015 Index[43] | 7.40% | 0.28% | 5.20% | 6.87% | -1.12% | 12.10% | 8.05% |
| **Average of All Comparators Above** | **5.97%** | **-0.70%** | **6.89%** | **12.83%** | **-4.02%** | **16.78%** | **11.21%** |
| | | | | | | | |
| **Northern Trust Focus 2015 Fund[44]** | **4.69%** | **-0.87%** | **5.46%** | **9.74%** | **-3.21%** | **14.58%** | **Unavail.** |
| **Northern Trust Focus Fund Underperformance vs. Comparators** | **-1.28%** | **-0.17%** | **-1.43%** | **-3.09%** | **0.81%** | **-2.20%** | **Unavail.** |

---

[37] *See* https://www.morningstar.com/funds/xnas/vtxvx/quote (last visited Feb. 3, 2021).

[38] *See* https://www.morningstar.com/funds/xnas/rfjtx/quote (last visited Feb. 3, 2021).

[39] *See* https://nb.fidelity.com/public/workplacefunds/performance-and-risk/5895?fundId=5895&planId=69632 (last visited May 25, 2021).

[40] *See* Complaint in *Allegretti v. Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 1 ¶ 63 (N.D. Ill. Aug. 9, 2019).

[41] *See* https://www.msci.com/documents/10199/b93d88ef-632f-4bdb-9069-d7c5aecd9d6d (last visited June 11, 2021); *accord Ford v. Takeda Pharmaceuticals USA, Inc. et al.*, No. 21-cv-10090 at Dkt. 27-2 to 27-5 (D. Mass. June 4, 2021) (Takeda Savings and Retirement Plan Disclosure Notice compiling MSCI ACWI IMI Index historical data).

[42] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2015-index/#overview (last visited Feb. 3, 2021).

[43] Data obtained from Bloomberg.

[44] Data was obtained from the Class Action Complaint in *Calloway v. The Northern Trust Co., et al.*, No. 20-cv-06497 (N.D. Ill. Nov. 2, 2020), *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.

132.    Table 2 below illustrates the underperformance of the Northern Trust Focus 2020
Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through
December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2020 Inv.[45] | 7.11% | -0.68% | 6.95% | 14.08% | -4.24% | 17.63% | 12.04% |
| American Funds 2020 Target Date Retirement Fund[46] | 6.74% | 0.19% | 7.05% | 12.87% | -2.69% | 15.59% | 10.99% |
| FIAM Blend Target Date 2020 Commingled Pool[47] | 6.42% | -0.22% | 7.54% | 14.82% | -4.76% | 18.84% | 13.83% |
| Morningstar Lifetime Moderate 2020 Index[48] | 5.87% | -1.88% | 7.66% | 12.79% | -4.16% | Unavail. | Unavail. |
| MSCI ACWI IMI Index[49] | 3.84% | -2.19% | 8.36% | 23.95% | -10.08% | 26.35% | 16.25% |
| S&P Target Date 2020 Index[50] | 5.67% | -0.19% | 7.22% | 12.80% | -4.16% | 16.52% | 10.24% |
| Dow Jones U.S. Target 2020 Index[51] | 8.00% | 0.27% | 6.28% | 8.46% | -1.42% | 13.89% | 8.82% |
| **Average of All Comparators Above** | **6.24%** | **-0.72%** | **7.29%** | **14.25%** | **-4.50%** | **18.14%** | **12.03%** |
|  |  |  |  |  |  |  |  |
| **Northern Trust Focus 2020 Fund[52]** | **4.46%** | **-1.27%** | **5.76%** | **10.58%** | **-3.64%** | **15.33%** | **10.78%** |
| **Northern Trust Focus Fund Underperformance vs. Comparators** | **-1.78%** | **-0.55%** | **-1.53%** | **-3.67%** | **0.86%** | **-2.81%** | **-1.25%** |

---

[45] *See* https://www.morningstar.com/funds/xnas/vtwnx/quote (last visited Feb. 3, 2021).

[46] *See* https://www.morningstar.com/funds/xnas/rrctx/quote (last visited Feb. 3, 2021).

[47] *See* https://nb.fidelity.com/public/workplacefunds/performance-and-risk/5905?fundId=5905&planId=69632 (last visited May 25, 2021).

[48] *See* Complaint in *Allegretti v. Walgreen Co. et al*., No. 19-cv-05392 at Dkt. 1 ¶ 69 (N.D. Ill. Aug. 9, 2019).

[49] *See* https://www.msci.com/documents/10199/b93d88ef-632f-4bdb-9069-d7c5aecd9d6d (last visited June 11, 2021); *accord Ford v. Takeda Pharmaceuticals USA, Inc. et.al.,* No. 21-cv-10090 at Dkt. 27-2 to 27-5 (D. Mass. June 4, 2021) (Takeda Savings and Retirement Plan Disclosure Notice compiling MSCI ACWI IMI Index historical data).

[50] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2020-index/#overview (last visited Feb. 3, 2021).

[51] Data obtained from Bloomberg.

[52] Data for 2017, 2019, and 2020 was obtained from the Red Cross "Annual Fee Disclosure Statement" dated March 2018, March 2020, and Feb. 2021, respectively. Data for 2014-2016 and 2018 was obtained from the Class Action Complaint in *Calloway v. The Northern Trust Co., et al*., No. 20-cv-06497 (N.D. Ill. Nov. 2, 2020), *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.

133.    Table 3 below illustrates the underperformance of the Northern Trust Focus 2025

Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through

December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2025 Inv.[53] | 7.17% | -0.85% | 7.48% | 15.94% | -5.15% | 19.63% | 13.30% |
| American Funds 2025 Target Date Retirement Fund[54] | 6.66% | 0.13% | 7.36% | 15.33% | -3.47% | 17.85% | 13.67% |
| FIAM Blend Target Date 2025 Commingled Pool[55] | 6.63% | -0.22% | 7.83% | 16.00% | -5.39% | 20.50% | 14.77% |
| Morningstar Lifetime Moderate 2025 Index[56] | 6.04% | -2.06% | 8.39% | 14.54% | -4.90% | Unavail. | Unavail. |
| MSCI ACWI IMI Index[57] | 3.84% | -2.19% | 8.36% | 23.95% | -10.08% | 26.35% | 16.25% |
| S&P Target Date 2025 Index[58] | 5.56% | -0.25% | 7.82% | 14.55% | -5.02% | 18.38% | 11.22% |
| Dow Jones U.S. Target 2025 Index[59] | 8.69% | 0.20% | 7.77% | 10.53% | -2.30% | 16.38% | 10.04% |
| **Average of All Comparators Above** | **6.37%** | **-0.75%** | **7.86%** | **15.83%** | **-5.19%** | **19.85%** | **13.21%** |
| | | | | | | | |
| **Northern Trust Focus 2025 Fund[60]** | **4.18%** | **-1.66%** | **6.31%** | **12.29%** | **-4.35%** | **16.66%** | **11.57%** |
| **Northern Trust Focus Fund Underperformance vs. Comparators** | **-2.19%** | **-0.91%** | **-1.55%** | **-3.54%** | **0.84%** | **-3.19%** | **-1.64%** |

---

[53] *See* https://www.morningstar.com/funds/xnas/vttvx/quote (last visited Feb. 3, 2021).

[54] *See* https://www.morningstar.com/funds/xnas/rfdtx/quote (last visited Feb. 3, 2021).

[55] *See* https://nb.fidelity.com/public/workplacefunds/performance-and-risk/5915?fundId=5915&planId=72980 (last visited May 25, 2021).

[56] *See* Complaint in *Allegretti v. Walgreen Co. et al*., No. 19-cv-05392 at Dkt. 1 ¶ 75 (N.D. Ill. Aug. 9, 2019).

[57] *See* https://www.msci.com/documents/10199/b93d88ef-632f-4bdb-9069-d7c5aecd9d6d (last visited June 11, 2021); *accord Ford v. Takeda Pharmaceuticals USA, Inc. et al.,* No. 21-cv-10090 at Dkt. 27-2 to 27-5 (D. Mass. June 4, 2021) (Takeda Savings and Retirement Plan Disclosure Notice compiling MSCI ACWI IMI Index historical data).

[58] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2025-index/#overview (last visited Feb. 3, 2021).

[59] Data obtained from Bloomberg.

[60] Data for 2017, 2019, and 2020 was obtained from the Red Cross "Annual Fee Disclosure Statement" dated March 2018, March 2020, and Feb. 2021, respectively. Data for 2014-2016 and 2018 was obtained from the Class Action Complaint in *Calloway v. The Northern Trust Co., et al*., No. 20-cv-06497 (N.D. Ill. Nov. 2, 2020), *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.

134.    Table 4 below illustrates the underperformance of the Northern Trust Focus 2030

Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through

December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|------|------|------|------|
| Vanguard Target Retirement 2030 Inv.[61] | 7.17% | -1.03% | 7.85% | 17.52% | -5.86% | 21.07% | 14.10% |
| American Funds 2030 Target Date Retirement Fund[62] | 7.06% | 0.47% | 7.71% | 18.40% | -4.16% | 20.06% | 15.16% |
| FIAM Blend Target Date 2030 Commingled Pool[63] | 6.80% | -0.45% | 8.51% | 18.79% | -6.54% | 23.10% | 15.80% |
| Morningstar Lifetime Moderate 2030 Index[64] | 6.01% | -2.30% | 9.26% | 16.59% | -5.82% | Unavail. | Unavail. |
| MSCI ACWI IMI Index[65] | 3.84% | -2.19% | 8.36% | 23.95% | -10.08% | 26.35% | 16.25% |
| S&P Target Date 2030 Index[66] | 5.64% | -0.30% | 8.35% | 16.19% | -5.99% | 20.38% | 11.91% |
| Dow Jones U.S. Target 2030 Index[67] | 9.35% | -0.15% | 9.12% | 12.67% | -3.29% | 19.18% | 11.49% |
| **Average of All Comparators Above** | **6.55%** | **-0.85%** | **8.45%** | **17.73%** | **-5.96%** | **21.69%** | **14.12%** |
| | | | | | | | |
| **Northern Trust Focus 2030 Fund[68]** | **3.90%** | **-2.09%** | **7.31%** | **15.55%** | **-5.73%** | **19.20%** | **12.13%** |
| **Northern Trust Focus Fund Underperformance vs. Comparators** | **-2.65%** | **-1.24%** | **-1.14%** | **-2.18%** | **0.23%** | **-2.49%** | **-1.99%** |

[61] *See* https://www.morningstar.com/funds/xnas/vthrx/quote (last visited Feb. 3, 2021).

[62] *See* https://www.morningstar.com/funds/xnas/rfetx/quote (last visited Feb. 3, 2021).

[63] *See* https://nb.fidelity.com/public/workplacefunds/performance-and-risk/5925 (last visited May 25, 2021).

[64] *See* Complaint in *Allegretti v. Walgreen Co. et al*., No. 19-cv-05392 at Dkt. 1 ¶ 81 (N.D. Ill. Aug. 9, 2019).

[65] *See* https://www.msci.com/documents/10199/b93d88ef-632f-4bdb-9069-d7c5aecd9d6d (last visited June 11, 2021); *accord Ford v. Takeda Pharmaceuticals USA, Inc. et al.,* No. 21-cv-10090 at Dkt. 27-2 to 27-5 (D. Mass. June 4, 2021) (Takeda Savings and Retirement Plan Disclosure Notice compiling MSCI ACWI IMI Index historical data).

[66] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2030-index/#overview (last visited Feb. 3, 2021).

[67] Data obtained from Bloomberg.

[68] Data for 2017, 2019, and 2020 was obtained from the Red Cross "Annual Fee Disclosure Statement" dated March 2018, March 2020, and Feb. 2021, respectively. Data for 2014-2016 and 2018 was obtained from the Class Action Complaint in *Calloway v. The Northern Trust Co., et al.*, No. 20-cv-06497 (N.D. Ill. Nov. 2, 2020), *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.

135.    Table 5 below illustrates the underperformance of the Northern Trust Focus 2035
Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through
December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2035 Inv.[69] | 7.24% | -1.26% | 8.26% | 19.12% | -6.58% | 22.44% | 14.79% |
| American Funds 2035 Target Date Retirement Fund[70] | 7.02% | 0.59% | 8.00% | 21.04% | -5.14% | 23.29% | 17.55% |
| FIAM Blend Target Date 2035 Commingled Pool[71] | 6.90% | -0.52% | 8.94% | 20.86% | -7.83% | 26.04% | 17.46% |
| Morningstar Lifetime Moderate 2035 Index[72] | 5.80% | -2.58% | 10.07% | 18.52% | -6.82% | Unavail. | Unavail. |
| MSCI ACWI IMI Index[73] | 3.84% | -2.19% | 8.36% | 23.95% | -10.08% | 26.35% | 16.25% |
| S&P Target Date 2035 Index[74] | 5.69% | -0.35% | 8.85% | 17.78% | -6.88% | 22.18% | 12.79% |
| Dow Jones U.S. Target 2035 Index[75] | 9.92% | -0.45% | 10.36% | 14.71% | -4.31% | 22.02% | 12.96% |
| **Average of All Comparators Above** | **6.63%** | **-0.97%** | **8.98%** | **19.43%** | **-6.81%** | **23.72%** | **15.30%** |
|  |  |  |  |  |  |  |  |
| **Northern Trust Focus 2035 Fund[76]** | **3.60%** | **-2.50%** | **8.30%** | **18.82%** | **-7.43%** | **22.64%** | **11.83%** |
| **Northern Trust Focus Fund Underperformance vs. Comparators** | **-3.03%** | **-1.53%** | **-0.68%** | **-0.61%** | **-0.62%** | **-1.08%** | **-3.47%** |

---

[69] *See* https://www.morningstar.com/funds/xnas/vtthx/quote (last visited Feb. 3, 2021).

[70] *See* https://www.morningstar.com/funds/xnas/reftx/quote (last visited Feb. 3, 2021).

[71] *See* https://nb.fidelity.com/public/workplacefunds/performance-and-risk/5935 (last visited May 25, 2021).

[72] *See* Complaint in *Allegretti v. Walgreen Co. et al*., No. 19-cv-05392 at Dkt. 1 ¶ 87 (N.D. Ill. Aug. 9, 2019).

[73] *See* https://www.msci.com/documents/10199/b93d88ef-632f-4bdb-9069-d7c5aecd9d6d (last visited June 11, 2021); *accord Ford v. Takeda Pharmaceuticals USA, Inc. et al.,* No. 21-cv-10090 at Dkt. 27-2 to 27-5 (D. Mass. June 4, 2021) (Takeda Savings and Retirement Plan Disclosure Notice compiling MSCI ACWI IMI Index historical data).

[74] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2035-index/#overview (last visited Feb. 3, 2021).

[75] Data obtained from Bloomberg.

[76] Data for 2017, 2019, and 2020 was obtained from the Red Cross "Annual Fee Disclosure Statement" dated March 2018, March 2020, and Feb. 2021, respectively. Data for 2014-2016 and 2018 was obtained from the Class Action Complaint in *Calloway v. The Northern Trust Co., et al*., No. 20-cv-06497 (N.D. Ill. Nov. 2, 2020), *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.

136.   Table 6 below illustrates the underperformance of the Northern Trust Focus 2040

Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through

December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2040 Inv.[77] | 7.15% | -1.59% | 8.73% | 20.71% | -7.32% | 23.86% | 15.47% |
| American Funds 2040 Target Date Retirement Fund[78] | 6.96% | 0.58% | 8.17% | 21.98% | -5.52% | 24.40% | 18.77% |
| FIAM Blend Target Date 2040 Commingled Pool[79] | 6.91% | -0.52% | 8.99% | 21.06% | -8.38% | 27.02% | 18.61% |
| Morningstar Lifetime Moderate 2040 Index[80] | 5.51% | -2.83% | 10.61% | 19.87% | -7.65% | Unavail. | Unavail. |
| MSCI ACWI IMI Index[81] | 3.84% | -2.19% | 8.36% | 23.95% | -10.08% | 26.35% | 16.25% |
| S&P Target Date 2040 Index[82] | 5.69% | -0.40% | 9.23% | 18.87% | -7.41% | 23.37% | 13.37% |
| Dow Jones U.S. Target 2040 Index[83] | 10.35% | -0.70% | 11.37% | 16.45% | -5.24% | 24.58% | 14.30% |
| **Average of All Comparators Above** | **6.63%** | **-1.09%** | **9.35%** | **20.41%** | **-7.37%** | **24.93%** | **16.13%** |
|  |  |  |  |  |  |  |  |
| **Northern Trust Focus 2040 Fund[84]** | **3.35%** | **-2.96%** | **8.59%** | **19.81%** | **-8.20%** | **23.65%** | **11.98%** |
| **Northern Trust Focus Fund Underperformance vs. Comparators** | **-3.28%** | **-1.87%** | **-0.76%** | **-0.60%** | **-0.83%** | **-1.28%** | **-4.15%** |

[77] *See* https://www.morningstar.com/funds/xnas/vforx/quote (last visited Feb. 3, 2021).

[78] *See* https://www.morningstar.com/funds/xnas/rfgtx/quote (last visited Feb. 3, 2021).

[79] *See* https://nb.fidelity.com/public/workplacefunds/performance-and-risk/5945?fundId=5945&planId=72980 (last visited May 25, 2021).

[80] *See* Complaint in *Allegretti v. Walgreen Co. et al*., No. 19-cv-05392 at Dkt. 1 ¶ 93 (N.D. Ill. Aug. 9, 2019).

[81] *See* https://www.msci.com/documents/10199/b93d88ef-632f-4bdb-9069-d7c5aecd9d6d (last visited June 11, 2021); *accord Ford v. Takeda Pharmaceuticals USA, Inc. et al.,* No. 21-cv-10090 at Dkt. 27-2 to 27-5 (D. Mass. June 4, 2021) (Takeda Savings and Retirement Plan Disclosure Notice compiling MSCI ACWI IMI Index historical data).

[82] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2040-index/#overview (last visited Feb. 3, 2021).

[83] Data obtained from Bloomberg.

[84] Data for 2017, 2019, and 2020 was obtained from the Red Cross "Annual Fee Disclosure Statement" dated March 2018, March 2020, and Feb. 2021, respectively. Data for 2014-2016 and 2018 was obtained from the Class Action Complaint in *Calloway v. The Northern Trust Co., et al*., No. 20-cv-06497 (N.D. Ill. Nov. 2, 2020), *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.

137. Table 7 below illustrates the underperformance of the Northern Trust Focus 2045 Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2045 Inv.[85] | 7.16% | -1.57% | 8.87% | 21.42% | -7.90% | 24.94% | 16.30% |
| American Funds 2045 Target Date Retirement Fund[86] | 7.09% | 0.64% | 8.27% | 22.44% | -5.58% | 24.68% | 19.21% |
| FIAM Blend Target Date 2045 Commingled Pool[87] | 6.80% | -0.60% | 9.02% | 21.03% | -8.34% | 27.01% | 18.57% |
| Morningstar Lifetime Moderate 2045 Index[88] | 5.25% | -3.03% | 10.84% | 20.53% | -8.17% | Unavail. | Unavail. |
| MSCI ACWI IMI Index[89] | 3.84% | -2.19% | 8.36% | 23.95% | -10.08% | 26.35% | 16.25% |
| S&P Target Date 2045 Index[90] | 5.67% | -0.46% | 9.54% | 19.56% | -7.74% | 24.02% | 13.66% |
| Dow Jones U.S. Target 2045 Index[91] | 10.61% | -0.87% | 12.06% | 17.67% | -5.97% | 26.49% | 15.34% |
| **Average of All Comparators Above** | **6.63%** | **-1.15%** | **9.57%** | **20.94%** | **-7.68%** | **25.58%** | **16.56%** |
| | | | | | | | |
| **Northern Trust Focus 2045 Fund[92]** | **3.35%** | **-2.95%** | **8.57%** | **19.65%** | **-8.13%** | **23.52%** | **12.02%** |
| **Northern Trust Focus Fund Underperformance vs. Comparators** | **-3.28%** | **-1.80%** | **-1.00%** | **-1.29%** | **-0.45%** | **-2.06%** | **-4.54%** |

---

[85] *See* https://www.morningstar.com/funds/xnas/vtivx/quote (last visited Feb. 3, 2021).

[86] *See* https://www.morningstar.com/funds/xnas/rfhtx/quote (last visited Feb. 3, 2021).

[87] *See* https://nb.fidelity.com/public/workplacefunds/performance-and-risk/5955 (last visited May 25, 2021).

[88] *See* Complaint in *Allegretti v. Walgreen Co. et al*., No. 19-cv-05392 at Dkt. 1 ¶ 99 (N.D. Ill. Aug. 9, 2019).

[89] *See* https://www.msci.com/documents/10199/b93d88ef-632f-4bdb-9069-d7c5aecd9d6d (last visited June 11, 2021); *accord Ford v. Takeda Pharmaceuticals USA, Inc. et al.,* No. 21-cv-10090 at Dkt. 27-2 to 27-5 (D. Mass. June 4, 2021) (Takeda Savings and Retirement Plan Disclosure Notice compiling MSCI ACWI IMI Index historical data).

[90] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2045-index/#overview (last visited Feb. 3, 2021).

[91] Data obtained from Bloomberg.

[92] Data for 2017, 2019, and 2020 was obtained from the Red Cross "Annual Fee Disclosure Statement" dated March 2018, March 2020, and Feb. 2021, respectively. Data for 2014-2016 and 2018 was obtained from the Class Action Complaint in *Calloway v. The Northern Trust Co., et al*., No. 20-cv-06497 (N.D. Ill. Nov. 2, 2020), *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.

138.    Table 8 below illustrates the underperformance of the Northern Trust Focus 2050

Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through

December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2050 Inv.[93] | 7.18% | -1.58% | 8.85% | 21.39% | -7.90% | 24.98% | 16.39% |
| American Funds 2050 Target Date Retirement Fund[94] | 7.02% | 0.65% | 8.33% | 22.61% | -5.61% | 25.04% | 19.42% |
| FIAM Blend Target Date 2050 Commingled Pool[95] | 6.82% | -0.60% | 9.01% | 21.06% | -8.41% | 27.06% | 18.58% |
| Morningstar Lifetime Moderate 2050 Index[96] | 5.00% | -3.19% | 10.89% | 20.78% | -8.41% | Unavail. | Unavail. |
| MSCI ACWI IMI Index[97] | 3.84% | -2.19% | 8.36% | 23.95% | -10.08% | 26.35% | 16.25% |
| S&P Target Date 2050 Index[98] | 5.69% | -0.47% | 9.74% | 20.18% | -7.94% | 24.35% | 13.86% |
| Dow Jones U.S. Target 2050 Index[99] | 10.67% | -0.92% | 12.36% | 18.26% | -6.40% | 27.57% | 16.04% |
| **Average of All Comparators Above** | **6.60%** | **-1.19%** | **9.65%** | **21.18%** | **-7.82%** | **25.89%** | **16.76%** |
| | | | | | | | |
| **Northern Trust Focus 2050 Fund[100]** | **3.34%** | **-2.96%** | **8.55%** | **19.48%** | **-8.03%** | **23.38%** | **11.92%** |
| **Northern Trust Focus Fund Underperformance vs. Comparators** | **-3.26%** | **-1.77%** | **-1.10%** | **-1.70%** | **-0.21%** | **-2.51%** | **-4.84%** |

[93] *See* https://www.morningstar.com/funds/xnas/vfifx/quote (last visited Feb. 3, 2021).

[94] *See* https://www.morningstar.com/funds/xnas/rfitx/quote (last visited Feb. 3, 2021).

[95] *See* https://nb.fidelity.com/public/workplacefunds/performance-and-risk/5965 (last visited May 25, 2021).

[96] *See* Complaint in *Allegretti v. Walgreen Co. et al*., No. 19-cv-05392 at Dkt. 1 ¶ 105 (N.D. Ill. Aug. 9, 2019).

[97] *See* https://www.msci.com/documents/10199/b93d88ef-632f-4bdb-9069-d7c5aecd9d6d (last visited June 11, 2021); *accord Ford v. Takeda Pharmaceuticals USA, Inc. et al.,* No. 21-cv-10090 at Dkt. 27-2 to 27-5 (D. Mass. June 4, 2021) (Takeda Savings and Retirement Plan Disclosure Notice compiling MSCI ACWI IMI Index historical data).

[98] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2050-index/#overview (last visited Feb. 3, 2021).

[99] Data obtained from Bloomberg.

[100] Data for 2017, 2019, and 2020 was obtained from the Red Cross "Annual Fee Disclosure Statement" dated March 2018, March 2020, and Feb. 2021, respectively. Data for 2014-2016 and 2018 was obtained from the Class Action Complaint in *Calloway v. The Northern Trust Co., et al*., No. 20-cv-06497 (N.D. Ill. Nov. 2, 2020), *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.

139.     Table 9 below illustrates the underperformance of the Northern Trust Focus 2055

Fund relative to the Comparator Funds and Comparator Indexes from January 1, 2014 through

December 31, 2020 on an annual basis:

| Fund | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2055 Inv.[101] | 7.19% | -1.72% | 8.88% | 21.38% | -7.89% | 24.98% | 16.32% |
| American Funds 2055 Target Date Retirement Fund[102] | 7.01% | 0.63% | 8.30% | 22.63% | -5.65% | 25.09% | 19.39% |
| FIAM Blend Target Date 2055 Commingled Pool[103] | 6.75% | -0.64% | 9.04% | 21.09% | -8.38% | 27.03% | 18.57% |
| Morningstar Lifetime Moderate 2055 Index[104] | 4.74% | -3.34% | 10.90% | 20.95% | -8.57% | Unavail. | Unavail. |
| MSCI ACWI IMI Index[105] | 3.84% | -2.19% | 8.36% | 23.95% | -10.08% | 26.35% | 16.25% |
| S&P Target Date 2055 Index[106] | 5.64% | -0.54% | 9.94% | 20.48% | -7.97% | 24.48% | 13.86% |
| Dow Jones U.S. Target 2055 Index[107] | 10.67% | -0.92% | 12.37% | 18.30% | -6.49% | 27.80% | 16.32% |
| **Average of All Comparators Above** | **6.55%** | **-1.25%** | **9.68%** | **21.25%** | **-7.86%** | **25.96%** | **16.79%** |
|  |  |  |  |  |  |  |  |
| **Northern Trust Focus 2055 Fund[108]** | **3.30%** | **-2.92%** | **8.53%** | **19.28%** | **-7.97%** | **23.22%** | **11.98%** |
| **Northern Trust Focus Fund Underperformance vs. Comparators** | **-3.25%** | **-1.67%** | **-1.15%** | **-1.97%** | **-0.11%** | **-2.74%** | **-4.81%** |

---

[101] *See* https://www.morningstar.com/funds/xnas/vffvx/quote (last visited Feb. 3, 2021).

[102] *See* https://www.morningstar.com/funds/xnas/rfktx/quote (last visited Feb. 3, 2021).

[103] *See* https://nb.fidelity.com/public/workplacefunds/performance-and-risk/3582 (last visited May 25, 2021).

[104] *See* Complaint in *Allegretti v. Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 1 ¶ 111 (N.D. Ill. Aug. 9, 2019).

[105] *See* https://www.msci.com/documents/10199/b93d88ef-632f-4bdb-9069-d7c5aecd9d6d (last visited June 11, 2021); *accord Ford v. Takeda Pharmaceuticals USA, Inc. et al.*, No. 21-cv-10090 at Dkt. 27-2 to 27-5 (D. Mass. June 4, 2021) (Takeda Savings and Retirement Plan Disclosure Notice compiling MSCI ACWI IMI Index historical data).

[106] *See* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2055-index/#overview (last visited Feb. 3, 2021).

[107] Data obtained from Bloomberg.

[108] Data for 2017, 2019, and 2020 was obtained from the Red Cross "Annual Fee Disclosure Statement" dated March 2018, March 2020, and Feb. 2021, respectively. Data for 2014-2016 and 2018 was obtained from the Class Action Complaint in *Calloway v. The Northern Trust Co., et al.*, No. 20-cv-06497 (N.D. Ill. Nov. 2, 2020), *available at* https://www.napa-net.org/sites/napa-net.org/files/TNT%20Focus%20Fund%20Suit.pdf.

140.     As the tables illustrate, the underperformance of the Northern Trust Focus Funds continued year after year. Starting at least as early as 2014, all of the Focus Funds consistently underperformed. The overall breadth and depth of the Focus Funds' underperformance raises a strong inference that Defendants' selection and monitoring process was tainted by a failure of competency or effort.

141.     On average, each Focus Fund underperformed the Comparators by 1-2% during each of the seven-year periods reflected in the tables above. The underperformance resulted in millions of dollars of lost earnings per year for Plan participants. For example, the aggregate Focus Fund balance in the Plan was $368,268,940 as of December 31, 2019 (the most recent year for which data is available).[109] Assuming an average 1.5% underperformance of all Focus Funds that year, the total lost earnings were $5.5 million for 2019 alone ($368 million x 1.5% = $5.5 million). Similar losses were incurred in each year after the Focus Funds were added to the Plan in 2017.

142.     As an even broader illustration of the Focus Funds' widespread underperformance, **Morningstar concluded that the Focus Funds consistently performed worse than the vast majority of all other funds in the Focus Funds' Morningstar Category**. For example, as of May 31, 2019, the Northern Trust Focus 2045 Fund performed worse than

---

[109] *See* Red Cross amended Form 5500 for the year ended December 31, 2019, at Financial Statements pg. 12.

78% and 95% of the other funds in the same Morningstar Category for the past 3-year and 5-year periods, respectively.[110] Most of the other Focus Funds performed just as poorly.[111]

143.     Morningstar also assigned a Morningstar Rating of two stars out of a possible five stars (based on performance) for at least the Northern Trust Focus 2045 Fund.[112] All other Focus Funds likely received similar negative ratings.

144.     Defendants established their own internal benchmark for each of the Focus Funds. The vast majority of the Focus Funds consistently lagged their internal benchmark for 1-year and 5-year returns. For example, the following chart illustrates the performance of the Focus Funds versus the internal benchmark selected by Defendants for 2019:[113]

---

[110] *See* Morningstar summary of Northern Trust Focus 2045 Fund, filed in *Allegretti v. Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 43 ECF pg. 24 (N.D. Ill. Dec. 6, 2019) (assigning the NT Focus 2045 Fund to the 78th percentile rank for the prior 3-year period and 95th percentile rank for the prior 5-year period). The summary sheet explained that "Morningstar Rank is the total return percentile rank within each Morningstar Category. The highest (or most favorable) percentile rank is zero and the lowest (or least favorable) percentile rank is 100." *Id.* at ECF pg. 28.

[111] *See* Second Amended Complaint in *Allegretti v. Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 67 ¶ 56 (N.D. Ill. Dec. 1, 2020) ("As of February 1, 2020, most of the Northern Trust Funds have performed worse than between 70% and 100% of the hundreds of funds within their respective Morningstar Categories for the past 3-year, 5-year, and 10-year periods.").

[112] *See* Morningstar summary of Northern Trust Focus 2045 Fund, filed in *Allegretti v. Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 43 ECF pg. 24 (N.D. Ill. Dec. 6, 2019) (Morningstar analysis as of May 31, 2019). Morningstar defined the Morningstar Rating as follows: "Ratings are based on the . . . Morningstar Risk-Adjusted Return measure which accounts for variation in monthly performance, placing more emphasis on downward variations and rewarding consistent performance . . . .  The top 10% of . . . funds in each category receive 5 stars, the next 22.5% receive 4 stars, the next 35% receive 3 stars, the next 22.5% receive 2 stars and the bottom 10% receive 1 star." *Id.* at ECF pg. 28.

[113] The data in the chart was obtained from the Plan's "Annual Fee Disclosure Statement" dated March 2020. Defendants do not define or describe the internal benchmark in the Annual Fee Disclosure Statement or other Plan documents, to Plaintiffs' knowledge.

| 2019 Performance of Focus Funds vs. Defendants' Internal Benchmark | | |
|---|---|---|
| | **1-Year Return** | **5-Year Return** |
| Defendants' Benchmark: "NT Focus 2020" | 15.52% | 5.22% |
| Northern Trust Focus 2020 Fund | 15.33% | 5.06% |
| **Northern Trust Underperformance vs. Benchmark** | **-0.19%** | **-0.16%** |
| | | |
| Defendants' Benchmark: "NT Focus 2025" | 16.86% | 5.65% |
| Northern Trust Focus 2025 Fund | 16.66% | 5.50% |
| **Northern Trust Underperformance vs. Benchmark** | **-0.20%** | **-0.15%** |
| | | |
| Defendants' Benchmark: "NT Focus 2030" | 19.38% | 6.51% |
| Northern Trust Focus 2030 Fund | 19.20% | 6.36% |
| **Northern Trust Underperformance vs. Benchmark** | **-0.18%** | **-0.15%** |
| | | |
| Defendants' Benchmark: "NT Focus 2035" | 22.93% | 7.45% |
| Northern Trust Focus 2035 Fund | 22.64% | 7.28% |
| **Northern Trust Underperformance vs. Benchmark** | **-0.29%** | **-0.17%** |
| | | |
| Defendants' Benchmark: "NT Focus 2040" | 23.90% | 7.60% |
| Northern Trust Focus 2040 Fund | 23.65% | 7.42% |
| **Northern Trust Underperformance vs. Benchmark** | **-0.25%** | **-0.18%** |
| | | |
| Defendants' Benchmark: "NT Focus 2045" | 23.77% | 7.56% |
| Northern Trust Focus 2045 Fund | 23.52% | 7.38% |
| **Northern Trust Underperformance vs. Benchmark** | **-0.25%** | **-0.18%** |
| | | |
| Defendants' Benchmark: "NT Focus 2050" | 23.63% | 7.51% |
| Northern Trust Focus 2050 Fund | 23.38% | 7.34% |
| **Northern Trust Underperformance vs. Benchmark** | **-0.25%** | **-0.17%** |
| | | |
| Defendants' Benchmark: "NT Focus 2055" | 23.47% | 7.46% |
| Northern Trust Focus 2055 Fund | 23.22% | 7.30% |
| **Northern Trust Underperformance vs. Benchmark** | **-0.25%** | **-0.16%** |
| | | |
| Defendants' Benchmark: "NT Focus 2060" | 23.34% | 7.43% |
| Northern Trust Focus 2060 Fund | 23.12% | Unavail. |
| **Northern Trust Underperformance vs. Benchmark** | **-0.22%** | Unavail. |

145.    The following chart illustrates the performance of the Focus Funds versus the internal benchmark selected by Defendants for 2020:[114]

| 2020 Performance of Focus Funds vs. Defendants' Internal Benchmark | | |
|---|---|---|
| | **1-Year Return** | **5-Year Return** |
| Defendants' Benchmark: "Focus 2020 Composite" | 10.81% | 7.12% |
| Northern Trust Focus 2020 Fund | 10.78% | 6.93% |
| **Northern Trust Underperformance vs. Benchmark** | **-0.03%** | **-0.19%** |
| | | |
| Defendants' Benchmark: "Focus 2025 Composite" | 11.26% | 7.64% |
| Northern Trust Focus 2025 Fund | 11.57% | 7.52% |
| **Northern Trust Underperformance vs. Benchmark** | **0.31%** | **-0.12%** |
| | | |
| Defendants' Benchmark: "Focus 2030 Composite" | 11.99% | 8.61% |
| Northern Trust Focus 2030 Fund | 12.13% | 8.45% |
| **Northern Trust Underperformance vs. Benchmark** | **0.14%** | **-0.16%** |
| | | |
| Defendants' Benchmark: "Focus 2035 Composite" | 12.73% | 9.60% |
| Northern Trust Focus 2035 Fund | 11.83% | 9.23% |
| **Northern Trust Underperformance vs. Benchmark** | **-0.90%** | **-0.37%** |
| | | |
| Defendants' Benchmark: "Focus 2040 Composite" | 12.81% | 9.80% |
| Northern Trust Focus 2040 Fund | 11.98% | 9.43% |
| **Northern Trust Underperformance vs. Benchmark** | **-0.83%** | **-0.37%** |
| | | |
| Defendants' Benchmark: "Focus 2045 Composite" | 12.80% | 9.76% |
| Northern Trust Focus 2045 Fund | 12.02% | 9.40% |
| **Northern Trust Underperformance vs. Benchmark** | **-0.78%** | **-0.36%** |
| | | |
| Defendants' Benchmark: "Focus 2050 Composite" | 12.78% | 9.72% |
| Northern Trust Focus 2050 Fund | 11.92% | 9.35% |
| **Northern Trust Underperformance vs. Benchmark** | **-0.86%** | **-0.37%** |
| | | |
| Defendants' Benchmark: "Focus 2055 Composite" | 12.76% | 9.67% |
| Northern Trust Focus 2055 Fund | 11.98% | 9.32% |
| **Northern Trust Underperformance vs. Benchmark** | **-0.78%** | **-0.35%** |
| | | |
| Defendants' Benchmark: "Focus 2060 Composite" | 12.75% | 9.64% |

---

[114] The data in the chart was obtained from the Plan's "Annual Fee Disclosure Statement" dated February 2021. Defendants do not define or describe the internal benchmark in the Annual Fee Disclosure Statement or other Plan documents, to Plaintiffs' knowledge. Defendants changed the name of their internal benchmark from 2019 to 2020.

| Northern Trust Focus 2060 Fund | 12.23% | 9.37% |
| **Northern Trust Underperformance vs. Benchmark** | **-0.52%** | **-0.27%** |

146.     Despite the Focus Funds being passively managed as index funds designed to meet or exceed industry-recognized benchmarks, the Focus Funds were chronic underperformers. The persistent underperformance should have prompted a meaningful analysis by Defendants as to the cause of the underperformance and ways to address it by switching to other available target date funds.

147.     Defendants breached their fiduciary duties by adding the Focus Funds to the Plan in 2017 despite a known history of underperformance prior to 2017 as noted in the charts above, and failing to replace the Focus Funds thereafter.

148.     An analysis of alternative target date funds, including either passive or active target date funds, would have revealed that superior alternative funds were available with experienced target date fund managers, superior performance, and reasonable fees.

149.     Despite the above, Defendants kept the Focus Funds in the Plan for years after their initial inclusion in 2017.

150.     When adding the Focus Funds to the Plan and failing to replace those funds thereafter despite persistent underperformance, Defendants failed to "balance the relevant factors and make a reasoned decision as to the preferred course of action – under circumstances in which a prudent fiduciary would have done so." *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 788 (7th Cir. 2011). With the information available to Defendants, there was no prudent reason to retain the Focus Funds in the Plan year after year.

151.     Defendants failed to adequately monitor the Focus Funds' performance relative to peer funds and indexes during the class period. When the Focus Funds were first selected, information available to Defendants revealed that the Focus Funds underperformed relative to

comparable target date funds and indexes. Once selected, the Focus Funds continued to underperform. Annual data documenting the Focus Funds' poor performance was readily available to Defendants, who were obligated under ERISA to monitor the performance of the Plan's investment options and remove imprudent options. Defendants either failed to examine the relevant data, or chose to ignore what it revealed. Their process of monitoring the Plan's investments was materially flawed.

152.    The underperformance of the Focus Funds caused the Plan to sustain substantial losses, which were compounded over time due to lost opportunities for compounded earnings.

## V.    CLASS ACTION ALLEGATIONS

153.    Pursuant to 29 U.S.C. § 1132(a)(2), any participant or beneficiary of the Plan may bring an action individually on behalf of the Plan to enforce a fiduciary's liability pursuant to 29 U.S.C. § 1109(a).

154.    In acting in this representative capacity, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan.

155.    Plaintiffs seek to certify, and to be appointed as representatives of, the following classes (collectively the "Class"):

> Excessive Fees Class: All persons who were participants in or beneficiaries of the American Red Cross Savings Plan at any time from March 2, 2015 through the date of judgment.

> Northern Trust Focus Funds Class: All participants in or beneficiaries of the American Red Cross Savings Plan who invested in any of the Northern Trust Focus Fund target date funds from March 2, 2015 through the date of judgment.

156.    Excluded from the Class are Defendants and any of their executive officers.

157.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons.

158.    <u>Numerosity</u>: The Class includes over 20,000 members and is so large that joinder of all its members is impracticable.

159.    <u>Commonality</u>: There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries, and took the actions alleged herein as to the Plan and not as to any individual participant. Common questions of law and fact include the following, without limitation:

a.      whether the fiduciaries of the Plan breached their fiduciary duties to the Plan;

b.      which the fiduciaries are liable for the remedies provided by 29 U.S.C. § 1109(a);

c.      what losses to the Plan resulted from the breaches of fiduciary duty; and

d.      what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches of fiduciary duty.

160.    <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were participants in the Plan during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

161.    <u>Adequacy of Representation</u>: Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the relevant period; suffered losses from Defendants' breaches of fiduciary duty; have no interests that are in conflict with other members of the Class; are committed to the vigorous representation of the Class; and have retained experienced and competent counsel to represent the Class.

162.    Prosecution of separate actions by individual participants would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for

Defendants with respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a). Also, individual non-class adjudications by participants regarding Defendants' breaches of fiduciary duty and remedies for the Plan would, as a practical matter, be dispositive of the interests of participants not parties to those individual adjudications or would substantially impair or impede those participants' ability to protect their interests. For these reasons, among others, this action should be certified as a class action pursuant to Rule 23(b)(1)(A) or (B).

163.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all individual participants is impracticable; the losses suffered by individual participants may be small and impracticable for individual members to enforce their rights through individual actions; and the common questions of law and fact predominate over any individual questions. Plaintiffs are aware of no dispositive difficulties likely to be encountered in the management of this matter as a class action. As a result, this action may be certified as a class action under Fed. R. Civ. P. 23(b)(3) if it is not certified under Fed. R. Civ. P. 23(b)(1)(A) or (B).

164.    Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g). Plaintiffs' counsel have been appointed to leadership positions in this action (Dkt. 19) and have been appointed as class counsel in many previous ERISA class actions.

## COUNT I
### BREACH OF FIDUCIARY DUTY (29 U.S.C. § 1104)
### REGARDING EXCESSIVE FEES
#### (Brought Against All Defendants)

165.     Plaintiffs incorporate all allegations from the preceding paragraphs as if fully set forth herein.

166.     At all relevant times, Defendants were fiduciaries of the Plan within the meaning of 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

167.     As fiduciaries of the Plan, Defendants were subject to the fiduciary duties imposed by 29 U.S.C. § 1104(a). These fiduciary duties include managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, and diligence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

168.     Defendants breached their fiduciary duties because they did not make decisions regarding the Plan's administrative fees based solely on what was in the best interests of the Plan's participants. Defendants failed to investigate and secure the availability of lower-cost recordkeeping and administrative services for the Plan.

169.     As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan suffered material losses due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them in their retirement accounts.

170.    Total Plan losses will be determined after discovery and analysis by one or more expert witnesses.

171.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duty, and must restore any profits resulting from such breaches. Plaintiffs are also entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth herein.

172.    Each Defendant knowingly participated in each breach of fiduciary duty by the other Defendants, knowing that such acts were a breach of duty. Each Defendant enabled the other Defendants to commit breaches of fiduciary duty by failing to lawfully discharge their own duties. Defendants knew of the breaches by other Defendants and failed to make any reasonable and timely effort to cease or remedy the breaches. Accordingly, each Defendant is liable for the breaches of its co-fiduciaries pursuant to 29 U.S.C. § 1105(a).

**COUNT II**
**FAILURE TO MONITOR FIDUCIARIES**
**REGARDING EXCESSIVE FEES**
**(Brought Against Defendants Red Cross and the Benefit Plan Committee)**

173.    Plaintiffs incorporate all allegations from the preceding paragraphs as if fully set forth herein.

174.    This Count is asserted against Defendants Red Cross and the Benefit Plan Committee.

175.    Defendant Red Cross is authorized to appoint members of the Benefit Plan Committee and its Doe members and, therefore, had a duty to monitor the performance of those appointees regarding the fulfillment of their fiduciary duties. Each Benefit Plan Committee member and fiduciary likewise had a duty to monitor the performance of each other member of

the Benefit Plan Committee and had a responsibility to monitor each individual to whom it delegated any fiduciary responsibilities.

176.    Under ERISA, a monitoring fiduciary must ensure that the persons to whom it delegates fiduciary duties are properly performing their fiduciary obligations, including with respect to the servicing of plan assets, and must take prompt and effective action to protect the plan and participants when the delegates fail to discharge their duties.

177.    To the extent any of the fiduciary responsibilities of Defendants Red Cross and/or the Benefit Plan Committee were delegated to another fiduciary, the Defendants' monitoring duties included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

178.    Defendants Red Cross and the Benefit Plan Committee breached their fiduciary monitoring duties by, among other things:

     a.    failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered material losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

     b.    failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the breach because of the unreasonable fees imposed in violation of ERISA;

     c.    failing to ensure that the monitored fiduciaries considered the availability of comparable service providers that charged materially lower fees and expenses than the Plan's service providers; and

d.      failing to remove appointees whose performance was inadequate in that they continued to allow unreasonable fees to be charged to the Plan, all to the detriment of Plan participants' retirement savings.

179.    As a direct result of these breaches of fiduciary duty to monitor, the Plan suffered substantial losses. Had Defendants Red Cross and the Benefit Plan Committee discharged their monitoring duties prudently, the Plan would not have suffered these losses.

180.    Total Plan losses will be determined after discovery and analysis by one or more expert witnesses.

## COUNT III
### BREACH OF FIDUCIARY DUTY (29 U.S.C. § 1104)
### REGARDING THE UNDERPERFORMING FOCUS FUNDS
### (Brought Against All Defendants)

181.    Plaintiffs incorporate all allegations from the preceding paragraphs as if fully set forth herein.

182.    This Count alleges breaches of fiduciary duty against all Defendants.

183.    Defendants are required to manage the assets of the Plan with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

184.    Defendants have and had a direct responsibility to select prudent investment options, evaluate and monitor the Plan's investments on an ongoing basis, eliminate imprudent investment options, and take necessary steps to ensure that the Plan's assets continue to be invested prudently. As the Supreme Court has stated, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1829.

185.    In carrying out these responsibilities, Defendants were required to act in a manner consistent with a prudent investment professional in similar circumstances.

186.    Despite these high duties, Defendants breached their duties of prudence under 29 U.S.C. § 1104(a)(1)(B) by selecting and continuing to retain the Northern Trust Focus Funds, which consistently underperformed and suffered from ongoing deficiencies.

187.    Defendants failed to engage in reasoned decision-making in concluding that the Focus Funds were prudent investments to be included in the Plan. Defendants failed to engage in a reasoned and diligent process in considering whether participants would be better served by other target date funds available to the Plan after considering all relevant factors.

188.    Defendants' decision to select the Focus Funds for inclusion in the Plan in 2017 and continue to retain them thereafter caused the Plan and participants to incur significant performance losses.

189.    Total Plan losses will be determined after discovery and analysis by one or more expert witnesses.

190.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to reimburse the Plan for any losses resulting from the breaches of fiduciary duty alleged herein. Each Defendant is also subject to other equitable or remedial relief as appropriate.

191.    Each Defendant participated in the breaches of fiduciary duty by other Defendants knowing that such acts were breaches. Each Defendant enabled other Defendants to commit breaches of fiduciary duty by failing to lawfully discharge their own fiduciary duties. Each Defendant knew of the breaches of fiduciary duty by the other Defendants, and failed to make any reasonable effort under the circumstances to cease or remedy the breaches. Thus, each

Defendant is liable for losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT IV**
**FAILURE TO MONITOR FIDUCIARIES**
**REGARDING THE UNDERPERFORMING FOCUS FUNDS**
**(Brought Against Defendants Red Cross and the Benefit Plan Committee)**

192.    Plaintiffs incorporate all allegations from the preceding paragraphs as if fully set forth herein.

193.    This Count is asserted against Defendants Red Cross and the Benefit Plan Committee.

194.    Defendant Red Cross is authorized to appoint members of the Benefit Plan Committee and its Doe members and, therefore, had a duty to monitor the performance of those appointees regarding the fulfillment of their fiduciary duties. Each Benefit Plan Committee member and fiduciary likewise had a duty to monitor the performance of each other member of the Benefit Plan Committee and had a responsibility to monitor each individual or entity to whom it delegated any fiduciary responsibilities.

195.    Under ERISA, a monitoring fiduciary must ensure that the persons to whom it delegates fiduciary duties are performing their fiduciary obligations, including with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when the delegate fails to discharge their duties.

196.    To the extent any of the fiduciary responsibilities of Defendants Red Cross and/or the Benefit Plan Committee were delegated to another fiduciary, the Defendants' monitoring duties included an obligation to ensure that any delegated tasks were being performed in accordance with ERISA's fiduciary standards.

197.    Defendants Red Cross and the Benefit Plan Committee breached their fiduciary monitoring duties by, among other things:

a.    failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered material losses as a result of their appointees' imprudent actions with respect to the Plan;

b.    failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the breaches of fiduciary duty in violation of ERISA;

c.    failing to ensure that the monitored fiduciaries considered the availability of comparable and better performing target date funds for the Plan; and

d.    failing to remove appointees whose performance was inadequate in that they continued to allow imprudent investment options to be retained in the Plan, all to the detriment of Plan participants' retirement savings.

198.    As a direct result of these breaches of fiduciary duty to monitor, the Plan suffered substantial losses. Had Defendants Red Cross and the Benefit Plan Committee discharged their fiduciary monitoring duties prudently as described above, the Plan would not have suffered these losses.

199.    Total Plan losses will be determined after discovery and analysis by one or more expert witnesses.

**JURY TRIAL DEMANDED**

200.    Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury.

**PRAYER FOR RELIEF**

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

      a.      find and declare that Defendants breached their fiduciary duties as described above;

      b.      find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for Defendants' breaches of fiduciary duty;

      c.      order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under § 1109(a);

      d.      approve the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

      e.      remove the fiduciaries who have breached their fiduciary duties or enjoin them from future ERISA violations;

      f.      surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, or otherwise in violation of ERISA;

      g.      reform the Plan to include only prudent investments;

      h.      certify the Class, appoint Plaintiffs as the class representatives, and appoint Berger Montague PC and Capozzi Adler, P.C. as Co-Lead Class Counsel and Edelson Lechtzin LLP as Class Counsel Executive Committee Chair;

i.      award to Plaintiff and the Class their attorney's fees and costs under 29

U.S.C. § 1132(g)(1) and the common fund doctrine;

j.      order the payment of interest to the extent allowed by law; and

k.      grant other equitable or remedial relief as the Court deems appropriate.


June 15, 2021                                  Respectfully submitted,

                                                /s/  Daniel J. Walker
                                               Daniel J. Walker (DC Bar No. 219439)
                                               **BERGER MONTAGUE PC**
                                               2001 Pennsylvania Ave., NW, Suite 300
                                               Washington, DC 20006
                                               Tel: (202) 559-9745
                                               Email: dwalker@bm.net

                                               Todd Collins (Admitted Pro Hac Vice)
                                               Jon Lambiras (Admitted Pro Hac Vice)
                                               **BERGER MONTAGUE PC**
                                               1818 Market St., Suite 3600
                                               Philadelphia, PA 19103
                                               Tel: (215) 875-3000
                                               Email: tcollins@bm.net
                                               Email: jlambiras@bm.net

                                               Mark K. Gyandoh (Admitted Pro Hac Vice)
                                               Gabrielle Kelerchian (Admitted Pro Hac Vice)
                                               **CAPOZZI ADLER, P.C.**
                                               312 Old Lancaster Road
                                               Merion Station, PA 19066
                                               Tel: (610) 890-0200
                                               Email: markg@capozziadler.com
                                               Email: gabriellek@capozziadler.com

                                               Donald R. Reavey
                                               **CAPOZZI ADLER, P.C.**
                                               2933 North Front Street
                                               Harrisburg, PA 17110
                                               Tel: (717) 233-4101
                                               Email: donr@capozziadler.com

                                               *Interim Co-Lead Class Counsel*

                                               59

Eric Lechtzin
**EDELSON LECHTZIN LLP**
3 Terry Drive, Suite 205
Newtown, PA 18940
Tel: (215) 867-2399
Email: elechtzin@edelson-law.com

*Interim Class Counsel Executive Committee Chair*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of June, 2021, I electronically filed a copy of the foregoing document with the Clerk of Court using the CM/ECF system which will send a notification to all counsel of record in this Action.

/s/    Daniel J. Walker