**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN RE THE AMERICAN NATIONAL RED CROSS ERISA LITIGATION | ) ) ) ) ) ) ) ) | CIVIL ACTION |
| | | Master File No. 1:21-cv-00541-EGS |
| This Document Relates to: All Actions | | |

**DEFENDANTS AMERICAN NATIONAL RED CROSS, BENEFIT PLAN COMMITTEE OF THE AMERICAN RED CROSS, AND INDIVIDUAL COMMITTEE MEMBERS' MOTION TO DISMISS AND MOTION TO STRIKE PLAINTIFFS' JURY DEMAND**

Pursuant to Federal Rules of Civil Procedure 12(b)(6), 12(b)(1), and 12(f)(2), Defendants American National Red Cross, Benefit Plan Committee of the American Red Cross, and Individual Committee Members respectfully move to dismiss with prejudice Plaintiffs' Consolidated Class Action Complaint ("Complaint") (Dkt. 20), and to strike the demand for a jury trial contained therein.

In support of their motion, Defendants contemporaneously submit their Memorandum of Law, Declaration of Michael J. Prame, and all exhibits thereto. Pursuant to Local Rule 7(f), Defendants respectfully request oral argument on this Motion.

Dated: August 16, 2021

Respectfully submitted,

**GROOM LAW GROUP, CHARTERED**

By: */s/ Michael J. Prame*_____
Michael J. Prame (DC Bar No. 451017)
William J. Delany (DC Bar No. 1021954)
Elizabeth L. Woods (DC Bar No. 230453)
Rachael Hancock (admitted *pro hac vice*)
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Ave., NW, Suite 1200
Washington, DC 20006

Telephone: (202) 857-0620
Facsimile: (202) 659-4503
E-mail: mprame@groom.com
       wdelany@groom.com
       ewoods@groom.com
       rhancock@groom.com

*Attorneys for Defendants the American National Red Cross, the Benefit Plan Committee of the American Red Cross, and Individual Committee Members*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN RE THE AMERICAN NATIONAL RED | ) | |
| CROSS ERISA LITIGATION | ) | CIVIL ACTION |
| | ) | |
| | ) | Master File No. 1:21-cv-00541-EGS |
| | ) | |
| | ) | |
| This Document Relates to: All Actions | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO
DISMISS AND MOTION TO STRIKE PLAINTIFFS' JURY DEMAND**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 5

LEGAL STANDARDS ........................................................................................................... 8

ARGUMENT ........................................................................................................................ 10

I.      Plaintiffs Have Not Plausibly Alleged That The Red Cross Or The Individual
        Committee Members Functioned As Fiduciaries. ......................................................... 10

        A.      Plaintiffs Have Failed To Plausibly Allege That The Red Cross Was Acting
                As A Fiduciary. .................................................................................................... 11

        B.      Plaintiffs Have Failed To Plausibly Allege That The Individual Committee
                Members Are Fiduciaries. .................................................................................... 13

II.     Plaintiffs Fail To State A Claim Regarding The Plan's Recordkeeping And
        Administrative Fees. ..................................................................................................... 14

        A.      Plaintiffs Misrepresent The Plan's R&A Fees. ...................................................... 15

        B.      As A Matter Of Law, Courts Reject The Notion That Recordkeeping Fees
                Must Fall Below A Certain Amount To Be Reasonable. ........................................ 17

        C.      Plaintiffs Fail To Compare The Plan's Services To The Services Of Other
                Plans. .................................................................................................................. 18

III.    Plaintiffs Fail To Allege A Plausible Claim Regarding The Focus Funds. ..................... 20

        A.      Plaintiffs Fail to Plead Facts Supporting a Claim That Defendants Were
                Imprudent in Selecting the Focus Funds in 2016. ................................................. 21

        B.      Plaintiffs Fail To Plead Facts Supporting A Claim That Defendants Were
                Imprudent In Monitoring And Retaining the Focus Funds. .................................... 26

IV.     Plaintiffs' Claims Regarding Failure to Monitor Fiduciaries Fail. ................................. 30

V.      Plaintiffs Lack Article III Standing. .............................................................................. 31

VI.     The Court Should Strike Plaintiffs' Jury Demand. ......................................................... 32

CONCLUSION ..................................................................................................................... 34

# **TABLE OF AUTHORITIES**

Cases

*Abraha v. Colonial Parking, Inc.*, 243 F.Supp.3d 179 (D.D.C. 2017)* ....................................... 21

*Alas v. AT&T*, No. 17–8106, 2019 WL 1744847 (C.D. Cal. Feb. 25, 2019)............................... 14

*Armstrong v. Lasalle Bank Nat. Ass'n*, 446 F.3d 728 (7th Cir. 2006)......................................... 25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)* ......................................................................................... 8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)* ........................................................................ 9

*Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003 (4th Cir. 1985).......................................................... 33

*Birse v. Centurylink, Inc.*, No. 17-cv-02872, 2020 WL 1062902 (D. Colo. Mar. 5, 2020).......... 26

*Borst v. Chevron Corp.*, 36 F.3d 1308 (5th Cir. 1994)................................................................. 33

*Bunch v. W.R. Grace & Co.*, 555 F.3d 1 (1st Cir. 2009) ............................................................. 22

*Chao v. Merino*, 452 F.3d 174 (2d Cir. 2006) ............................................................................... 8

*Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267 (11th Cir. 2005) ........................................... 12

*Coulter v. Morgan Stanley & Co.*, 753 F.3d 361 (2d Cir. 2014) ........................................... 11, 12

*Coviello et al, v. BHS Mgmt Servs. Inc.*, No. 3:20-cv-30198 (D. Mass.) .................................... 25

*Davis v. Wash. Univ. in St. Louis*, No. 17-cv-01641 (E.D. Mo.)................................................. 25

*DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457 (7th Cir. 1990) ............ 22

*Divane v. Northwestern University*, 953 F.3d 980 (7th Cir. 2020)......................................... 9, 18

*Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983) ............................................................ 21

*Donovan v. Mazzola*, 176 F.2d 1226 (9th Cir. 1983) .................................................................. 21

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997)................................ 5

*Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014).................................................. 22, 26

*Fink v. Nat'l Sav. & Tr. Co.*, 772 F.2d 951 (D.C. Cir. 1985)* ................................................ 8, 21

*Fitts v. Federal Nat'l Mortg. Ass'n*, 44 F.Supp.2d 317 (D.D.C. 1999)* ..................................... 33

*Ganton Techs Nat'l Indus Grp. Pension Plan*, 76 F.3d 462 (2d Cir. 1996) ............................... 26

*Gerken v. Mantech Int'l*, No. 20-cv-1536 (E.D.Va.) .................................................................. 25

*Harmon v. FMC Corp.*, No. 16-6073, 2018 WL 1366621 (E.D. Pa. Mar. 16, 2018)................... 31

*Harris v. Koenig*, 815 F. Supp. 2d 26 (D.D.C. 2011 .................................................................... 8

*Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009)*................................................................ 29

*Hettinga v. United States*, 677 F.3d 471 (D.C. Cir. 2012)........................................................ 9, 12

*Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45 (D.D.C. 2009)................................................ 5

*In re Mut. Fund Inv. Litig.*, 403 F. Supp. 2d 434 (D. Md. 2005)................................................. 11

*In re Nokia ERISA Litig.*, No. 10-cv-3306, 2011 WL 7310321 (S.D.N.Y. Sept. 6, 2011).......... 31

*Intern. Union of Operating Eng'rs*, 965 F.Supp. 2d 119 (D.D.C. 2013)....................................... 5

*Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67 (1983).............................................................. 31

*Johnson v. Delta Air Lines, Inc.*, No. 1:17-CV- 2608-TCB, 2017 WL 10378320 (N.D. Ga. Dec. 12, 2017)..................................................................................................................................... 32

*Johnson v. PNC Fin. Servs. Grp.*, No. 2:20-cv-01493, 2021 WL 3417843 (W.D. Pa. Aug. 3, 2021).......................................................................................................................................... 19

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994) ........................................ 12

*LaRue v. Dewolff, Boberg & Assocs., Inc.*, 552 U.S. 248 (2008) ................................................. 5

*Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011)............................................................... 29

*Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*, No. 20-6827, 2021 WL 2103231 (D.N.J. May 24, 2021) ................................................................................................................ 14

*Majad ex rel. Nokia Ret. Sav. and Inv. Plan v. Nokia, Inc.*, 528 Fed. App'x 52 (2d Cir. 2013) .. 31

*Martin v. CareerBuilder, LLC*, No. 19-CV-6463, 2020 WL 3578022 (N.D. Ill. July 1, 2020) ... 29

*Meiners v. Wells Fargo & Co.*, 898 F.3d 820 (8th Cir. 2018) .................................... 21, 23, 24, 28

*Munro v. Univ. of S. Cal.*, No. 16–6191, 2019 WL 4543115 (C.D. Cal. Aug. 27, 2019) ............ 14

*Oliver v. Black Knight Asset Mgmt., LLC*, 812 F. Supp. 2d 2 (D.D.C. 2011) ............................. 10

*Patterson v. Morgan Stanley*, No. 16-CV-6568 (RJS), 2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019)* ....................................................................................................... 24, 27, 28, 32

*Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)* ................................................................. 10, 11

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013) ............................................................... 8

*Romero v. Nokia, Inc.*, No. 12-cv-6260, 2013 WL 5692324 (N.D. Cal. Oct. 15, 2013) ............. 31

*Russell v. Harman Intern. Industries, Inc.*, 945 F.Supp.2d 68 (D.D.C. 2013) ............................ 30

*Sacerdote v. New York Univ.*, 328 F. Supp.3d 273 (S.D.N.Y. 2018) .................................... 19, 22

*Scalia v. WPN Corp.*, 417 F. Supp. 3d 658 (W.D. Pa. 2019) ................................................... 30

*Thomas v. Oregon Fruit Prod. Co.*, 228 F.3d 991 (9th Cir. 2000) ............................................. 33

*Tracey v. Massachusetts Inst. of Tech.*, 395 F. Supp. 3d 150 (D. Mass. 2019)* ........................ 33

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) .............................................................................. 32

*Wehner v. Genetech, Inc.*, No. 20-cv-06894-WHO, 2021 WL 507599 (N.D. Cal. Feb. 9, 2021) ................................................................................................................ 24, 28

*White v. Chevron Corp.*, No. 16-cv-0793, 2017 WL 2352137 (N.D. Cal. May 31, 2017)* .. 16, 19, 20, 28, 29

*Wilcox v. Georgetown Univ.*, No. CV 18-422 (RMC), 2019 WL 2289631 (D.D.C. May 29, 2019) ........................................................................................................................ 6, 10

*Wilcox v. Georgetown Univ.*, No. CV-18-422, 2019 WL 132281 (D.D.C. Jan. 8, 2019)* .... *passim*

*Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 Fed. Appx. 31 (2d Cir. 2009) .............................. 19

Statutes

29 U.S.C. § 1001 .................................................................................................................... 2

29 U.S.C. § 1002(21) ............................................................................................................ 10

29 U.S.C. § 1102(a) ................................................................................................................ 5

29 U.S.C. § 1104(a)(1)(B)) .................................................................................................. 9, 22

## <u>INTRODUCTION</u>

The American National Red Cross ("Red Cross") is a charitable organization with few parallels in our society.  It is a voluntary relief movement not prompted in any manner by desire for gain.  It is dedicated to preventing and alleviating human suffering, wherever it may be found.  Its people are committed to the cause of protecting life and health and ensuring respect for the human being.

For people who decide to devote their lives to working for this humanitarian organization, the Red Cross offers the opportunity to participate in the American Red Cross Savings Plan (the "Plan").  The Plan allows Red Cross employees to elect to invest pre-tax and after-tax contributions to save for their retirement, with the Red Cross generously matching those contributions—up to 4% of each employee's eligible compensation—to further assist its employees in saving for retirement.

The Benefit Plan Committee of the American Red Cross ("Committee") oversees the Plan.  To ensure that employees who participate in the Plan are able to develop a retirement planning strategy tailored to their personal needs and preferences, the Committee chose sixteen different investment options to make available to the Plan participants during the majority of the period at issue in this lawsuit.  The sixteen investment options provided a wide array of investment objectives and styles, with differing levels of investment risk.  The investment fees charged by the mutual fund companies and investment managers were very low, ranging from 0.01% to 0.5% (*i.e.*, $0.10 to $5.00 annually for every $1,000 invested by a participant). [1]

---

[1] Investment fees also often are referred to in terms of "basis points" or "bps."  One basis point is equal to 1/100th of 1%, or 0.01%.

1

Like all 401(k) plans, the Plan requires recordkeeping services to ensure the accurate tracking of Plan participant contributions, investment, distributions, etc., for which services the Plan pays the recordkeeper a per-capita fee. The Plan also pays for legal, trustee, audit and other services related to the operation of the Plan.

Plaintiffs, who are current and former participants in the Plan, take issue with how the Plan has been managed. Their complaint, however, should be considered in the broader context. It is one of over 120 lawsuits filed in the last two years alone against companies nationwide claiming that the expenses for their 401(k) plan are too high and that different investment options should have been used. The cookie-cutter complaint filed in this case is one of 45 such complaints filed by Plaintiffs' counsel with the goal of trying to get past the motion to dismiss stage and, due to the litigation cost associated with defending these matters, force defendants— even a charitable organization with a responsibility to serve as a steward of donations made to support the organization's vital relief and support services—to the settlement table.

Plaintiffs purport to bring this action against the Red Cross, the Committee, and individual Committee members Does 1–20 ("Individual Committee Members") (collectively, "Defendants"), alleging that they breached their fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* The Consolidated Class Action Complaint asserts four claims. In Count One, Plaintiffs assert that Defendants breached their fiduciary duties under ERISA by causing the Plan to overpay for recordkeeping and administrative services. Dkt. 20, Consolidated Class Action Complaint ("Compl.") ¶¶ 165–72. In Count Two, Plaintiffs allege that the Red Cross and the Committee breached their fiduciary duties by failing to monitor the Committee and the Individual Committee Members with respect to the allegedly excessive recordkeeping and administrative fees. *Id.* ¶¶ 173–80. In Count

Three, Plaintiffs claim that Defendants breached their fiduciary duties by selecting and keeping as investment options allegedly imprudent suite of "target date funds" (the "Northern Trust Focus Funds" or "Focus Funds"). *Id.* ¶¶ 181–91. And, in Count Four, Plaintiffs allege that the Red Cross and the Committee breached their fiduciary duties by failing to monitor the Committee and the Individual Committee Members with respect to the selection and retention of the Focus Funds in the Plan. *Id.* ¶¶ 192–99. Plaintiffs make each of these claims on behalf of a putative class of Plan participants. *Id.* ¶¶ 153–64.

Plaintiffs' allegations do not plausibly state a claim for relief under ERISA. As a threshold matter, Plaintiffs have failed to allege a basis for claiming that either the Red Cross or the Individual Committee Members acted as fiduciaries with respect to the conduct challenged in the Complaint. Therefore, the claims against the Red Cross and the Individual Committee Members should be dismissed.

Plaintiffs' claims regarding recordkeeping and administrative expenses fail because Plaintiffs' Complaint is founded on information that Plaintiffs' counsel knows to be incorrect. Specifically, Plaintiffs fail to disclose to the Court the information regarding the recordkeeping fee structure that the Red Cross provided to them prior to the filing of the Complaint, and thereby misrepresent the amounts paid by Plan participants. Further, courts have concluded that conclusory and unsupported allegations of a purported "reasonable" range of fees and inapt comparisons to the fees of other plans are insufficient to survive a motion to dismiss.

Plaintiffs' claims regarding the Focus Funds likewise fail because Plaintiffs have not plead any facts showing that the selection or retention of the Focus Funds was imprudent. The Court simply cannot infer, based on the allegations of the Complaint, that the selection of the Focus Funds was imprudent. Absent from Plaintiffs' Complaint, for example, is any allegation

of a "red flag" that would have put Defendants on notice that the Focus Funds were an imprudent investment at the time the Focus Funds were added to the menu of investment options.  Also notably absent from the Complaint is any discussion of the Focus Funds' cost, which is likely because the Focus Funds cost less than any of Plaintiffs' proposed alternative funds.[2]  In pressing this claim, the Complaint erroneously relies on hindsight evaluations of the investments' performance compared to other funds and irrelevant benchmarks.  Such hindsight performance comparisons are insufficient to establish a violation of ERISA.

Plaintiffs' claims for failure to monitor fiduciaries also should be dismissed.  The monitoring claims are dependent on Plaintiffs plausibly alleging a breach of ERISA's duty of prudence with respect to the Plan's recordkeeping and administrative expenses or the Focus Funds, which, as described above, they failed to do.

Further, because Plaintiffs have not invested in all of the Focus Funds challenged in the Complaint, they do not have standing to bring claims as to those Focus Funds in which no Plaintiff ever invested.

Finally, Plaintiffs have included a demand for a jury trial.  It is well established that jury trials are unavailable to plaintiffs asserting claims under ERISA.  The Court should strike Plaintiffs' jury demand.

---

[2]  Plaintiffs' failure to address the Focus Funds' investment cost is significant not only because cost is one of the important factors that plan fiduciaries evaluate when selecting investment options, but also because Plaintiffs' counsel are prolific filers of lawsuits challenging the cost of investment options in 401(k) plans.  Plaintiffs' failure to challenge the Focus Funds' investment costs is an indication that the low fees of the Focus Funds were reasonable and appropriate.

## BACKGROUND

The Plan is an individual account "defined contribution" plan that "promises the participant the value of an individual account at retirement, which is largely the function of the amounts contributed to that account [by the participant and the employer] and the investment performance of those contributions." *LaRue v. Dewolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 250 n.1 (2008).  Plaintiffs are six current or former Plan participants who allege they were harmed by excessive Plan recordkeeping fees and underperformance of the Focus Funds between March 2, 2015 and the present ("Class Period").[3]  Compl. ¶¶ 18–23.

Every ERISA plan is required to have a "named fiduciary"—a person or entity specifically identified in the governing "plan document" as a fiduciary.[4]  29 U.S.C. § 1102(a).

---

[3] The Complaint erroneously alleges that all Plaintiffs are current Plan participants.  Compl. ¶¶ 18–23.  However, four Plaintiffs (Plaintiffs Bagenstose, Moxley, Richard, and Tracy) are former participants. *See* Declaration of Michael J. Prame ("Prame Decl."), Ex. N at 3 (Plan account statement of Plaintiff Bagenstose showing $0.00 Plan account balance as of March 9, 2020); 11-12 (Plan account statement of Plaintiff Moxley showing $0.00 Plan account balance as of March 31, 2019); 19-20 (Plan account statement of Plaintiff Richard showing $0.00 Plan account balance as of September 30, 2020); 28-29 (Plan account statement of Plaintiff Tracy showing $0.00 Plan account balance as of July 13, 2020).

[4] At the motion to dismiss stage, a court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  Where a complaint "necessarily relies" on documents outside the pleadings, courts consider them to be incorporated in the complaint "even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009).

Courts routinely consider plan documents, plan disclosures, and public investment information when resolving motions to dismiss ERISA cases.  *See, e.g., Haines v. Gen. Pension Plan of Intern. Union of Operating Eng'rs*, 965 F.Supp. 2d 119, 123 (D.D.C. 2013) ("[W]hen a complaint centers on plan benefits, the key plan documents are properly considered without converting the motion to dismiss into one for summary judgment."); *Wilcox v. Georgetown Univ.*, No. CV-18-422, 2019 WL 132281, *4 n.5 (D.D.C. Jan. 8, 2019) (taking judicial notice of "publicly available definitions and information" on a plan's investment options).

Here, the "named fiduciary" of the Plan is the Committee. Prame Decl., Ex. B, First Amendment

to the American Red Cross Savings Plan ("Plan Amendment One") at 1.[5] The Plan's governing

document also designates the Committee as the Plan's administrator, meaning it is responsible

for day-to-day management of the Plan. *Id.; see also* 29 C.F.R. § 2510.3-16(a). The Individual

Committee Members are the Red Cross employees serving on the Committee during the Class

Period. Compl. ¶ 29.

The fiduciaries of a defined contribution plan select a recordkeeper for the plan. *Wilcox*

*v. Georgetown Univ.*, No. CV-18-422, 2019 WL 132281, *11 (D.D.C. Jan. 8, 2019)

("[R]ecordkeeping services are a necessary administrative requirement for retirement plans.")

(internal quotations and citations omitted). Recordkeepers track participant account activity and

often provide hard copy reports and online access for participants to view their accounts and

investments. *See id.* The Plan's recordkeeper was Hewitt Associates until 2017. Compl. ¶ 82.

The Plan switched recordkeepers from Hewitt Associates to Alight Solutions in 2017. *Id.* The

Red Cross also provides administrative services to the Plan, outside counsel and auditors provide

legal and audit services to the Plan, and Northern Trust provides trustee services to the Plan. *Id.*

¶ 86.

---

[5] As of March 6, 2019, the Committee assumed the duties and responsibilities of two former
Committees, the Benefit Plan Administration Committee ("BPAC") and the Benefit Plan
Investment Committee ("BPIC"). The BPAC was the former administrator of the Plan and
named fiduciary with respect to the Plan's administration prior to March 6, 2019. Prame Decl.,
Ex. A, Plan Document at §§ 1.4, 9.1(b). The BPIC was the former named fiduciary of the Plan
with respect to investment matters prior to March 6, 2019. *Id.* at § 9.3. The BPAC and BPIC
were replaced by the Committee in 2019, and the Committee assumed the role as both
administrator and named fiduciary for all matters regarding the Plan. Prame Decl., Ex. B, Plan
Amendment One at 2-4.

The Plan offers participants a variety of investment options in which they may choose to direct their savings. *Id.* ¶¶ 31, 47. During the majority of the period relevant here there were sixteen investment options offered in the Plan.[6] The Northern Trust Focus Funds were added to the Plan's investment menu starting in 2017. *Id.* ¶ 120. The Focus Funds are a suite of ten target date funds, with target retirement dates every five years from 2020 through 2060. *Id.*

Target date funds "are designed to provide a single diversified investment vehicle for plan participants" and are typically "offered as a suite of funds, with each fund based on the participant's anticipated retirement date." *Id.* ¶ 97. "Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement." *Id.* ¶ 101. The target date is often included in a fund's name, and "refers to the participant's expected retirement year." *Id.* ¶ 103. "For example, 'target date 2030' funds are designed for individuals who intend to retire in 2030. As the year 2030 approaches, the fund's investment manager adjusts the underlying asset mix to become more conservative." *Id.*

Within the broad category of "target date funds" are subcategories of different types of target date funds. *See* "Target Date Retirement Funds—Tips for ERISA Plan Fiduciaries," U.S. Dep't of Labor, at 1 (Feb. 2013), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-

---

[6] At the beginning of the class period, the Plan offered twenty investment options. Prame Decl., Ex. E, 2015 Annual Fee Disclosure at 4-5; Ex. F, 2016 Annual Fee Disclosure at 4-5. In 2017, the investment lineup was reconfigured and the Plan offered sixteen investment options. Prame Decl., Ex. G, 2017 Annual Fee Disclosure at 4-5. In 2021, the investment options increased to seventeen. Prame Decl., Ex. K, 2021 Annual Fee Disclosure at 4-5. During the relevant period, the Plan offered participants access to a brokerage window, meaning that participants had access to the array of investments in the marketplace generally in addition to those in the Plan's investment line up. Prame Decl., Ex. E, 2015 Annual Fee Disclosure at 2; Ex. F, 2016 Annual Fee Disclosure at 2; Ex. G, 2017 Annual Fee Disclosure at 2; Ex. H, 2018 Annual Fee Disclosure at 2; Ex. I, 2019 Annual Fee Disclosure at 2; Ex. J, 2020 Annual Fee Disclosure at 2; Ex. K, 2021 Annual Fee Disclosure at 2.

sheets/target-date-retirement-funds.pdf (last visited Aug. 16, 2021).  Two target date funds with

the same target date often may utilize widely different investment strategies, require different

administrative fees, and follow different "glide paths" —*i.e.*, how and when the investment

manager for the target date fund adjusts the underlying asset mix over time.  *Id.*  In other words,

not all target date funds are comparable to each other, even though they all fall under the same

broad heading of being "target date funds."  *See id.*

## <u>LEGAL STANDARDS</u>

"Prudence under ERISA is measured according to the objective prudent person standard

developed in the common law of trusts."  *Fink v. Nat'l Sav. & Tr. Co.*, 772 F.2d 951, 955 (D.C.

Cir. 1985).  "ERISA does not impose a 'duty to take any particular course of action if another

approach seems preferable.'"  *Harris v. Koenig*, 815 F. Supp. 2d 26, 32 (D.D.C. 2011) (quoting

*Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006)).  Rather, ERISA requires a fiduciary to

"discharge his duties with respect to a plan solely in the interest of the participants and

beneficiaries," and with "care, skill, prudence, and diligence" based on "the circumstances then

prevailing."  29 U.S.C. § 1104(a).  Importantly, courts "judge a fiduciary's actions based upon

information available to the fiduciary *at the time of each investment decision* and *not from the*

*vantage point of hindsight*."  *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs.*

*Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (emphasis added).

In order to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6),

Plaintiffs' Complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations

omitted).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

requires more than labels and conclusions, and a formulaic recitation of a cause of action's

elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (citations omitted).

"Factual allegations must be enough to raise a right to relief above the speculative level on the

assumption that all of the complaint's allegations are true." *Id.* Moreover, courts cannot accept

as true "legal conclusions cast as factual allegations." *Hettinga v. United States*, 677 F.3d 471,

476 (D.C. Cir. 2012).[7]

Further, a plaintiff must establish Article III standing by demonstrating "(1) that he or she

suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the

injury was caused by the defendant[s], and (3) that the injury would likely be redressed by the

requested judicial relief." *Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1618 (2020) (citing *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). A motion to dismiss for lack of standing

---

[7] Relative to the pleading standard for claims under ERISA, the Supreme Court recently granted a petition for a writ of certiorari to review the Seventh Circuit's decision in *Divane v. Northwestern University*, 953 F.3d 980 (7th Cir. 2020), *cert. granted sub nom., Hughes v. Northwestern University*, No. 19-1401, 2021 WL 2742780 (U.S. July 2, 2021) ("*Hughes*"). The question presented by the petition is "[w]hether allegations that a defined-contribution retirement plan paid or charged its participants fees that substantially exceeded fees for alternative available investment products or services are sufficient to state a claim against plan fiduciaries for breach of the duty of prudence under ERISA, 29 U.S.C. § 1104(a)(1)(B)." *Id.*

The Solicitor General also had recommended that the petition be granted, but framed the issue more narrowly as "[w]hether participants in a defined-contribution ERISA plan state[_] a plausible claim for . . . breach of the duty of prudence by alleging that the fiduciaries caused the participants to pay investment-management or administrative fees higher than those available for other *materially identical investment* products or services." Brief of the United States as Amicus Curiae, *Hughes v. Northwestern University*, No. 19-1401 (U.S. May 25, 2021) (emphasis added). The Solicitor General's reference to "materially identical investments" more narrowly defines the grounds on which a claim potentially could be asserted than the "alternative available investment" standard proposed in the plaintiffs' original petition in *Hughes*. Although the Supreme Court may address related issues in *Hughes*, Defendants are not seeking a stay of these proceedings at this time given the threadbare nature of the allegations in the Complaint.

is properly considered under Federal Rule of Civil Procedure 12(b)(1).  *Wilcox*, 2019 WL

132281 at *6 (citing *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987)).[8]

## ARGUMENT

**I.     Plaintiffs Have Not Plausibly Alleged That The Red Cross Or The Individual
        Committee Members Functioned As Fiduciaries.**

In order to state a claim for breach of fiduciary duty, Plaintiffs must first allege a

plausible basis for concluding that each defendant was acting as a fiduciary with respect to the

specific conduct at issue in the Complaint.  Absent being designated in the plan document as the

"named fiduciary," ERISA makes clear that a person is a fiduciary only "to the extent" that he or

she "exercises any discretionary authority or discretionary control respecting management of

such plan" or "has any discretionary authority or discretionary responsibility in the

administration of such plan."  29 U.S.C. § 1002(21).  Accordingly, when a court evaluates

allegations of a breach of fiduciary duty, "the threshold question is . . . whether that person was

acting as a fiduciary . . . *when taking the action subject to complaint*."  *Pegram v. Herdrich*, 530

U.S. 211, 226 (2000) (emphasis added); *see also Oliver v. Black Knight Asset Mgmt., LLC*, 812

F. Supp. 2d 2, 11 (D.D.C. 2011).

---

[8] There is subsequent appellate history in the *Wilcox* case, but the Court's January 2019 opinion
has not been disturbed.  In May 2019, in an opinion separate from the Court's opinion regarding
defendants' motion to dismiss, this Court denied Plaintiffs' Motion Seeking Leave to File
Plaintiffs' First Amended Complaint.  *Wilcox v. Georgetown Univ*., No. CV 18-422 (RMC),
2019 WL 2289631 (D.D.C. May 29, 2019), *vacated and remanded*, 987 F.3d 143 (D.C. Cir.
2021).  That holding addressed whether the plaintiffs had demonstrated good cause to "set aside
[a] judgment."  *Id*. at *2.  In February 2021, the D.C. Circuit vacated the District Court's
decision, and "remand[ed] the case to the district court for renewed consideration of their motion
[for leave to file an amended complaint]", but "[did] not reach appellants' challenges to the
dismissal of their complaint."  *Wilcox v. Georgetown Univ*., 987 F.3d 143, 145 (D.C. Cir. 2021)
(rehearing denied May 10, 2021).

Here, "the action subject to complaint," *Pegram*, 530 U.S. at 226, is the administration of the Plan with respect to its recordkeeping expenses and the selection and retention of the Focus Funds.  *See* Compl. ¶¶ 2–3.  The Committee was the "named fiduciary" and the Committee was responsible for "managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries," "select[ing] prudent investment options" and "evaluat[ing] and monitor[ing] the Plan's investments." *Id.* ¶¶ 167, 184.  Accordingly, it is the Committee—not the Red Cross or the Individual Committee Members—that is the fiduciary responsible for the actions subject to the Complaint.

### A.    Plaintiffs Have Failed To Plausibly Allege That The Red Cross Was Acting As A Fiduciary.

As an initial matter, Plaintiffs allege that the Red Cross "is the Plan Sponsor."  Compl. ¶ 24.  However, "plan sponsorship by itself does not create fiduciary status, because it is merely a corporate or settlor function."  *In re Mut. Fund Inv. Litig.*, 403 F. Supp. 2d 434, 447 (D. Md. 2005); *see also Coulter v. Morgan Stanley & Co.*, 753 F.3d 361, 367 (2d Cir. 2014) ("In defining the scope of a fiduciary's duty under ERISA, courts have distinguished between fiduciary functions, which give rise to ERISA liability, and 'settlor' functions, which are akin to actions taken by the settlor of a trust and do not trigger ERISA liability.").  Thus, the Red Cross's role as the Plan's sponsor does not make it a fiduciary under ERISA.

Plaintiffs also allege that the Red Cross is a "'named fiduciary' and 'administrator' of the Plan." Compl. ¶ 25.  Not so.  The "named fiduciary" of the plan is the "Administrator" of the Plan, and the "Administrator" is the Committee.  Prame Decl., Ex. A, Plan Document at §§ 1.4, 9.2; Ex. B, Plan Amendment One at 1-4.

The rest of Plaintiffs' allegations in support of their claim that the Red Cross is a fiduciary are simply bare legal conclusions that track portions of ERISA's statutory definitions

of fiduciary status.  For example, without providing any factual support, Plaintiffs allege that the Red Cross "exercises discretionary authority or control regarding management of the Plan, exercises authority or control regarding disposition of Plan assets, and/or has discretionary authority or responsibility in the administration of the Plan."  Compl. ¶ 26.  This allegation merely restates the statutory definition of a "fiduciary," and is plainly insufficient.  *See* 29 U.S.C. § 1002(21); *see also Hettinga*, 677 F.3d at 476 (holding that courts need not "accept legal conclusions cast as factual allegations") (citing *Kowal v. MCI Commc'ns Corp*., 16 F.3d 1271, 1276 (D.C.Cir.1994)); *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1277 (11th Cir. 2005) (dismissing claim that "simply recites portions of the statutory definition" of an ERISA fiduciary).

Moreover, the only responsibilities that the Plan Document allocates to the Red Cross are to "(I) Adopt and execute significant amendments to the Plan as recommended by the Compensation and Management Development Committee of the Board of Governors, or its successor (the "Compensation Committee"); and (II) Completely or partially terminate the Plan or the Trust."  Prame Decl., Ex. A, Plan Document at § 9.1.  Both amending the Plan and terminating the Plan are "settlor" functions, not "fiduciary" functions.  *See Black Knight Asset Mgmt., LLC*, 812 F. Supp. 2d at 12 ("[I]t has long been the rule that an employer or plan sponsor does not act in a fiduciary capacity when adopting, modifying or terminating an employee benefit plan") (collecting cases); *see also Coulter*, 753 F.3d at 367 ("'Settlor' functions, in contrast [to fiduciary functions], include conduct such as establishing, funding, amending, or terminating a plan.").

Plaintiffs thus failed to plausibly allege that the Red Cross acted in a fiduciary capacity with respect to the actions challenged in the Complaint.  As such, all claims against the Red Cross should be dismissed.

**B.      Plaintiffs Have Failed To Plausibly Allege That The Individual Committee Members Are Fiduciaries.**

Plaintiffs also name the Individual Committee Members as Defendants (referred to in the Complaint as part of the "Doe Defendants" or "Does 1–20").  Compl. ¶¶ 27–29.  Just as Plaintiffs failed to plausibly allege that the Red Cross acted as a fiduciary, Plaintiffs have similarly failed to plausibly allege that the Individual Committee Members were fiduciaries.

The only facts pled in support of Plaintiffs' theory that the Individual Committee Members functioned as fiduciaries is that "[t]he Benefit Plan Committee ***and its individual members*** exercise discretionary authority or control regarding management of the Plan, exercise authority or control regarding disposition of Plan assets, and/or have discretionary authority or responsibility in the administration of the Plan."  *Id.* ¶ 28 (emphasis added); *see also id.* ¶ 29 (repeating that the Doe Defendants, including the Individual Committee Members, are fiduciaries because they "exercised discretionary authority or control over the management of the Plan.").  These allegations fail to establish that the Individual Committee Members are fiduciaries for at least two reasons.

First, Plaintiffs failed to allege that the Individual Committee Members had an *individual* discretionary role with respect to the Plan separate and apart from being members of the Committee.  Plaintiffs' allegations in Paragraph 28 of the Complaint assume—without providing support—that the individuals are fiduciaries simply by virtue of being Committee members.  *Id.* ¶ 28.  The Individual Committee Members, however, do not have authority independent of that of the Committee to take actions that would result in "exercis[ing] discretionary authority" over

13

the Plan.  Rather, the Committee acts as a whole.  Prame Decl., Ex. D, Benefit Plan Committee

Charter, at 1, 3.  Courts have dismissed claims against individual defendants where, as here, a

plaintiff alleges "no facts demonstrating [individual defendants'] liability, as they must in order

to bring an ERISA claim against a fiduciary in their individual capacity." *Munro v. Univ. of S.

Cal.*, No. 16–6191, 2019 WL 4543115, *5 (C.D. Cal. Aug. 27, 2019); *see also Alas v. AT&T*,

No. 17–8106, 2019 WL 1744847, *4 (C.D. Cal. Feb. 25, 2019) (dismissing claims against

individual defendants where complaint "pleads no acts of the Individual Defendants that

allegedly breached their fiduciary duties, but merely notes that they were members of the Benefit

Plan Investment Committee for varying lengths of time.").

Second, as with Plaintiffs' allegations regarding the Red Cross, the allegations regarding

the Individual Committee Members merely recite the statutory definition of an ERISA fiduciary.

*See supra* at 11-12.  Simply alleging that the Individual Committee Members are fiduciaries

because, per the statutory text, they "exercised discretionary authority over management or

disposition of Plan assets" is "insufficient to plausibly plead that the individual Committee

members were fiduciaries."  *Luense v. Konica Minolta Bus. Sols. U.S.A., Inc*., No. 20-6827, 2021

WL 2103231, *6 (D.N.J. May 24, 2021) (characterizing such an allegation against individual

plan committee members as a "conclusory assertion").  And, as discussed below, *see infra* at 30-

32, Plaintiffs have failed to plausibly allege that any Defendant breached a duty to monitor the

Committee.

## II.     Plaintiffs Fail To State A Claim Regarding The Plan's Recordkeeping And Administrative Fees.

Plaintiffs allege that, in violation of ERISA's duty of prudence, the Plan's fiduciaries

caused it to overpay in recordkeeping fees and administrative fees ("R&A Fees").  Specifically,

14

Plaintiffs assert that the Plan should have paid less in R&A Fees, as compared to other plans that Plaintiffs purport paid an average of $34 per participant during 2019.  Compl. ¶ 88.

Plaintiffs fail to state a claim regarding the Plan's R&A Fees for several reasons. Plaintiffs misrepresent the Plan's R&A Fees and omit the fee information that Red Cross's counsel provided to them prior to the filing of the most-recent iteration of their Complaint.  This information established not only the Plan's true R&A Fees, but also that the participants only paid a portion of those fees.  The information also established that, in accordance with ERISA's fiduciary duties, the R&A fees were regularly reviewed and increasingly lower fees were negotiated with the Plan's recordkeeper.  In addition, Plaintiffs fail to make any allegations at all regarding the services offered to the plan or that of the "comparable" plans named in the Complaint.

### A.    Plaintiffs Misrepresent The Plan's R&A Fees.

Plaintiffs' claim regarding the Plan's R&A Fees suffers from an initial fatal flaw: Plaintiffs misrepresent the amount paid by the Plan participants.  Before Plaintiffs filed the current Complaint, the Red Cross provided Plaintiffs with documentation that the Plan's recordkeeping fee was $45 per participant in 2016 and, in 2020, was reduced to $31.50 per participant.  *See* Prame Decl., Ex. L, 2017 Aon Hewitt Fee Disclosure at 4 (noting that the $45 fee was in effect per the services agreement dated January 1, 2016); Ex. M, 2020 Alight Solutions Fee Disclosure at 4 (noting that the $31.50 fee was in effect per the services agreement amendment dated December 30, 2019).[9]  The Complaint completely omits this information

---

[9] The Court may properly consider these documents at the Motion to Dismiss stage.  *See, e.g., Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1063, 1066-67 (N.D. Cal. 2017) (taking judicial notice of "Plan-related documents," including "the master services agreement between [the plan sponsor] and JP Morgan Retirement Plan Services," which "was the record-keeper for the Plan").

regarding the per-participant recordkeeping charge.  Plaintiffs withheld that information and, in doing so, misled the court.  The information provided to counsel established that, in fact, the Plan's recordkeeping fee was regularly reviewed and lowered by the Plan's fiduciaries, which is evidence of compliance with their duties under ERISA.  This alone defeats Plaintiffs' prudence allegations regarding R&A Fees.  *See infra* at 17.

Rather than use the information the Red Cross provided to them, Plaintiffs present a misleading and incorrect calculation of R&A Fees.  *See* Compl. ¶ 86.  Despite knowing the actual per-participant charge, they attempt to reverse-engineer the Plan's R&A Fees by taking amounts listed in the Form 5500s and dividing those amounts by the number of Plan participants with balances at the end of the year.[10]  *Id.*  This method of calculation is inaccurate for several reasons.

*First*, the amounts disclosed on the Plan's Form 5500s include participant-specific fees (such as one-time distribution fees incurred at a participant's own request), artificially inflating the price per participant.  *See White v. Chevron Corp.*, No. 16-cv-0793, 2017 WL 2352137, *14 (N.D. Cal. May 31, 2017) ), *aff'd*, 752 F. App'x 453 (9th Cir. 2018) ("*White II*") (disregarding inaccurate recordkeeping fee allegations derived from plaintiff's calculations that were contradicted by plan disclosures).

*Second*, as the Red Cross informed Plaintiffs' counsel, individual participants did not pay all the R&A Fees.  The Plan charged Plan participants 15 basis points (0.15% of their account

---

[10] Reliance on the number of participants listed in Paragraph 86 of the Complaint is misleading, as it accounts only for the number of Plan participants with account balances at the *end* of the Plan year.  Plaintiffs' calculations disregard individuals who had account balances *during* the Plan year, who took a full distribution prior to the end of the Plan year, but who would have paid for recordkeeping and administrative fees during that year.  Their calculations therefore artificially inflate average expenses by deflating the number of Plan participants.

balance) annually for *all* administrative expenses—not just for the recordkeeping fees, but also for the trustee, legal, audit and other administration expenses.  *See* Prame Decl., Ex. G, 2017 Annual Fee Disclosure at 5.[11]  Although participants only paid 15 basis points, that charge was insufficient to cover the administrative fees charged by the Plan's service providers.  *See id.* at 5 n.1.  The remainder of the fees for those services was not paid by Plan participants, but instead by forfeitures of employer contributions to the Plan.  *See* Prame Decl., Ex. A, Plan Document at § 4.2(b).  In other words, Plaintiffs actually only paid a portion of the fees that they challenge, but misrepresent that they paid all of them.

For these reasons, Plaintiffs' allegations regarding the fees paid by Plan participants not only are inaccurate, they are insufficient to state claim that the Plan participants themselves had paid unreasonable R&A fees.

### B.   As A Matter Of Law, Courts Reject The Notion That Recordkeeping Fees Must Fall Below A Certain Amount To Be Reasonable.

Plaintiffs posit that the Plan's total R&A Fees are unreasonable because they exceed an arbitrary, self-calculated $34 per participant average of the costs of eleven other plans cherry-picked by Plaintiffs. Compl. ¶¶ 87–88.  Plaintiffs also suggest that because some courts, in specific factual scenarios, have found recordkeeping rates "averag[ing] around $35 per participant" to be reasonable, the Plan's R&A Fees should have been closer to $35.  *Id.* ¶ 92.  Putting aside that the Plan's base recordkeeping fee meets this criteria, *see supra* at 15 (discussing the Plan's actual base recordkeeping fee, which has been $31.50 since 2020), courts have rejected attempts to hold retirement plans to the arbitrary benchmark Plaintiffs propose.

---

[11] Plaintiffs rely on these same Plan disclosures in their Complaint.  *See* Compl. ¶¶ 51, 132 n.52, 133 n.60, 134 n.68, 135 n.76, 136 n.84, 137 n.92, 138 n.100, and 139 n.108.  As such, they may be considered by the Court in connection with Defendants' Motion to Dismiss.

*See, e.g., Wilcox*, 2019 WL 132281 at *13 ("The mere allegation that Georgetown could continue to offer the same Plans and the same associated services for $35/year has no factual support, is entirely speculative, contrary to case law and common sense, and does not warrant discovery."); *Divane*, 953 F.3d at 990–91 ("Northwestern was not required to search for a recordkeeper willing to take $35 per year per participant as plaintiffs would have liked . . . . And plaintiffs have failed to explain how a hypothetical lower-cost recordkeeper would perform at the level necessary to serve the best interests of the plans' participants.") (internal citation omitted).[12]  The Court should reject any suggestion by Plaintiffs that they can state a claim by alleging that the Plan should have paid $34-$35 per participant for recordkeeping and administrative fees

### C.    Plaintiffs Fail To Compare The Plan's Services To The Services Of Other Plans.

Plaintiffs derive their proposed $34–$35 fee benchmark from what they calculated as the average of recordkeeping and administrative fees paid by eleven other cherry-picked plans.  *See* Compl. ¶ 87.  But, as Plaintiffs acknowledge, "'recordkeeping' is a catchall term for the suite of administrative services typically provided to a defined contribution plan," which "**typically include, among other things**, maintaining plan records, tracking participant account balances and investment elections, transaction processing, call center support, participant communications, and trust and custody services."  *Id.* ¶ 64 (emphasis added).  Because "recordkeepers may offer a variety of collateral services to participants which also have

---

[12] Plaintiffs also offer inapt citations to the "401k Averages Book (20th ed.)."  Compl. ¶ 91. Plaintiffs themselves recognize that their citations to the 401k Averages Book for average recordkeeping fees of $5 and $12 are related to plan fees "for smaller plans, specifically those with under $200 million in assets."  *Id.*  Plaintiffs complain that the Plan's costs exceeded those averages without offering any explanation as to why average fees for plans much smaller than the Red Cross Plan are at all relevant.

value . . . any examination of fees needs to account for total value—that is, both recordkeeping and collateral services," or else a plaintiff's allegations are deficient. *Sacerdote v. New York Univ.*, 328 F. Supp.3d 273, 294 (S.D.N.Y. 2018) *aff'd*, No. 18-2707-CV, 2021 WL 3610355 (2d Cir. Aug. 16, 2021).[13]   In other words, because plans can pay more or less for recordkeeping and administrative services based on the range of services they are receiving, Plaintiffs must make allegations regarding the actual recordkeeping and administrative services offered to the plan at issue, as well as those offered to comparable plans, in order to state a plausible claim.   Here, Plaintiffs' pleading deficiency is even more egregious, since Plaintiffs are challenging not just recordkeeping fees, but the fees for all of the Plan's administrative services such as trustee, legal and auditing fees.   As such, Plaintiffs must allege "facts from which one could infer that the same services were available for less on the market." *White v. Chevron Corp.*, No. 16-cv-0793, 2016 WL 4502808, *14 (August 29, 2016) ("*White I*") (citing *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 Fed. Appx. 31, 33 (2d Cir. 2009) (holding plaintiffs did not state a plausible recordkeeping fee claim where they "fail[ed] to allege that the fees were excessive relative to the services rendered")).

In *Johnson v. PNC Financial Services Group*, which involved the same recordkeeper as the Red Cross Plan, the Western District of Pennsylvania recently rejected plaintiffs' allegations that average annual recordkeeping fees of $51–$57 per participant—higher than the Plan's R&A fees here—gave rise to an inference of imprudence. *Johnson v. PNC Fin. Servs. Grp.*, No. 2:20-

---

[13] The Second Circuit vacated a separate 2017 decision by the *Sacerdote* district court in which the district court dismissed plaintiffs' imprudence claims based on defendants' selection of investments in more expensive share classes. *See Sacerdote,* 2021 WL 3610355 at *11 (vacating in part *Sacerdote v. New York Univ.*, No. 16-CV-6284, 2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017)).  Plaintiffs here do not make any allegations regarding the share classes of the Plan's investments.

cv-01493, 2021 WL 3417843, *4–6 (W.D. Pa. Aug. 3, 2021).  The *Johnson* court found that "the fact that the Plan's recordkeeping fees trend downward for the period at issue points in the direction of prudence rather than imprudence."  *Id.* at *4.  The court also held that the complaint failed to plausibly allege excessive recordkeeping and administrative expenses based on alleged comparators "without additional detail about the Plan's fee structure and the ***services received in exchange for those fees***."  *Id.* (emphasis added).[14]

So too here.  As discussed previously, the Plan's recordkeeping fees trended downward from 2016 to 2020.  *See supra* at 15.  And, Plaintiffs make no allegations whatsoever about the scope of recordkeeping and administrative services actually provided to the Plan.  Nor do Plaintiffs make any allegations regarding the services provided to the "comparablearmstro" plans they hand selected for inclusion in the Complaint.  Because Plaintiffs do not make any allegations regarding the services offered to other plans versus the Plan, let alone make an "apples to apples" comparison of those services, Plaintiffs' Complaint fails to state plausible claim regarding the Plan's R&A Fees.  *See White I*, 2016 WL 4502808 at *12 (holding that an "apples-to-oranges comparison" is not "suggestive of imprudent action").

**III.**   **Plaintiffs Fail To Allege A Plausible Claim Regarding The Focus Funds.**

Plaintiffs also fail to state a claim for breach of the duty of prudence regarding the Focus Funds.  Plaintiffs do not identify any "red flags" or other facts in existence at the end of 2016

---

[14] The *Johnson* court likewise criticized the plaintiffs' reliance on The 401k Averages Book, stating that the comparisons it made were to "much smaller plans" and that the figures cited in the *Johnson* complaint did not take into account a plan's fee structure, including features such as revenue sharing (a method used to pay some or all of a plan's recordkeeping fee through revenue the recordkeeper receives from the funds made available in its investment platform).  *Id.* at *2, *4.  Here, Plaintiffs' reference to The 401k Averages Book falls even shorter: the Complaint makes a passing reference to the 401k Averages Book, but does not identify any information contained therein from which the Court could infer an imprudent process here.  *See supra* at 18 n. 13.

that could make plausible their theory the plan fiduciaries acted imprudently in selecting the

Focus Funds at that time.   The Complaint otherwise is devoid of any allegations establishing or

even inferring a deficient process on the part of the Plan's fiduciaries in selecting and retaining

the Focus Funds.

A.    **Plaintiffs Fail to Plead Facts Supporting a Claim That Defendants Were Imprudent in Selecting the Focus Funds in 2016.**

*i.   Plaintiffs Allege No Red Flags Regarding The Focus Funds.*

ERISA's prudence standard looks not to the ultimate performance of an investment, but

rather to the process plan fiduciaries employed to select and retain an investment.  *See Donovan*

*v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983) ("[T]he test of prudence—the Prudent Man

Rule—is one of conduct, not a test of the result of performance of the investment."); *see also St.*

*Vincent*, 712 F.3d at 716 ("[T]his standard focus[es] on a fiduciary's conduct in arriving at an

investment decision, not its results . . .") (internal quotations omitted).  Accordingly, in

evaluating Plaintiffs' claims, this Court must inquire "whether the individual trustees, at the time

they engaged in the challenged transactions, employed the appropriate methods to investigate the

merits of the investment and to structure the investment."  *Fink,* 772 F.2d at 955 (holding that

"[a] court's task in evaluating fiduciary compliance with [the prudence] standard is to inquire

'whether the individuals . . .  employed the appropriate methods to investigate the merits of the

investment . . . .'") (citing *Donovan v. Mazzola*, 176 F.2d 1226, 1232 (9th Cir. 1983), *cert.*

*denied*, 464 U.S. 1040 (1984)); *see Wilcox*, 2019 WL 132281 at *8 (same); *Wright v. Oregon*

*Metallurgical Corp.*, 360 F.3d 1090, 1097 (9th Cir. 2004) (same); *Abraha v. Colonial Parking,*

*Inc.*, 243 F.Supp.3d 179, 185 (D.D.C. 2017).

Where a complaint—like Plaintiffs' Complaint here—does not contain allegations

regarding a fiduciary's process, it must be dismissed unless it can be inferred from the pleaded

allegations that "a prudent fiduciary in like circumstances would have selected a different fund." *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018) (quotation omitted); *see also St. Vincent*, 712 F.3d at 718–19.  Thus, the relevant inquiry focuses on the information available to the fiduciary at the time of the relevant investment decision.  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) (prudence inquiry is tethered to "circumstances . . . prevailing at the time of the fiduciary acts" (citing 29 U.S.C. § 1104(a)(1)(B))).

ERISA requires fiduciaries to act with "prudence, not prescience."  *St. Vincent*, 712 F.3d at 716; *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) (same); *see also Dudenhoeffer*, 573 U.S. at 427 ("Fiduciaries are not expected to predict the future of [an investment's] performance").  As such, "[w]hether a fiduciary's actions are prudent cannot be measured in hindsight."  *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009).  In sum, when analyzing a fiduciary's compliance with ERISA's fiduciary duties, courts should evaluate the facts in existence when the investment decision was made, rather than look at the subsequent performance of the investment.

Here, the Complaint contains absolutely no allegations that there were any warning signs about the Focus Funds prior to 2017 that should have warned the fiduciaries of 401(k) plans nationwide that the Focus Funds were not prudent investment.  Indeed, weighing decidedly against an inference of imprudence is that fact that the 2016 Form 5500 filings for the Focus Funds show that, under the prevailing circumstances at the time, the fiduciaries of over 30 other ERISA-covered plans had chosen to invest in the Focus Funds.  *See, e.g.,* Prame Decl., Ex. C, Form 5500 for the Northern Trust Focus 2025 Fund at 6-8 (listing 36 plans that offered the 2025 Focus Fund); *see also Sacerdote*,328 F. Supp. 3d at 312 (finding allegations of imprudence insufficient and stating that "[i]t is notable that [a challenged investment option] is also widely

accepted as an appropriate and desirable investment by other market participants").  Having

failed to identify any facts in existence at the end of 2016 to support a theory the Focus Funds

were not prudent investments,  Plaintiffs' claims related to the selection of the Focus Funds at

that time are plainly deficient and should be dismissed.

> ii.   *Plaintiffs Fail To Allege Facts That Establish A Plausible Breach Of Prudence Claim.*

Rather than point to any red flags about the Focus Funds that existed at the end of 2016,

Plaintiffs' Complaint attempts to allege imprudence by comparing the performance of the Focus

Funds to the performance of three other investable target date funds (managed by Vanguard,

American Funds, and Fidelity), and four indices (Morningstar LifeTime Moderate Index, MSCI

ACWI IMI Index, S&P Target Date Index, and Dow Jones U.S. Target Index) for each "vintage"

of the Focus Funds.  Compl. ¶ 127.

As an initial matter, it bears noting that the Complaint demonstrates that the Plan's target

date funds actually outperformed Plaintiffs' hand-picked alternatives under certain market

conditions.[15]  And even assuming, *arguendo*, Defendants would have been able to predict the

Focus Funds' future performance at the time of selection in 2016, it is not "necessarily sufficient

to show that better investment opportunities were available at the time of the relevant decisions."

---

[15] *See*, *e.g.*, Compl. ¶ 131 (Table 1 showing the Northern Trust Focus 2015 Fund outperforming multiple comparators in 2014 and 2015); *id.* ¶ 132 (Table 2 showing the Northern Trust Focus 2020 Fund outperforming multiple comparators in 2015); *id.* ¶ 133 (Table 3 showing the Northern Trust Focus 2025 Fund outperforming multiple comparators in 2014, 2015, and 2016); *id.* ¶ 134 (Table 4 showing the Northern Trust Focus 2030 Fund outperforming multiple comparators in 2015); *id.* ¶ 135 (Table 5 showing Northern Trust Focus 2035 Fund outperforming multiple comparators in 2015 and 2016); *id.* ¶ 136 (Table 6 showing the Northern Trust Focus 2040 Fund outperforming multiple comparators in 2016); *id.* ¶ 137 (Table 7 showing Northern Trust Focus 2045 Fund outperforming multiple comparators in 2015 and 2016); *id.* ¶ 138 (Table 8 showing Northern Trust Focus 2050 Fund outperforming multiple comparators in 2015 and 2016); *id.* ¶ 139 (Table 9 showing the Northern Trust Focus 2055 Fund outperforming multiple comparators in 2015 and 2016).

*St. Vincent*, 712 F.3d at 718.  A "fiduciary is not required to select the best performing fund" but instead must "discharge their duties with care, skill prudence, and diligence *under the circumstances then prevailing*" when making decisions.  *Wilcox*, 2019 WL 132281 at *11 (quoting *Meiners*, 898 F.3d at 823) (emphasis added).  Therefore, Plaintiffs' allegations regarding investment performance are precisely the type of hindsight second-guessing that courts routinely dismiss as insufficient to state a claim.  *See, e.g., Patterson v. Morgan Stanley*, No. 16-CV-6568 (RJS), 2019 WL 4934834, *11 (S.D.N.Y. Oct. 7, 2019) (dismissing underperformance allegations as improperly hindsight-based and noting that "[d]ata compiled [during the year the complaint was filed] would not have been known to the fiduciaries earlier in the class period"); *Wehner v. Genetech, Inc.*, No. 20-cv-06894-WHO, 2021 WL 507599, *9 (N.D. Cal. Feb. 9, 2021) (dismissing plaintiff's "hindsight assessment" of "underperformance . . . based on annual returns over three- and five-year periods").

Plaintiffs also point to the Focus Funds performance compared to four market indices, but indices are not investments.  *See* Compl. ¶ 127(d)–(g) (referring to each of the four indices as a "benchmark").  Further, as Plaintiffs acknowledge, the Plan's Focus Funds had a benchmark (different from the four they identify) against which the Committee measured the Funds' performance; that is the "meaningful benchmark" against which their performance should be measured.  *Id.* at ¶ 144.[16]  The information available to the Committee in 2016 when the Focus Funds were selected shows that the Focus Funds were adequately performing and tracking their

---

[16] Plaintiffs state that "Defendants changed the name of their internal benchmark from 2019 to 2020," but the only change to the Focus Funds' benchmark during this time was whether "NT" was included in the benchmark's title.  *See* Prame Decl., Ex. J, 2020 Annual Fee Disclosure at 4; Ex. K, 2021 Annual Fee Disclosure at 4.  To be clear, the Focus Funds' benchmarks stayed the same throughout the time they were included in the Plan.

benchmarks at that time.  Compl. ¶¶ 131–39, Tables 1–9 (showing the Focus Funds'

performance from 2014 to 2016).  That Plaintiffs would prefer to measure the Focus Funds'

performance against another entirely different set of irrelevant indices is insufficient to state a

claim.  *See Meiners* 898 F.3d at 823; *Anderson*, 2021 WL 229235 at \*9.

Finally, the Complaint entirely fails to address an important consideration for any

fiduciary in choosing a plan's investment menu: cost.  The Focus Funds were very low cost, with

an asset-based fee of just 7 basis points (0.07%).  Plaintiffs do not challenge or even *mention* the

cost of the Focus Funds, perhaps because the Focus Funds cost less than every single one of the

target date funds that Plaintiffs identify as alternatives.  As Plaintiffs' counsel has filed numerous

lawsuits across the country alleging that plan fiduciaries breached fiduciary duties by choosing

investments that were too expensive, the question must be asked as to why, in the Complaint,

Plaintiffs purposefully ignore the Focus Funds' low cost.[17]  Put another way, while the Focus

Funds were more conservative in their investment strategy than some other target date funds,

they also were less expensive than the other target date funds that Plaintiffs identify.  The lower

cost of the Focus Funds served to preserve the principal amount of the Plan participants'

investments.

Although Plaintiffs may not agree with the Plan fiduciaries' decisions, they have not

alleged a basis for plausibly concluding that the selection of the Focus Funds exceeded the range

of discretion afforded by ERISA to fiduciaries charged with "balancing . . . competing interests

under conditions of uncertainty."  *Armstrong v. Lasalle Bank Nat. Ass'n*, 446 F.3d 728, 733 (7th

---

[17] *See e.g., Davis v. Wash. Univ. in St. Louis*, No. 17-cv-01641 (E.D. Mo.) (filed by Berger
Montague); *Gerken v. Mantech Int'l*, No. 20-cv-1536 (E.D.Va.) (filed by Capozzi Adler, P.C.);
*Coviello et al, v. BHS Mgmt Servs. Inc.*, No. 3:20-cv-30198 (D. Mass.) (filed by Capozzi Adler,
P.C.).

Cir. 2006); *see also Ganton Techs Nat'l Indus Grp. Pension Plan,* 76 F.3d 462, 468 (2d Cir. 1996) ("[T]rustees maintain the broad discretion to act in the best interest of all participants."); *Birse v. Centurylink, Inc.*, No. 17-cv-02872, 2020 WL 1062902, *3–4 (D. Colo. Mar. 5, 2020) (granting summary judgment to defendants because the fiduciary, in selecting an investment option that would "protect against downside risk," "analyzed the purpose the Fund would serve, how it would accomplish that purpose, and the Fund's strategic place within the overall portfolio of the Plan"). Plaintiffs allege no facts establishing that, in 2016, a prudent fiduciary could not have reasonably decided to use the Focus Funds. *Dudenhoeffer*, 573 U.S. at 428–30 (instructing courts to consider whether a complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that it was appropriate to make the decision at issue). Accordingly, Plaintiffs have failed to allege a plausible claim that the selection of the Focus Funds' investment in 2016 was imprudent, and therefore that claim should be dismissed.

**B.     Plaintiffs Fail To Plead Facts Supporting A Claim That Defendants Were Imprudent In Monitoring And Retaining the Focus Funds.**

Plaintiffs also suggest that imprudence can be inferred from the Plan's retention of the Focus Funds. Compl. ¶ 151. The Complaint asserts that because the Plan's Focus Funds had, per yearly returns, trailed behind Plaintiffs' hand-picked alternatives in certain years, the Court should infer that the Committee failed to employ any prudent process to monitor and replace the Focus Funds. *Id.* at 147.

For the same reasons that Plaintiffs' claims regarding the selection of the Focus Funds are inadequate, Plaintiffs' hindsight-based claims regarding retention of the Focus Funds are plainly insufficient to state a claim for breach of fiduciary duty. As discussed above, the bulk of Plaintiff makes no allegations related to the Focus Funds' performance other than highlighting their comparator funds' aggregate yearly returns. *See* Compl. ¶¶ 131–39. These annual

comparisons prove nothing because each target date fund sets its own allocations of assets based on its investment strategy. *See* "Target Date  Retirement Funds—Tips for ERISA Plan Fiduciaries," U.S. Dep't of Labor, at 1*; see also supra* at 23-24 (discussing inadequacy of hindsight-based allegations); *see also Patterson*, 2019 WL 4934834 at *10 (noting that "average annual returns" and allegations regarding "cumulative performance" were "unavailable to fiduciaries" during the relevant period, and therefore insufficient to state a claim); *St. Vincent*, 712 F.3d at 716 ("We judge a fiduciary's actions based on information available to the fiduciary at the time of each investment decision, and not from the vantage point of hindsight.").

Moreover, even as the Complaint's annual returns demonstrate, the Plan's target date funds delivered billions of dollars in *positive* investment returns over the relevant period (*i.e.*, participants did not lose their principal investment), and the investment performance of the Focus Funds frequently exceeded the performance of Plaintiffs' own comparators in certain market conditions.[18] *See supra* at 23 n.15 (discussing that Plaintiffs' allegations, Compl. ¶¶ 131-139, show that the Focus Funds outperformed Plaintiffs' alleged comparators during several years).

Plaintiffs' Complaint also fails to identify a specific point in time during the class period that the Focus Funds purportedly became an imprudent investment.  Plaintiffs rely on tables created for the Focus Funds' 2019 and 2020 performance based on 1- and 5-year annual average returns.  Compl. ¶¶ 144–45.  These tables obscure the full view of the Focus Fund's actual performance during the class period.  Two years of alleged underperformance is not a justified reason to remove a fund from a plan.  Indeed, courts agree that allegations of short-term

---

[18]  Unlike in many other ERISA lawsuits in which plaintiffs argue that a plan's fiduciaries should have removed an investment option because it was too risky, Plaintiffs essentially seek to impose ERISA liability because, in their view, the Focus Funds were perhaps too conservative in seeking to protect the principal amounts invested by Plan participants.

underperformance do not support a breach of the duty of prudence.  Rather, "a fiduciary may—
and often does—retain investments through a period of underperformance as part of a long-range
investment strategy."  *White I*, 2016 WL 4502808 at *17 (defendant did not breach fiduciary
duties by retaining the same mutual funds in 401(k) plan lineup even though those funds lost
money over a three-year period as it can be reasonable to "stay with . . . mutual funds even
during years of lower performance") (citing *Jenkins*, 444 F.3d at 926); *see also Wehner*, 2021
WL 507599 at *9 ("There is nothing presumptively imprudent about a retirement plan retaining
investments 'through periods of underperformance as part of a long-range investment strategy.'")
(citing *White II*, 2017 WL 2352137 at *20); *Wildman v. Am. Century Services, LLC*, 362 F.
Supp. 3d 685, 707 (W.D. Mo. 2019) (holding that fiduciary did not breach duty of prudence
where fiduciary "was hesitant to remove a fund simply because it had not performed well in the
short term") (citing *White I*, 2016 WL 4502808 at *17).  That the Focus Funds did not track their
benchmarks *exactly* is also patently insufficient to state a claim.  *See Patterson*, 2019 WL
4934834 at *10  (holding that while some courts recognize "that allegations of consistent, ten-
year underperformance may support a duty of prudence claim," the underperformance must be
substantial, and underperformance "of less than one percentage point is certainly insubstantial"
and insufficient to state a claim); *see also Meiners*, 898 F.3d at 823; *St. Vincent*, 712 F.3d at 716;
*Wilcox*, 2019 WL 132281 at *11.

Undermining Plaintiffs' theory that Defendants lacked the proper process to monitor the
Plan's investments, the Complaint actually establishes that Defendants in fact implemented a
process for monitoring the Focus Funds.  Plaintiffs admit, "Defendants established their own
internal benchmark for each of the Focus Funds" which shows that the fiduciaries chose a
monitoring standard in compliance with the duties under ERISA.  Compl. ¶ 144.  And, after

regularly monitoring and reviewing the Plan's investment lineup in light of those standards, the Plan's investment options were modified in 2021.  *See* Prame Decl., Ex. L, 2021 Annual Fee Disclosure, at 4-5.

The broader array of investment options available to Plan participants further indicates that, rather than abdicating their duties, the Committee employed a process to monitor the Plan's investments.  In addition to the Focus Funds, the Plan offered six other investment options with expense ratios of 1 bps (0.01%) to 45 bps (0.45%), which regularly outperformed their selected benchmarks.[19]  The Plan's other investment options, and access to a brokerage window, offered participants many avenues for investing their Plan accounts, not only in terms of fee variability but in terms of asset class, risk profile, and investment goals, which supports the conclusion that the fiduciaries had complied with their duties under ERISA.[20]  *See Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (dismissing prudence claims where facts supported conclusion that fiduciaries included a "sufficient mix of investments" in plan); *White I*, 2016 WL 4502808 at *11 (dismissing prudence claims where "Plan fiduciaries provided a diverse mix of investment options and expense ratios for participants"); *see also Loomis v. Exelon Corp.*, 658 F.3d 667, 672–74 (7th Cir. 2011) (same); *Martin v. CareerBuilder, LLC*, No. 19-CV-6463, 2020 WL 3578022 at *6 (N.D. Ill. July 1, 2020) (same).

---

[19] *See, e.g.,* Prame Decl., Ex. G, 2017 Annual Fee Disclosure, at 5.  As noted in the Disclosures and discussed previously, *supra* at 16, a 15 basis point fee (0.15%) was added to the expense ratio of each investment so that the Plan participant paid his or her portion of the recordkeeping and other administrative fees.

[20] Prame Decl., Ex. G, 2017 Annual Fee Disclosure, at 5 (showing that the Plan offered a stable value fund, a fixed income index fund, a real return fund, a U.S. equity large cap index fund, a U.S. equity mid/small cap index fund, and an international equity index fund).

Because Plaintiffs have failed to plead any facts supporting an inference that the Committee breached its fiduciary duty of prudence, their claims regarding the Focus Funds should be dismissed.

## IV.    **Plaintiffs' Claims Regarding Failure to Monitor Fiduciaries Fail.**

Plaintiffs also allege that Defendants breached their duty to monitor the Plan's fiduciaries.  Compl. ¶¶ 173-180, 192-199.  As an initial matter, Plaintiffs' duty to monitor claims fail because they have not alleged a plausible claim for an underlying breach of fiduciary duty. "A failure to monitor claim is derivative in nature and is premised on an earlier breach of a fiduciary duty." *Scalia v. WPN Corp.*, 417 F. Supp. 3d 658, 669 (W.D. Pa. 2019).  "Where a claim is predicated on the existence of an underlying breach of fiduciary duty, the claims rise and fall together." *Russell v. Harman Intern. Industries, Inc.*, 945 F.Supp.2d 68, 72 n. 2 (D.D.C. 2013).  Accordingly, because Plaintiffs' breach of fiduciary duty claims fail, their duty to monitor claims fail as well.  *See infra* at 14-29.

Second, even if Plaintiffs had established an underlying breach of fiduciary duty, Plaintiffs' monitoring claim is illogical.  Counts Two and Four of the Complaint name both the Red Cross and the Benefit Plan Committee.  Compl. ¶¶ 173–80, 192–199.  Specifically, Plaintiffs allege that "[e]ach Benefit Plan Committee member and fiduciary likewise had a duty to monitor the performance of each other member of the Benefit Plan Committee and had a responsibility to monitor each individual to whom it delegated any fiduciary responsibility." *Id.* ¶¶ 175, 194.  The Committee, however, cannot monitor itself.  Further, as discussed previously, the Individual Committee Members are not fiduciaries and, therefore, cannot have a duty to monitor.  *See supra* at 13-14.

Third, Plaintiffs' duty to monitor allegations lack factual support and are entirely conclusory.  Plaintiffs state only that Defendants failed to "monitor their appointees, to evaluate their performance, or to have a system in place for doing so," "monitor their appointees' fiduciary process," "ensure that the monitored fiduciaries considered the availability of comparable service providers" or "better performing target date funds," and "remove appointees whose performance was inadequate."  Compl. ¶¶ 178, 197.  Plaintiffs fail to allege any facts about what the Defendants' monitoring processes were, let alone why they were deficient or what monitoring procedures should have been in place.  *See Harmon v. FMC Corp.*, No. 16-6073, 2018 WL 1366621, *5 (E.D. Pa. Mar. 16, 2018) (holding that a complaint "falls short" because "[i]t offers no direct allegations of flaws in Defendants' process"); *Romero v. Nokia, Inc.*, No. 12-cv-6260, 2013 WL 5692324, *5 (N.D. Cal. Oct. 15, 2013) (dismissing duty to monitor claim where plaintiff did not "present any specific facts regarding the monitoring process or how it was deficient"); *In re Nokia ERISA Litig.*, No. 10-cv-3306, 2011 WL 7310321, *5 (S.D.N.Y. Sept. 6, 2011), *aff'd*, *Majad ex rel. Nokia Ret. Sav. and Inv. Plan v. Nokia, Inc.*, 528 Fed. App'x 52 (2d Cir. 2013) (dismissing duty to monitor claim where complaint did not "allege any specific factual basis to support Plaintiffs' conclusory allegation of a lack of legally sufficient monitoring by Defendants").

Therefore, Plaintiffs' duty to monitor claims in Counts Two and Four should be dismissed.

## V.   <u>Plaintiffs Lack Article III Standing</u>.

It is axiomatic that "[t]o satisfy the Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983).  In particular, Plaintiffs must allege

that they "*personally suffered a concrete and particularized injury* in connection with the conduct about which [they] complain[]." *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018) (emphasis added) (internal quotation marks and alterations omitted); *Wilcox*, 2019 WL 132281 at *8 ("Thus for either Plaintiff to have standing to sue about their defined contribution Plan, he must show fiduciary breaches that impair his individual account's value.").

Plaintiffs here have suffered no personal injury with respect to five of the Focus Funds challenged in the Complaint—the 2030, 2035, 2040, 2050, and 2060 Focus Funds—because no Plaintiff invested in any those Focus Funds.[21]  Plaintiffs therefore lack Article III standing with respect to those five Focus Funds.  *See Johnson v. Delta Air Lines, Inc*., No. 1:17-CV- 2608-TCB, 2017 WL 10378320, *2 (N.D. Ga. Dec. 12, 2017) (holding that "Plaintiffs do not have standing" where they "have not alleged that they were invested in the criticized funds"); *Patterson*, 2019 WL 4934834, *4–7 (agreeing with defendants' argument that "Plaintiffs lack standing to bring claims related to the seven funds in which they did not invest").  Thus, any claims related to the 2030, 2035, 2040, 2050, and 2060 Focus Funds Focus Funds should be dismissed.

## VI.     The Court Should Strike Plaintiffs' Jury Demand.

Plaintiffs' Complaint demands a trial by jury, but no such right attaches here.  Compl. ¶ 200.  Plaintiffs seek equitable relief under both ERISA §§ 502(a)(2) and 502(a)(3) for breach of fiduciary duty.  Plaintiffs' claims "sound[] in equity," meaning that the Seventh Amendment

---

[21] Prame Decl., Ex. N at 1-4 (account statement of Plaintiff Bagenstose showing investment in only the 2020 and 2025 Focus Funds); 5-6 (account statements of Plaintiff Juarbe showing investment in only the 2025 Focus Fund); 7-13 (account statements of Plaintiff Moxley, showing investment in only the 2055 Focus Fund); 14-21 (account statements of Plaintiff Richard showing investment in only the 2045 Focus Fund); 22-23 (account statements of Plaintiff Scaramuzzo showing investment in no Focus Funds); 25-29 (account statements of Plaintiff Tracy showing investment in no Focus Funds).

to the United States Constitution does not afford participants and beneficiaries suing under ERISA the right to a jury trial. *Fitts v. Federal Nat'l Mortg. Ass'n*, 44 F.Supp.2d 317, 331 (D.D.C. 1999) (remanded on other grounds, 236 F.3d 1 (D.C. Cir. 2001) (concluding that ERISA "does not permit the plaintiff to have her ERISA claim, which sounds in equity, decided by a jury"); *Thomas v. Oregon Fruit Prod. Co*., 228 F.3d 991, 997 (9th Cir. 2000) ("[W]e hold that the remedies available to a participant or beneficiary under ERISA are equitable in nature and the Seventh Amendment does not require that a jury trial be afforded for claims made by participants or beneficiaries."); *Borst v. Chevron Corp.*, 36 F.3d 1308, 1324 (5th Cir. 1994) ("We have held, as the majority of the other circuits, that ERISA claims do not entitle a plaintiff to a duty trial."); *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1007 (4th Cir. 1985) ("Courts addressing this issue have almost uniformly held that under the common law of trusts proceedings to determine rights under employee benefit plans are equitable in character and thus a matter for a judge, not a jury."). Because Plaintiffs have no federal right to a jury trial, this Court should strike Plaintiffs' jury demand from the Complaint. *See* Fed. R. Civ. P. 12(f).

Plaintiffs may argue that they are entitled to a jury trial because they seek monetary relief. However, in *Cigna Corp. v. Amara*, the Supreme Court confirmed that "the fact that [ERISA] relief takes the form of a money payment does not remove it from the category of traditionally equitable relief." *Cigna Corp. v. Amara*, 563 U.S. 421, 441–42 (2011) (explaining that "[e]quity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment"). Thus, the fact that Plaintiffs may seek relief in the form of monetary compensation does not entitle them to a jury trial. *See Tracey v. Massachusetts Inst. of Tech.*,

395 F. Supp. 3d 150, 153, 154 (D. Mass. 2019) (rejecting jury demand for ERISA claims brought against fiduciaries, and collecting cases decided in the last five years holding same).

Because Plaintiffs' claims "sound in equity," they do not have a right to a jury trial with respect to their ERISA claims.  Therefore, the Court should strike Plaintiffs' jury demand.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed in its entirety, with prejudice, and the Court should strike Plaintiffs' jury demand.

Dated:   August 16, 2021                         Respectfully submitted,


                                    */s/ Michael J. Prame*_____
                                   Michael J. Prame (DC Bar No. 451017)
                                   William J. Delany (DC Bar No. 1021954)
                                   Elizabeth L. Woods (DC Bar No. 230453)
                                   Rachael Hancock (admitted *pro hac vice*)
                                   GROOM LAW GROUP, CHARTERED
                                   1701 Pennsylvania Avenue, N.W.
                                   Washington, DC 20006-5811
                                   Tel: (202) 857-0620
                                   E-mail: mprame@groom.com
                                           wdelany@groom.com
                                           ewoods@groom.com
                                           rhancock@groom.com

                                   *Counsel for Defendants the American National
                                   Red Cross, the Benefit Plan Committee of the
                                   American Red Cross, and Individual Committee
                                   Members*

## CERTIFICATE OF SERVICE

I certify that on August 16, 2021, I filed in this action the foregoing **DEFENDANTS'**

**MOTION AND MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO**

**DISMISS AND MOTION TO STRIKE PLAINTIFFS' JURY DEMAND** electronically via

the Court's ECF System.  Notice of this filing will be sent in this action by operation of the

Court's electronic system to all counsel of record in the ECF System.

Respectfully Submitted,

*/s/ Michael J. Prame_____*
Michael J. Prame (DC Bar No. 451017)
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Ave., N.W.
Washington, D.C. 20006
202-861-0620 (phone)
202-659-4503 (fax)
mprame@groom.com