# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE THE AMERICAN NATIONAL RED CROSS ERISA LITIGATION | ) ) ) ) ) ) ) ) | CIVIL ACTION |
| | | Master File No. 1:21-cv-00541-EGS |
| This Document Relates to: All Actions | | |

## DEFENDANTS AMERICAN NATIONAL RED CROSS, BENEFIT PLAN COMMITTEE OF THE AMERICAN RED CROSS, AND INDIVIDUAL COMMITTEE MEMBERS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), Defendants American National Red Cross, Benefit Plan Committee of the American Red Cross, and Individual Committee Members, respectfully move to dismiss with prejudice Plaintiffs' First Amended Consolidated Class Action Complaint ("First Amended Complaint" or "FAC") (Dkt. No. 26).

In support of their motion, Defendants contemporaneously submit their Memorandum of Law, Declaration of Michael J. Prame, and all exhibits thereto.  Pursuant to Local Rule 7(f), Defendants respectfully request oral argument on this Motion.

Dated: November 4, 2021

Respectfully submitted,

**GROOM LAW GROUP, CHARTERED**

By: */s/ Michael J. Prame*_____
Michael J. Prame (DC Bar No. 451017)
William J. Delany (DC Bar No. 1021954)
Elizabeth L. Woods (DC Bar No. 230453)
Rachael Hancock (admitted *pro hac vice*)
1701 Pennsylvania Ave., NW, Suite 1200
Washington, DC 20006

Telephone: (202) 857-0620
Facsimile: (202) 659-4503
E-mail: mprame@groom.com
        wdelany@groom.com
        ewoods@groom.com
        rhancock@groom.com

*Attorneys for Defendants The American
National Red Cross, The Benefit Plan
Committee of the American Red Cross, and
The Individual Committee Members*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE THE AMERICAN NATIONAL RED | ) | |
| CROSS ERISA LITIGATION | ) | CIVIL ACTION |
| | ) | |
| | ) | Master File No. 1:21-cv-00541-EGS |
| | ) | |
| | ) | |
| This Document Relates to: All Actions | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................................... 1

BACKGROUND ....................................................................................................... 3

LEGAL STANDARDS ............................................................................................. 8

ARGUMENT .......................................................................................................... 10

I.      Plaintiffs Have Not Plausibly Alleged That The Red Cross Or The Individual Committee Members Functioned As Fiduciaries. ............................................................. 10

      A.      Plaintiffs Fail To Plausibly Allege That The Red Cross Acted As A Fiduciary. . 11

      B.      Plaintiffs Failed To Plausibly Allege That The Individual Committee Members Are Fiduciaries. ............................................................................................. 13

II.      Plaintiffs Fail To State A Claim Regarding The Plan's Recordkeeping And Administrative Fees. ........................................................................................ 15

      A.      Plaintiffs Continue to Misrepresent The Plan's R&A Fees. ............................... 16

      B.      As A Matter Of Law, Courts Reject The Notion That Recordkeeping Fees Must Fall Below A Certain Amount To Be Reasonable. ............................................... 17

      C.      Plaintiffs' Efforts to Compare The Red Cross Plan to Other 401(k) Plans Are Insufficient to Maintain a Claim…………………………………………………20

III.      Plaintiffs Fail To Allege A Plausible Claim Regarding The Focus Funds. ..................... 22

      A.      Plaintiffs Fail to Plead Facts Supporting a Claim That Defendants Were Imprudent in Selecting the Focus Funds. ............................................................. 22

      B.      Plaintiffs Fail To Plead Facts Supporting A Claim That, after 2017, Defendants Were Imprudent In Monitoring And Retaining the Focus Funds. ........................ 30

IV.      Plaintiffs' Claims Regarding Failure to Monitor Fiduciaries Fail. .................................. 35

V.      Plaintiffs Lack Article III Standing. ................................................................................. 36

CONCLUSION ...................................................................................................... 37

## <u>TABLE OF AUTHORITIES</u>

Cases

*Abraha v. Colonial Parking, Inc.*, 243 F.Supp. 179 (D.D.C. 2017)\* ..................................... 21, 23

*Alas v. AT&T*, No. 17-8106, 2019 WL 1744847 (C.D. Cal. Feb. 25, 2019) ............................... 14

*Anderson v. Intel Corp.*, 2021 WL 229235 (N.D. Cal. Jan. 21, 2021) ........................................ 27

*Armstrong v. Lasalle Bank Nat. Ass'n*, 446 F.3d 728 (7th Cir. 2006)......................................... 29

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................... 9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................................... 9

*Birse v. CenturyLink, Inc.*, No. 17-CV-02872-CMA-NYW, 2019 WL 1292861 (D. Colo. Mar. 20, 2019)..................................................................................................................................... 8

*Birse v. CenturyLink, Inc.*, No. 17-CV-02872-CMA-NYW, 2020 WL 1062902 (D. Colo. Mar. 5, 2020)....................................................................................................................................... 29

*Brown-Davis v. Walgreen Co.*, No. 1:19-CV-05392, 2020 WL 8921399 (N.D. Ill. Mar. 16, 2020) ....................................................................................................................................... 37

*Bunch v. W.R. Grace & Co.*, 555 F.3d 1 (1st Cir. 2009) .............................................................. 23

*Chao v. Merino*, 452 F.3d 174 (2d Cir. 2006) ............................................................................... 8

*Cho v. Prudential Ins. Co. of America*, No. 19-19886, 2021 WL 4438186 (D.N.J. Sept. 27, 2021) ....................................................................................................................................... 26

*Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267 (11th Cir. 2005)........................................... 13

*Coulter v. Morgan Stanley & Co.*, 753 F.3d 361 (2d Cir. 2014) ................................................. 11

*DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457 (7th Cir. 1990) ............ 24

*Divane v. Northwestern University*, 953 F.3d 980 (7th Cir. 2020)......................................... 9, 18

*Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983) ........................................................... 22

*Donovan v. Mazzola*, 716 F.2d 1226 (9th Cir. 1983) .................................................................. 23

*Dorman v. Charles Schwab Corp.*, 2019 WL 580785 (N.D. Cal. Feb. 8, 2019)......................... 32

*Falberg v. Goldman Sachs, Grp., Inc.*, No. 19-Civ. 9910, 2020 WL 3893285 (S.D.N.Y. July 9, 2020)....................................................................................................................................... 24

*Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014)\* .................................................... 23

*Fink v. Nat'l Sav. & Tr. Co.*, 772 F.2d 951 (D.C. Cir. 1985)\* ............................................... 8, 23

*Forman v. TriHealth, Inc.*, No. 1:10-cv-613, 2021 WL 4346764 (S.D. Ohio Sept. 24, 2021) .... 26

*Ganton Techs Nat'l v. Indus Grp. Pension Plan*, 76 F.3d 462 (2d Cir. 1996) ........................... 29

*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987)\* .................................................................... 10

*Harmon v. FMC Corp.*, No. 16-6073, 2018 WL 1366621 (E.D. Pa. Mar. 16, 2018)................... 36

*Harris v. Koenig*, 815 F. Supp. 2d 26 (D.D.C. 2011)\* .................................................................. 8

*Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009)\*............................................................... 34

*Hettinga v. United States*, 677 F.3d 471 (D.C. Cir. 2012)\*.................................................... 9, 13

*In re M&T Bank Corp. ERISA Litig.*, No. 16-CV-375, 2018 WL 4334807 n.11 (W.D.N.Y. Sept. 11, 2018)................................................................................................................................... 24

*In re Mut. Fund Inv. Litig.*, 403 F. Supp. 2d 434 (D. Md. 2005)................................................. 11

*In re Nokia ERISA Litig.*, No. 10-cv-3306, 2011 WL 7310321 (S.D.N.Y. Sept. 6, 2011).......... 36

*Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67 (1983) ........................................................... 36

*Jenkins v. Yager*, 444 F.3d 916 (7th Cir. 2006) .......................................................................... 32

*Johnson v. Delta Air Lines, Inc.*, No. 1:17-CV-2608-TCB, 2017 WL 10378320 (N.D. Ga. Dec. 12........................................................................................................................................... 37

ii

*Johnson v. PNC Fin. Servs. Grp.*, No. 2:20-cv-01493, 2021 WL 3417843 (W.D. Pa. Aug. 3, 2021)................................................................................................................................. 21

*Kendall v. Pharm. Prod. Dev., LLC*, No. 7:20-CV-71-D, 2021 WL 1231415 (E.D.N.C. Mar. 31, 2021)................................................................................................................................. 18

*Kong v. Trader Joe's Co.*, No. CV 20-05790, 2020 WL 7062395 (C.D. Cal. Nov 30, 2020) ..... 19

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C.Cir.1994)* ................................................ 13

*LaRue v. Dewolff, Boberg & Assocs., Inc.*, 552 U.S. 248 (2008) ................................................. 3

*Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011)............................................................... 34

*Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*, No. 20-6827, 2021 WL 2103231 (D.N.J. May 24, 2021)....................................................................................................................... 15

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................................. 10

*Majad ex rel. Nokia Ret. Sav. and Inv. Plan v. Nokia, Inc.*, 528 Fed. App'x 52 (2d Cir. 2013) .. 36

*Martin v. CareerBuilder, LLC*, No. 19-CV-6463, 2020 WL 3578022 (N.D. Ill. July 1, 2020) ... 34

*Meiners v. Wells Fargo & Co.*, 898 F.3d 820 (8th Cir. 2018)............................................. passim

*Munro v. Univ. of S. Cal.*, No. 16–6191, 2019 WL 4543115 (C.D. Cal. Aug. 27, 2019) ............ 14

*Obelso v. Great-West Cap. Mgmt., LLC*, 477 F.Supp.3d 1216 (D. Colo. 2020) ......................... 18

*Oliver v. Black Knight Asset Mgmt., LLC*, 812 F. Supp. 2d 2 (D.D.C. 2011) ................. 11, 12, 15

*Patterson v. Morgan Stanley*, No. 16-CV-6568 (RJS), 2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019).............................................................................................................................. passim

*Pegram v. Herdrich*, 530 U.S. 211 (2000)................................................................................. 11

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013)* ............................................................. passim

*Romero v. Nokia, Inc.*, No. 12-cv-6260, 2013 WL 5692324 (N.D. Cal. Oct. 15, 2013) ............. 36

*Russell v. Harman Intern. Indus., Inc.*, 945 F.Supp.2d 68 (D.D.C. 2013)*................................ 35

*Sacerdote v. New York Univ.*, 328 F.Supp.3d 273 (S.D.N.Y. 2018) ..................................... 21, 25

*Scalia v. WPN Corp.*, 417 F.Supp.3d 658 (W.D. Pa. 2019) ....................................................... 35

*Smith v. CommonSpirit Health*, 2021 WL 4097052 (E.D. Ky. Sept. 8, 2021) ............................ 18

*Thole v. U. S. Bank N.A*, 140 S. Ct. 1615 (2020)....................................................................... 10

*Tobias v. NVIDIA Corp.*, 2021 WL 4148706 (N.D. Cal. Sept. 13, 2021) ................................... 26

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018).................................................................................. 36

*Wehner v. Genentech, Inc.*, No. 20-cv-06894, 2021 WL 507599 (N.D. Cal. Feb. 9, 2021)... 28, 32

*Wehner v. Genentech, Inc.*, No. 20-cv-06894, 2021 WL 2417098 (N.D. Cal. June. 14, 2021) ... 33

*White v. Chevron Corp.*, No. 16-cv-0793, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ... 21, 22, 32, 34

*White v. Chevron Corp.*, No. 16-cv-0793, 2017 WL 2352137 (N.D. Cal. May 31, 2017) .......... 32

*Wilcox v. Georgetown Univ.*, 987 F.3d 143 (D.C. Cir. 2021)..................................................... 10

*Wilcox v. Georgetown Univ.*, No. CV-18-422, 2019 WL 132281 (D.D.C. Jan. 8, 2019)* ... passim

*Wilcox v. Georgetown Univ.*, No. CV 18-422 (RMC), 2019 WL 2289631 (D.D.C. May 29, 2019) ...................................................................................................................................... 10

*Wildman v. Am. Century Servs., LLC*, 362 F.Supp.3d 685 (W.D. Mo. 2019)............................ 32

*Wilson v. Craver*, 994 F.3d 1085 (9th Cir. 2021) ..................................................................... 23

*Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090 (9th Cir. 2004) ..................................... 23

*Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 Fed. Appx. 31 (2d Cir. 2009) .............................. 21

Statutes

29 U.S.C. § 1001................................................................................................................ 2

29 U.S.C. § 1002(21) ................................................................................................ 11, 13
29 U.S.C. § 1104(a)(1)(B) ................................................................................. 8, 9, 19, 23

Rules

Federal Rule of Civil Procedure 12(b)(1) ................................................................... 10
Rule 12(b)(6) ............................................................................................................... 13

Regulations

29 C.F.R. § 2510.3-16(a) ............................................................................................. 10
29 C.F.R. § 2550.404a-5 .............................................................................................. 33
75 Fed. Reg.  (Oct. 20, 2010)....................................................................................... 33

## INTRODUCTION

Plaintiffs' "First Amended Complaint" is actually the fourth version of their Complaint. Despite now having had four bites at the apple and, in each successive version of their Complaint, materially altering their allegations in an effort to correct gross misstatements in prior iterations, the allegations in the First Amended Complaint still fall well-short of alleging a plausible claim that the American Red Cross Savings Plan's ("Plan") recordkeeping fees were excessive or that the Northern Trust Focus Funds (or "Focus Funds") were imprudent investment options.

With regard to the Plan's recordkeeping fees, the Plaintiffs who filed the *Tracy* complaint initially claimed to have paid between $126 and $207 annually. *Tracy v. American National Red Cross et al.*, 1:21-cv-00541 (D.D.C.) Dkt. No. 1, ¶ 66. In the *Scaramuzzo* complaint, Plaintiffs alleged these fees were $188 per year. *Scaramuzzo v. American Red Cross et al.*, 1:21-cv-00620 (D.D.C.) Dkt. No. 1, ¶ 2. In their prior Consolidated Complaint, Plaintiffs revised the allegation to $71 per year. Consolidated Complaint, Dkt. No. 20, ¶ 88. And now, in the First Amended Complaint, Plaintiffs allege that they paid $45 or less annually in recordkeeping fees from 2015 through 2019 (*i.e.*, only one-quarter of what initially they alleged they had paid), and only paid $31.50 in 2020. Dkt. No. 26, Plaintiffs' First Amended Complaint ("FAC") ¶ 94.

As Plaintiffs' allegations regarding the amount of the annual recordkeeping fee dropped precipitously in successive versions of their Complaint, Plaintiffs changed and lowered the ceiling for what they claim to be a "reasonable" recordkeeping fee. In *Tracy*, Plaintiffs initially asserted that the "average" paid by "comparator plans" was $35 per year. *Tracy*, 1:21-cv-00541, Dkt. No. 1 at ¶ 72. The *Scaramuzzo* complaint alleged $40 per year. *Scaramuzzo*, 1:21-cv-00620, Dkt. No. 1 ¶ 88. In their Consolidated Complaint, Plaintiffs claimed recordkeeping fees

should not have exceeded $34 per year.  Consolidated Complaint, Dkt. No. 20, ¶ 88.  Now, by removing references to the recordkeeping fees of $40 or more paid by other plans that Plaintiffs previously had alleged were appropriate comparators to the Plan, Plaintiffs in the First Amended Complaint have reduced the purported "average" recordkeeping fee paid by other "comparator plans" to $30 per year.  FAC ¶ 93.  Regardless of these inconsistencies, as a matter of law, Plaintiff's comparison of the Plan's fees to an "average" cannot plausibly establish that a higher recordkeeping fee is "unreasonable" because, by definition, using an "average" as a liability standard would mean that 50% of the retirement plans in America would be operating in violation of the fiduciary standards set forth in the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*  Further, the NEPC study that Plaintiffs cite in their Complaint describes not only that there is *a range* of reasonable recordkeeping fees, but also that an annual recordkeeping fee per participant in the low to mid $40s—like that purportedly paid by participants in the Plan—was not in any way an outlier, and instead was well within the range of reasonable during the Class Period based on the very study that Plaintiffs cite.  FAC ¶ 96.

Likewise, the First Amended Complaint alters the comparator funds and benchmarks against which Plaintiffs previously compared the Northern Trust Focus Funds.  FAC ¶ 136. Plaintiffs' divergent, inconsistent allegations in the various iterations of their Complaint are an indication that they are cherry-picking the comparator funds and benchmarks in a desperate, but futile effort to survive a motion to dismiss.  As discussed below, the comparator funds and benchmarks they chose this time are not appropriate to measure the prudence of the Focus Funds either when they were added to the Plan's investment lineup in 2017 or any time thereafter.

In sum, the revised allegations in the First Amended Complaint do not correct the deficiencies in Plaintiffs' theories and the Complaint still fails to cross the line between possibility to plausibility. The First Amended Complaint should be dismissed with prejudice.

## BACKGROUND

The American National Red Cross ("Red Cross") is a charitable organization with few parallels. It is a voluntary relief movement not prompted in any manner by desire for gain. It is dedicated to preventing and alleviating human suffering, wherever it may be found. Its people are committed to protecting life and health and ensuring respect for the human being.

For people who decide to devote their lives to working for this humanitarian organization, the Red Cross offers the opportunity to participate in the American Red Cross Savings Plan.[1] The Plan allows Red Cross employees to elect to invest pre-tax and after-tax contributions to save for their retirement, with the Red Cross generously matching those contributions—up to 4% of each employee's eligible compensation—to further assist its employees in saving for retirement. The Benefit Plan Committee of the American Red Cross ("Committee") oversees the administration of the Plan.

Like all 401(k) plans, the Plan requires recordkeeping services to ensure the accurate tracking of Plan participant contributions, investments, distributions, etc., for which services the recordkeeper charges a per-capita fee. *Wilcox v. Georgetown Univ*., No. CV-18-422, 2019 WL 132281, at *11 (D.D.C. Jan. 8, 2019) ("[R]ecordkeeping services are a necessary administrative requirement for retirement plans.") (internal quotations and citations omitted). The Plan's

---

[1] The Plan is a "defined contribution" plan that "promises the participant the value of an individual account at retirement, which is largely the function of the amounts contributed to that account [by the participant and the employer] and the investment performance of those contributions." *LaRue v. Dewolff, Boberg & Assocs., Inc*., 552 U.S. 248, 250 n.1 (2008).

recordkeeper was Hewitt Associates until 2017.  FAC ¶ 88.  The Plan switched recordkeepers

from Hewitt Associates to Alight Solutions in 2017.  *Id.*  The Plan also pays for legal, trustee,

audit and other services related to the operation of the Plan.  *Id.* ¶ 103 n.40.

To ensure that employees who participate in the Plan are able to develop a retirement

planning strategy tailored to their personal needs and preferences, the Committee chose sixteen

different investment options to make available to the Plan participants during the majority of the

period at issue in this lawsuit. [2]  The sixteen investment options provided a wide array of

investment objectives and styles, with differing levels of investment risk.[3]  The investment fees

charged by the mutual fund companies and investment managers were very low, ranging from

0.01% to 0.5% (*i.e.*, $0.10 to $5.00 annually for every $1,000 invested by a participant). [4]

The Northern Trust Focus Funds were added to the Plan's investment menu in 2017.  *Id.*

¶ 129.  The Focus Funds are a suite of ten target date funds, with target retirement dates every

five years from 2020 through 2060.  *Id.*  Target date funds "are designed to provide a single

diversified investment vehicle for plan participants" and are typically "offered as a suite of funds

with each fund based on the participant's anticipated retirement date."  *Id.* ¶ 105.  "Target date

---

[2] At the beginning of the Class Period, the Plan offered twenty investment options.  Prame Decl.,
Ex. E, 2015 Annual Fee Disclosure at 4–5; Ex. F, 2016 Annual Fee Disclosure at 4–5.  In 2017,
the investment lineup was reconfigured and the Plan offered sixteen investment options.  Prame
Decl., Ex. G, 2017 Annual Fee Disclosure at 4–5.  In 2021, the investment options increased to
seventeen.  Prame Decl., Ex. K, 2021 Annual Fee Disclosure at 4–5.

[3] During the relevant period, the Plan also offered participants access to a brokerage window,
meaning that participants had access to the array of investments in the marketplace generally in
addition to those in the Plan's investment line up.  Prame Decl., Ex. E, 2015 Annual Fee
Disclosure at 2; Ex. F, 2016 Annual Fee Disclosure at 2; Ex. G, 2017 Annual Fee Disclosure at
2;  Ex. H, 2018 Annual Fee Disclosure at 2; Ex. I, 2019 Annual Fee Disclosure at 2; Ex. J, 2020
Annual Fee Disclosure at 2; Ex. K, 2021 Annual Fee Disclosure at 2.

[4] Investment fees also often are referred to in terms of "basis points" or "bps."  One basis point is
equal to 1/100th of 1%, or 0.01%.

funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement." *Id.* ¶ 109.  The target date is often included in a fund's name, and "refers to the participant's expected retirement year."  *Id.* ¶ 111.  "For example, 'target date 2030' funds are designed for individuals who intend to retire in 2030.  As the year 2030 approaches, the fund's investment manager adjusts the underlying asset mix to become more conservative."  *Id.*

Within the broad category of "target date funds" are subcategories of different types of target date funds.  *See* "Target Date Retirement Funds—Tips for ERISA Plan Fiduciaries," U.S. Dep't of Labor, at 1 (Feb. 2013), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf (last visited Oct. 22, 2021).  Two funds with the same target date often will utilize widely different investment strategies, require different administrative fees, and follow different "glide paths"—*i.e.*, how and when the investment manager for the target date fund adjusts the underlying asset mix over time.  *Id.*  In other words, not all target date funds are comparable to each other, even though they all fall under the same broad heading of being "target date funds."  *See id.*

Plaintiffs, who are current and former participants in the Plan, take issue with how the Plan was managed between March 2, 2015 and the present ("Class Period").  FAC ¶¶ 18–23.  Their lawsuit, however, should be considered in the broader context.  It is one of over 120 lawsuits filed in the last two years against companies nationwide claiming that the expenses for their 401(k) plan are too high and that different investment options should have been used.  The cookie-cutter Complaint filed in this case is one of at least 45 such complaints filed by Plaintiffs' counsel with the goal of trying to get past the motion to dismiss stage and, due to the litigation

cost associated with defending these matters, force defendants—even a charitable organization like the Red Cross with a responsibility to serve as a steward of donations made to support the organization's vital relief and support services—to the settlement table.

Plaintiffs purport to bring this action against the Red Cross, the Committee, and individual Committee members Does 1–20 ("Individual Committee Members") (collectively, "Defendants"), alleging that they breached their fiduciary duties under ERISA.  The First Amended Complaint asserts four claims.  In Count I, Plaintiffs assert that Defendants breached their fiduciary duties under ERISA by causing the Plan to overpay for recordkeeping and administrative ("R&A") services.  *Id.* ¶ 191–98.  In Count II, Plaintiffs allege that the Red Cross and the Committee breached their fiduciary duties by failing to monitor the Committee and the Individual Committee Members with respect to the allegedly excessive R&A fees.  *Id*. ¶¶ 199–206.  In Count III, Plaintiffs claim that Defendants breached their fiduciary duties by adding in 2017 and thereafter keeping the Northern Trust Focus Funds as investment options.  *Id*. ¶¶ 207–17.  And, in Count IV, Plaintiffs allege that the Red Cross and the Committee breached their fiduciary duties by failing to monitor the Committee and the Individual Committee Members with respect to the selection and retention of the Focus Funds.  *Id*. ¶¶ 218–25.  Plaintiffs make each of these claims on behalf of a putative class of Plan participants.  *Id*. ¶¶ 179–90.

Plaintiffs' allegations do not plausibly state a claim for relief under ERISA.  As a threshold matter, Plaintiffs have failed to allege a basis for claiming that either the Red Cross or the Individual Committee Members acted as fiduciaries with respect to the conduct challenged in the First Amended Complaint.  Therefore, the claims against the Red Cross and the Individual Committee Members should be dismissed.

Plaintiffs' claims regarding recordkeeping and administrative expenses fail because Plaintiffs' First Amended Complaint is founded on information that Plaintiffs' counsel knows to be incorrect.  Specifically, Plaintiffs misrepresent how and how much they and other Plan participants actually paid for R&A fees.  Moreover, their reference to an "average" fee paid by comparable plans is not an appropriate benchmark as a matter of law and courts otherwise have concluded that conclusory and unsupported allegations of a purported "reasonable" range of fees and inapt comparisons to the fees of other plans are insufficient to survive a motion to dismiss, especially when, as here, it is clear that Plaintiffs are cherry-picking the other plans against which to compare the Red Cross Plan and, thereby, manipulate the "average" fee paid by those other plans.

Plaintiffs' claims regarding the Focus Funds likewise fail because Plaintiffs have not plead any facts showing that the selection or retention of the Focus Funds was imprudent.  The Court simply cannot infer, based on the allegations of the First Amended Complaint, that the selection of the Focus Funds was imprudent.  Absent from Plaintiffs' First Amended Complaint is any allegation of a "red flag" that would have put Defendants on notice that the Focus Funds were an imprudent investment when they were added to the menu of investment options in 2017.  In pressing this claim, the First Amended Complaint erroneously relies on hindsight evaluations of the investments' performance compared to other funds and irrelevant benchmarks.  Such hindsight comparisons are insufficient to establish a violation of ERISA.  Plaintiffs also misrepresent the cost of the Focus Funds.

Plaintiffs' claims for failure to monitor fiduciaries also should be dismissed.  The monitoring claims are dependent on Plaintiffs plausibly alleging a breach of ERISA's duty of

prudence with respect to the Plan's recordkeeping and administrative expenses or the Focus Funds, which, as described above, they failed to do.

Further, because Plaintiffs have not invested in all of the Focus Funds challenged in the First Amended Complaint, they do not have standing to bring claims as to those Focus Funds in which no Plaintiff ever invested.

## LEGAL STANDARDS

ERISA requires a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). "Prudence under ERISA is measured according to the objective prudent person standard developed in the common law of trusts." *Fink v. Nat'l Sav. & Tr. Co*., 772 F.2d 951, 955 (D.C. Cir. 1985). "ERISA does not impose a 'duty to take any particular course of action if another approach seems preferable.'" *Harris v. Koenig*, 815 F. Supp. 2d 26, 32 (D.D.C. 2011) (quoting *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006)).

Importantly, courts "judge a fiduciary's actions based upon information available to the fiduciary *at the time of each investment decision* and *not from the vantage point of hindsight*." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (emphasis added). *See also Birse v. CenturyLink, Inc.*, No. 17-CV-02872-CMA-NYW, 2019 WL 1292861, at *3 (D. Colo. Mar. 20, 2019) (to establish a claim for breach of the duty of prudence a plaintiff must allege that a fiduciary's decisions—in the conditions prevailing at the time, and without the benefit of hindsight—are such that a reasonably prudent fiduciary would not have made that decision) (citing *St. Vincent*, 712 F.3d at 716).

To survive a motion to dismiss, Plaintiffs' First Amended Complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (citations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true."  *Id.*  Moreover, courts need not accept as true "legal conclusions cast as factual allegations." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012).[5]

Further, a plaintiff must establish Article III standing by demonstrating "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant[s], and (3) that the injury would likely be redressed by the

---

[5]  Relative to the pleading standard for claims under ERISA, the Supreme Court recently granted a petition for a writ of certiorari to review the Seventh Circuit's decision in *Divane v. Northwestern University*, 953 F.3d 980 (7th Cir. 2020), *cert. granted sub nom., Hughes v. Northwestern University*, No. 19-1401, 2021 WL 2742780 (U.S. July 2, 2021) ("*Hughes*").  The question presented by the petition is "[w]hether allegations that a defined-contribution retirement plan paid or charged its participants fees that substantially exceeded fees for alternative available investment products or services are sufficient to state a claim against plan fiduciaries for breach of the duty of prudence under ERISA, 29 U.S.C. § 1104(a)(1)(B)." *Id.*

The Solicitor General also had recommended that the petition be granted, but framed the issue more narrowly as "[w]hether participants in a defined-contribution ERISA plan state[_] a plausible claim for . . . breach of the duty of prudence by alleging that the fiduciaries caused the participants to pay investment-management or administrative fees higher than those available for other *materially identical investment* products or services." Brief of the United States as Amicus Curiae, *Hughes v. Northwestern Univ.*, No. 19-1401 (U.S. May 25, 2021) (emphasis added).  The Solicitor General's reference to "materially identical investments" more narrowly defines the grounds on which a claim potentially could be asserted than the "alternative available investment" standard proposed in the plaintiffs' original petition in *Hughes*.

requested judicial relief." *Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1618 (2020) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).  A motion to dismiss for lack of standing is properly considered under Federal Rule of Civil Procedure 12(b)(1).  *Wilcox*, 2019 WL 132281 at *6 (citing *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987)).[6]

## ARGUMENT

**I.      Plaintiffs Have Not Plausibly Alleged That The Red Cross Or The Individual Committee Members Functioned As Fiduciaries.**

Every ERISA plan is required to have a "named fiduciary"—a person or entity specifically identified in the governing "plan document" as a fiduciary.  29 U.S.C. § 1102(a).  Here, the "named fiduciary" of the Plan is the Committee.  Prame Decl., Ex. B, First Amendment to the American Red Cross Savings Plan ("Plan Amendment One") at 2.  The Plan's governing document also designates the Committee as the Plan's Administrator, meaning it is responsible for day-to-day management of the Plan.  *Id*. at 1; *see also* 29 C.F.R. § 2510.3-16(a).  The Individual Committee Members are the Red Cross employees serving on the Committee during the Class Period.  FAC ¶ 34.

In order to state a claim for breach of fiduciary duty, Plaintiffs first must allege a plausible basis for concluding that each named defendant *was acting as* a fiduciary with respect to the specific conduct at issue in the First Amended Complaint.  ERISA makes clear that a

---

[6] There is subsequent appellate history in the *Wilcox* case, but the Court's January 2019 opinion has not been disturbed.  In May 2019, in an opinion separate from the Court's opinion regarding defendants' motion to dismiss, this Court denied Plaintiffs' Motion Seeking Leave to File Plaintiffs' First Amended Complaint.  *Wilcox v. Georgetown Univ*., No. CV 18-422 (RMC), 2019 WL 2289631 (D.D.C. May 29, 2019), *vacated and remanded*, 987 F.3d 143 (D.C. Cir. 2021).  That holding addressed whether the plaintiffs had demonstrated good cause to "set aside [a] judgment."  *Id*. at *2.  In February 2021, the D.C. Circuit vacated the District Court's decision, and "remand[ed] the case to the district court for renewed consideration of their motion [for leave to file an amended complaint]", but "[did] not reach appellants' challenges to the dismissal of their complaint."  *Wilcox v. Georgetown Univ*., 987 F.3d 143, 145 (D.C. Cir. 2021).

person is a fiduciary only "to the extent" that he or she "exercises any discretionary authority or discretionary control respecting management of such plan" or "has any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21). Accordingly, when a court evaluates allegations of a breach of fiduciary duty, "the threshold question is . . . whether that person was acting as a fiduciary . . . *when taking the action subject to complaint*."  *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) (emphasis added); *see also Oliver v. Black Knight Asset Mgmt., LLC*, 812 F. Supp. 2d 2, 11 (D.D.C. 2011).

Here, "the action subject to complaint," *Pegram*, 530 U.S. at 226, is the administration of the Plan with respect to its recordkeeping expenses and the selection and retention of the Focus Funds.  *See* FAC ¶¶ 2–3.  The Committee was the "named fiduciary" and the Committee was responsible for "managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries," "select[ing] prudent investment options" and "evaluat[ing] and monitor[ing] the Plan's investments."  *Id.* ¶ 210.  The First Amended Complaint fails to allege a plausible basis for maintaining that the Red Cross and the Individual Committee Members were fiduciaries responsible for the actions that Plaintiffs challenge.

### A.   Plaintiffs Fail To Plausibly Allege That The Red Cross Acted As A Fiduciary.

As an initial matter, Plaintiffs allege that the Red Cross "is the Plan Sponsor."  *Id.* ¶ 24. However, "plan sponsorship by itself does not create fiduciary status, because it is merely a corporate or settlor function."  *In re Mut. Fund Inv. Litig.*, 403 F. Supp. 2d 434, 447 (D. Md. 2005); *see also Coulter v. Morgan Stanley & Co.*, 753 F.3d 361, 367 (2d Cir. 2014) ("In defining the scope of a fiduciary's duty under ERISA, courts have distinguished between fiduciary functions, which give rise to ERISA liability, and 'settlor' functions, which are akin to actions

taken by the settlor of a trust and do not trigger ERISA liability.").  Thus, the Red Cross's role as the Plan's sponsor does not make it a fiduciary under ERISA.

Plaintiffs' First Amended Complaint alleges that the Red Cross "acts" as a "named fiduciary" of the Plan.  FAC ¶ 26.  But the Complaint contains no factual support regarding any action that the Red Cross purportedly took with respect to the matters at issue.  And while trying to cast Red Cross as a "named fiduciary," Plaintiffs, in the same breath, concede that the "named fiduciary" of the Plan is the "Administrator" and that the Administrator is not the Red Cross, but rather the Committee.  *Id.* ¶¶ 29, 31 n.12; *see also* Prame Decl., Ex. A, Plan Document at §§ 1.4, 9.2; Ex. B, Plan Amendment One at 1–4.

In an attempt to sidestep the plan document's designation of the Committee as the named fiduciary, Plaintiffs argue that the Plan "infers that the Red Cross is a fiduciary for ERISA purposes."  FAC ¶ 28.  Plaintiffs point to a section of the Plan titled "Fiduciary Responsibility," which references the "Employer, the Administrator, the Benefit Plan Investment Committee, the Trustee [and] any other Plan fiduciary."  *Id.*  Plaintiffs assert that the "[u]se of the word 'other' infers that the Red Cross is a fiduciary."  *Id.*[7]  Their speculative reading of the Plan conflicts with the express terms that designates the Committee as the entity with responsibility for the matters

---

[7] The only responsibilities that the plan document allocates to the Red Cross are to "(I) Adopt and execute significant amendments to the Plan as recommended by the Compensation and Management Development Committee of the Board of Governors, or its successor (the "Compensation Committee"); and (II) Completely or partially terminate the Plan or the Trust." Prame Decl., Ex. A, Plan Document at § 9.1. These responsibilities are insufficient to prove that the Red Cross is a fiduciary because both amending the Plan and terminating the Plan are "settlor" functions, not "fiduciary" functions.  *See Black Knight Asset Mgmt.*, *LLC*, 812 F. Supp. 2d at 12 ("[I]t has long been the rule that an employer or plan sponsor does not act in a fiduciary capacity when adopting, modifying or terminating an employee benefit plan") (collecting cases); *see also Coulter*, 753 F.3d at 367 ("'Settlor' functions, in contrast [to fiduciary functions], include conduct such as establishing, funding, amending, or terminating a plan.").

at issue in the lawsuit and, again, Plaintiffs do not support their reading with any factual allegations of actions taken by the Red Cross.  Plaintiffs' speculation at most amounts to a theory that it is "possible" that Red Cross could be a fiduciary—not that it is "plausible" that Red Cross is a fiduciary, which is what is necessary to survive a motion to dismiss under Rule 12(b)(6).

Plaintiffs' remaining allegations in support of their claim that the Red Cross is a fiduciary are bare legal conclusions that track portions of ERISA's statutory definitions of fiduciary status. For example, without providing any factual support, Plaintiffs allege that the Red Cross "exercises discretionary authority or control regarding management of the Plan, exercises authority or control regarding disposition of Plan assets, and/or has discretionary authority or responsibility in the administration of the Plan."  FAC ¶ 25.  This allegation merely restates the statutory definition of a "fiduciary," and is plainly insufficient.  *See* 29 U.S.C. § 1002(21); *Hettinga*, 677 F.3d at 476 (holding that courts need not "accept legal conclusions cast as factual allegations") (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994)); *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1277 (11th Cir. 2005) (dismissing claim that "simply recites portions of the statutory definition" of an ERISA fiduciary).

Like prior versions, Plaintiffs' most recent Complaint fails to plausibly allege that the Red Cross acted in a fiduciary capacity with respect to the recordkeeping fees and Focus Funds. As such, all claims against the Red Cross should be dismissed.

### B. Plaintiffs Failed To Plausibly Allege That The Individual Committee Members Are Fiduciaries.

Plaintiffs also name the Individual Committee Members as Defendants (referred to in the First Amended Complaint as part of the "Doe Defendants" or "Does 1–20").  FAC ¶¶ 34–36. Just as Plaintiffs failed to plausibly allege that the Red Cross acted as a fiduciary, Plaintiffs have similarly failed to plausibly allege that the Individual Committee Members were fiduciaries.

The only facts pled in support of Plaintiffs' theory that the Individual Committee Members functioned as fiduciaries is that "[t]he Benefit Plan Committee **and its individual members** exercise discretionary authority or control regarding management of the Plan, exercise authority or control regarding management of the Plan, exercise authority or control regarding disposition of Plan assets, and have discretionary authority or responsibility in the administration of the Plan." *Id.* ¶ 30 (emphasis added); *see also id.* ¶ 34 (repeating that the Doe Defendants, including the Individual Committee Members, are fiduciaries because they "exercised discretionary authority or control over the management of the Plan"). These allegations fail to establish that the Individual Committee Members are fiduciaries for at least two reasons.

First, Plaintiffs failed to allege that the Individual Committee Members had an *individual* discretionary role with respect to the Plan separate and apart from being members of the Committee. Plaintiffs' allegations in Paragraph 30 of the First Amended Complaint assume— without providing support—that the individuals are fiduciaries simply by virtue of being Committee members. *Id.* ¶ 30. The Individual Committee Members, however, do not have authority independent of that of the Committee to take actions that would result in "exercis[ing] discretionary authority" over the Plan. Rather, the Committee acts as a whole. Prame Decl., Ex. D, Benefit Plan Committee Charter, at 1, 3. Courts have dismissed claims against individual defendants where, as here, a plaintiff alleges "no facts demonstrating [individual defendants'] liability, as they must in order to bring an ERISA claim against a fiduciary in their individual capacity." *Munro v. Univ. of S. Cal.*, No. 16–6191, 2019 WL 4543115, at *5 (C.D. Cal. Aug. 27, 2019); *see also Alas v. AT&T*, No. 17-8106, 2019 WL 1744847, at *4 (C.D. Cal. Feb. 25, 2019) (dismissing claims against individual defendants where complaint "pleads no acts of the

14

Individual Defendants that allegedly breached their fiduciary duties, but merely notes that they were members of the Benefit Plan Investment Committee for varying lengths of time").

Second, the allegations regarding the Individual Committee Members merely recite the statutory definition of an ERISA fiduciary. *See supra* at 13.  Simply alleging that the Individual Committee Members are fiduciaries because, per the statutory text, they "exercised discretionary authority over management or disposition of Plan assets" is "insufficient to plausibly plead that the individual Committee members were fiduciaries."  *Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*, No. 20-6827, 2021 WL 2103231, at *6 (D.N.J. May 24, 2021) (characterizing such an allegation against individual plan committee members as a "conclusory assertion").

## II.     Plaintiffs Fail To State A Claim Regarding The Plan's Recordkeeping And Administrative Fees.

In Counts I and II of the First Amended Complaint, Plaintiffs allege that, in violation of ERISA's duty of prudence, the Plan's fiduciaries caused it to overpay in recordkeeping fees and administrative fees ("R&A Fees").  Specifically, Plaintiffs assert that the Plan should have paid less in R&A Fees based on comparisons they make to fees allegedly paid by other 401(k) plans.

Plaintiffs' allegations fail to establish a plausible claim for breach of fiduciary duty with respect to the Plan's R&A Fees.  Plaintiffs still misrepresent the Plan's R&A Fees, failing to incorporate the information that Red Cross's counsel provided to them regarding how and how much the participants paid.  In addition, Plaintiffs' most-recent theory regarding what would constitute a reasonable recordkeeping fee ($30 annually) was calculated by removing prior allegations regarding other 401(k) plans that paid $40 or more in recordkeeping fees.  The removal of those plans from Plaintiffs' list of "comparable" plans confirms that Plaintiffs are not objectively surveying comparable plans, but instead are cherry-picking plans in a desperate effort to establish a claim (having learned that their initial theories that the Plan paid recordkeeping

fees of $126 or more were completely devoid of merit).  Such cherry-picking/gamesmanship should not be countenanced.

Moreover, Plaintiffs' reference to a purported "average" of R&A fees paid by other plans is insufficient to establish a claim as a matter of law.  Plaintiff's theory would mean that one-half of plan fiduciaries in America—those with plan fees above the average—would be operating in violation of ERISA's duty of prudence.  The NEPC study that Plaintiffs' rely upon shows that there is a range of reasonable fees—both above and below the average—and the Plan's fees fit squarely within than range.  Equally fatal to Plaintiff's theories, the First Amended Complaint— like Plaintiffs' Consolidated Complaint—contains no allegations regarding the scope of services offered to the Plan or those offered to the purportedly "comparable" plans.

### A.   Plaintiffs Continue to Misrepresent The Plan's R&A Fees.

Despite having the benefit of the information provided by Defendants' counsel and the opportunity to amend their Complaint, Plaintiffs continue to misrepresent the Plan's R&A fees. Recognizing the error of their prior convoluted efforts to calculate Plan's R&A Fees, Plaintiffs now allege based on ERISA "408(b)(2)" disclosures that the Red Cross provided that the recordkeeping fee was $45 or less between 2015 and 2019 and was reduced to $31.50 annually in 2020.  FAC ¶ 98.

Although Plaintiffs get closer to correctly alleging the amount of the recordkeeper's fees, Plaintiffs still fail to address the fact that individual Plan participants do not pay all of the R&A fees.  As acknowledged by Plaintiffs, the Plan did not charge participants $45 or $31.50. Instead, Plan participants were charged 15 basis points (0.15% of their account balance) annually for all administrative expenses—not just for the recordkeeping fees, but also for the trustee,

legal, audit and other administration expenses.  *See* FAC ¶ 115 n.41.[8]  The 15 basis point charge did not cover the cost of all of the Plan's administrative services.  The remainder of the fees for all of the Plan's services, including the R&A fees, was not paid by Plan participants, but instead by forfeitures of employer contributions to the Plan.  *See* Prame Decl., Ex. A, Plan Document at § 4.2(b).  In other words, Plaintiffs actually only paid a portion of the R&A fees that they challenge, but their Complaint is based on a theory they paid all of the fees.

Plaintiffs argue in a footnote that the 15 basis point cap's effect on fees is "not known" and should be "subject to discovery."  FAC ¶ 115 n.41.  Not so.  It is Plaintiffs' burden at this stage to plausibly allege that the R&A fees actually paid by participants were excessive.  The Plan's 15 basis point charge was in place throughout the Class Period and, as Plaintiffs acknowledge, was communicated to participants.  *See id.* ¶¶ 99, 100, 103 n.40.  The basis point payment methodology directly rebuts Plaintiffs' allegations of how and how much participants actually paid.  Plaintiffs should not be permitted to proceed because counsel has not done the advance work necessary to figure out the effect of the 15 basis point cap.

For these reasons, Plaintiffs' allegations not only are inaccurate, they are insufficient to state a claim that the Plan participants actually paid unreasonable R&A Fees.

**B.      As A Matter Of Law, Courts Reject The Notion That Recordkeeping Fees Must Fall Below A Certain Amount To Be Reasonable.**

Plaintiffs also allege that recordkeeping fees "averag[ing] around $35 per participant" would be reasonable for a plan the size of the Red Cross Plan.  FAC ¶ 97.  Using a cherry-picked set of other 401(k) plans, Plaintiffs also calculate a $30 "average" of recordkeeping and

---

[8]  The 15 basis point charge was separate from the investment fees charged by the managers of the investment options in which the Plan participants chose to invest.  *See* Prame Decl., Ex. G, 2017 Annual Fee Disclosure at 5.

administrative fees paid by several other plans.  *See* FAC ¶¶ 93, 94.  Plaintiffs further allege that

the Plan's R&A Fees exceeded the "average" fee of $40 for similarly sized plans, according to a

2019 survey conducted by NEPC.  *Id.* ¶ 96.  Even if the Plaintiffs had alleged the amount that the

Plan participants actually paid (*see supra*, Section II.A), Plaintiffs' comparison of the Plan's fees

to an "average" fails to state a claim as a matter of law.

As an initial matter, courts have rejected attempts to hold retirement plans to an arbitrary

benchmark, including those that Plaintiffs allege.  *See, e.g., Wilcox*, 2019 WL 132281 at *13

("The mere allegation that Georgetown could continue to offer the same Plans and the same

associated services for $35/year has no factual support, is entirely speculative, contrary to case

law and common sense, and does not warrant discovery."); *Divane*, 953 F.3d at 990–91

("Northwestern was not required to search for a recordkeeper willing to take $35 per year per

participant as plaintiffs would have liked . . . . And plaintiffs have failed to explain how a

hypothetical lower-cost recordkeeper would perform at the level necessary to serve the best

interests of the plans' participants.") (internal citation omitted).

More significantly, ERISA's prudence requirement does not require fees to be measured

compared to a median or average—nor should it, as by definition, one-half of 401(k) plans

would be operating in violation of ERISA.  *See Obelso v. Great-West Cap. Mgmt., LLC*, 477

F.Supp.3d 1216, 1226 n.4 (D. Colo. 2020) ("Of course, industry average fees cannot possibly set

the outer bounds" of reasonable fees because if they could, half of all plans would have

excessive fees).  Moreover, "[a] median value for an entire category [of recordkeeping fees]

cannot be said to be identical save for price" and therefore cannot plausibly suggest a breach.

*Kendall v. Pharm. Prod. Dev., LLC*, No. 7:20-CV-71-D, 2021 WL 1231415, at *7 (E.D.N.C.

Mar. 31, 2021); *see also Smith v. CommonSpirit Health*, 2021 WL 4097052, at *12 (E.D. Ky.

Sept. 8, 2021) (dismissing claims of excessive recordkeeping fees based on alleged $35/participant average fees in the 401(k) Averages Book because plaintiff "fail[ed]to allege an adequate market comparison") (citing *Kong v. Trader Joe's Co.*, No. CV 20-05790, 2020 WL 7062395, at *5 (C.D. Cal. Nov 30, 2020)).  Instead, ERISA's prudence requirement focuses on fiduciaries acting with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  In this regard, there can be a range of reasonable approaches and fees used by a prudent person who is familiar with such matters.

The existence of a range of reasonableness is borne out by the NEPC survey that Plaintiffs cite in the First Amended Complaint.  The graph from the NEPC survey cited by Plaintiffs is below.[9]



The NEPC survey clearly shows that there is a range of reasonable R&A fees.  It also clearly shows that a $45 per-participant fee falls within the grey box at the far right, which

[9] NEPC, "NEPC 2019 Defined Contribution Progress Report," available at https://cdn2.hubspot.net/hubfs/2529352/2019%20DC%20Plan%20and%20Fee%20Survey%20(progress%20report)/2019%20NEPC%20DC%20Plan%20Progress%20Report.pdf (last accessed November 4, 2021).

represents the range of fees paid by participants in the 25th–75th percentile (the second and third

quartiles) of plans with more than 15,000 participants.  A $45 fee does not even fall on the higher

end of R&A fees (the fourth quartile of plans) represented by the line above the grey box.  In

sum, the very study on which Plaintiffs rely proves that they have failed to state a plausible basis

for claiming that the Plan's R&A Fees were unreasonable during the Class Period.

### C.   Plaintiffs' Efforts to Compare The Red Cross Plan to Other 401(k) Plans Are Insufficient to Maintain a Claim.

Plaintiffs propose a $30 recordkeeping fee benchmark based on counsel's calculation of

what they believe to be the "average" recordkeeping and administrative fees paid by several

other plans.  *See* FAC ¶ 93.  As an initial matter, Plaintiffs' calculation is inherently flawed.  The

alleged "comparator" plans are no more than cherry-picked examples chosen by counsel.  A

comparison of the current version of the Complaint to the prior version lays bare Plaintiffs'

blatant effort to manipulate the analysis.  In the instant Complaint, Plaintiffs conveniently

swapped out six "comparator" plans—including Plans that paid $45, $40, and $38 per

participant— that they has used for a similar analysis in their prior Complaint, which

conveniently reduced what they previously had calculated to be the "average" fee paid by

comparator plans.  *Compare id.* ¶¶ 93–94 *with* Consolidated Complaint ¶¶ 87–88.  Plaintiffs also

added eleven plans to further lower their self-calculated average.  The manipulation of the

analysis through the cherry-picking of a handful of plans from the hundreds (if not thousands) of

plans similar in size to the Red Cross Plan shows Plaintiffs' "average" analysis to be patently

unreliable.

Aside from the cherry-picked nature of Plaintiffs' alleged comparator plans, the First

Amended Complaint's recordkeeping fee allegations suffer from the same flaws as those in the

Consolidated Complaint.  Because "recordkeepers may offer a variety of collateral services to

participants which also have value . . . any examination of fees needs to account for total value—that is, both recordkeeping and collateral services," or else a plaintiff's allegations are deficient. *Sacerdote v. New York Univ.*, 328 F.Supp.3d 273, 294 (S.D.N.Y. 2018) *aff'd*, No. 18-2707-CV, 2021 WL 3610355 (2d Cir. Aug. 16, 2021).  In other words, because plans can pay more or less for recordkeeping and administrative services based on the range of services they are receiving, Plaintiffs must set forth allegations regarding the actual recordkeeping and administrative services offered to the plan at issue, as well as those offered to comparable plans.  Plaintiffs also must allege "facts from which one could infer that the same services were available for less on the market." *White v. Chevron Corp.*, No. 16-cv-0793, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016) ("*White I*") (*citing Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 Fed. Appx. 31, 33 (2d Cir. 2009) (holding plaintiffs did not state a plausible recordkeeping fee claim where they "fail[ed] to allege that the fees were excessive relative to the services rendered")); *Abraha v. Colonial Parking, Inc.*, 243 F.Supp. 179, 188 (D.D.C. 2017) (same).

In *Johnson v. PNC Financial Services Group*, which involved the same recordkeeper as the Red Cross Plan, the Western District of Pennsylvania recently rejected plaintiffs' allegations that average annual recordkeeping fees of $51–$57 per participant—higher than the Plan's R&A fees here—gave rise to an inference of imprudence.  *Johnson v. PNC Fin. Servs. Grp.*, No. 2:20-cv-01493, 2021 WL 3417843, at *4–6 (W.D. Pa. Aug. 3, 2021).  The court found that "the fact that the Plan's recordkeeping fees trend downward for the period at issue points in the direction of prudence rather than imprudence." *Id*. at *4.  The court also held that the complaint failed to plausibly allege excessive recordkeeping and administrative expenses based on alleged comparators "without additional detail about the Plan's fee structure and the services received in exchange for those fees." *Id*. (emphasis added).

21

So too here.  As acknowledged by Plaintiffs, the Plan's recordkeeping fees trended downward from 2016 to 2020.  *See* FAC ¶ 98.  Plaintiffs' bare allegation that the R&A services the Plan received were "garden variety" and that R&A expenses were "bloated" are simply not supported by facts alleged in the First Amended Complaint.  *Id.* ¶ 99.  Nor do Plaintiffs make any allegations regarding the services provided to the "comparable" plans they hand selected. Because the First Amended Complaint does not contain any allegations regarding the services offered to other plans versus the Plan here, let alone make an "apples to apples" comparison of those services, Plaintiffs' Complaint fails to state plausible claim regarding the Plan's R&A Fees.  *See White I*, 2016 WL 4502808 at *12 (holding that an "apples-to-oranges comparison" is not "suggestive of imprudent action").

### III.   **Plaintiffs Fail To Allege A Plausible Claim Regarding The Focus Funds.**

Plaintiffs also fail to state a claim for breach of the duty of prudence regarding the Focus Funds.  In their fourth effort to assert a claim, Plaintiffs still have not identified any "red flags" or other facts in existence when the Plan fiduciaries decided to add the Focus Funds to the Plan's investment line up beginning in 2017.  The First Amended Complaint also remains devoid of any allegations establishing or even inferring that the Plan's fiduciaries relied on a deficient process in selecting and retaining the Focus Funds.

#### A.   **Plaintiffs Fail to Plead Facts Supporting a Claim That Defendants Were Imprudent in Selecting the Focus Funds.**

##### i.   *Plaintiffs Allege No Red Flags Regarding The Focus Funds.*

ERISA's prudence standard looks not to the ultimate performance of an investment, but rather to the process plan fiduciaries employed to select and retain an investment.  *See Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983) ("[T]he test of prudence—the Prudent Man Rule—is one of conduct, not a test of the result of performance of the investment."); *see also St.*

*Vincent*, 712 F.3d at 716 ("[T]his standard focus[es] on a fiduciary's conduct in arriving at an investment decision, not its results . . .") (internal quotations omitted).  Accordingly, in evaluating Plaintiffs' claims, this Court must inquire "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment."  *Fink*, 772 F.2d at 955 (holding that "[a] court's task in evaluating fiduciary compliance with [the prudence] standard is to inquire 'whether the individuals . . .  employed the appropriate methods to investigate the merits of the investment . . . .'") (citing *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983), *cert. denied*, 464 U.S. 1040 (1984)); *see Wilcox*, 2019 WL 132281 at *8; *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1097 (9th Cir. 2004) (same); *Colonial Parking*, 243 F.Supp.3d at 185.  Where a complaint—like Plaintiffs' First Amended Complaint—lacks allegations regarding a fiduciary's process, the complaint must be dismissed unless the court can infer from the pleaded allegations that "a prudent fiduciary in like circumstances would have selected a different fund."  *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018) (quotations omitted); *see also St. Vincent*, 712 F.3d at 718–19.

The relevant inquiry at this stage focuses on the information available to the fiduciary *at the time of the relevant investment decisions*.  *See Wilson*, 994 F.3d at 1091–92. (citing *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) (prudence inquiry is tethered to "circumstances . . . prevailing at the time of the fiduciary acts" (citing 29 U.S.C. § 1104(a)(1)(B))).  Accordingly, "[w]hether a fiduciary's actions are prudent cannot be measured in hindsight."  *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009).  Instead, analyzing a fiduciary's compliance with ERISA requires an evaluation of the facts in existence when the investment was made, rather than a look at the subsequent performance of the investment.  In

other words, ERISA requires fiduciaries to act with "prudence, not prescience."  *St. Vincent*, 712

F.3d at 716; *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir.

1990) (same).

In their First Amended Complaint, Plaintiffs failed to allege facts that establish that a

fiduciary using a proper monitoring and selection process would not have selected and retained

the Focus Funds.  Plaintiffs do not allege a single warning sign about the Focus Funds prior to

their selection in 2016 that would have alerted 401(k) plans nationwide that the Focus Funds

were purportedly not a prudent investment.  What few conclusory statements Plaintiffs do

include lack any specificity—they simply argue that the Focus Funds were imprudent

investments by attempting to portray the Focus Funds as  "obscure" and "narrowly accepted."

FAC ¶¶ 168–70.  According to Plaintiffs, because the Focus Funds were allegedly unknown,

Defendants should have "adjusted their due diligence processes (if any) accordingly, and

exercised caution in choosing to add" the Focus Funds.  *Id.* ¶ 170.  However, Plaintiffs

themselves acknowledge why there was less publicly available information about the Focus

Funds because the Focus Funds are collective investment trusts ("CITs")[10] for which "[p]ublic

information is not as readily available."  *Id.* ¶ 126 n.42.  Though less information is publicly

available, they also generally present a less expensive investment option than mutual funds

"because they have lower marketing, overhead and compliance costs."  *Falberg v. Goldman*

*Sachs, Grp., Inc.*, No. 19-Civ. 9910, 2020 WL 3893285, at *2 n.5 (S.D.N.Y. July 9, 2020).  As

such, the purported lack of readily-accessible public information about the Focus Funds (or CITs

in general) should not give rise to a claim that they were imprudent investments.

---

[10] Collective investment trusts are pooled investment vehicles administered by bank or trust companies that "assemble a mix of assets such as stocks, bond and cash."  *In re M&T Bank Corp. ERISA Litig.*, No. 16-CV-375, 2018 WL 4334807, at *8 n.11 (W.D.N.Y. Sept. 11, 2018).

To support their claims that the Focus Funds were too obscure to be a prudent selection in late 2016, Plaintiffs resort to hindsight observations of the number of companies that held the Focus Funds in their retirement plans *in 2019*—over two years after the Funds were added to the Plan.  *Id.* ¶ 169.  Information from 2016 when the Focus Funds were selected tells a different story.  Indeed, weighing decidedly against an inference of imprudence, the 2016 Form 5500 filings for the Focus Funds show that, under the prevailing circumstances at the time, the fiduciaries of over 28 other ERISA-covered plans—including other large, reputable organizations like Walgreens, Allstate and Sprint—had chosen to invest in the Focus Funds.  *See, e.g.,* Prame Decl., Ex. C, Form 5500 for the Northern Trust Focus 2025 Fund at 7–9 (listing plans that offered the 2025 Focus Fund); *see also Sacerdote*, 328 F.Supp.3d at 312 (finding allegations of imprudence insufficient and stating that "[i]t is notable that [a challenged investment option] is also widely accepted as an appropriate and desirable investment by other market participants").  Thus, Plaintiffs cannot plausibly establish imprudence at the time the Focus Funds were selected for inclusion in the Plan's investment lineup.  *See Meiners*, 898 F.3d at 823 (holding that plaintiff's complaint lacked "sufficient factual, accepted as true," to demonstrate that challenged funds "were an imprudent choice").

Having failed to identify any facts in existence in 2016 to support a theory the Focus Funds were not prudent investments when they were selected, Plaintiffs' claims related to the selection of the Focus Funds are plainly deficient and should be dismissed.

> ii. *Plaintiffs Fail To Allege Facts That Establish A Plausible Breach Of Prudence Claim.*

Rather than point to any red flags about the Focus Funds that existed at the end of 2016, Plaintiffs' First Amended Complaint doubles down on hindsight comparisons to other target date funds.  As made clear in previous briefing, the Plan's target date funds actually outperformed

Plaintiffs' cherry-picked alternative funds in the prior versions of the Complaint. Perhaps realizing the futility of those inapt comparisons, Plaintiffs adjusted what they claim to be appropriate comparators for the Focus Funds in this version of their Complaint.

Of the over 180 target date funds to which Plaintiffs could compare, [11] Plaintiffs chose only three other target funds (managed by Vanguard, American Funds, and Fidelity) and three indices to assess the performance of each "vintage" of the Focus Funds. FAC ¶ 136(i)–(vi). Plaintiffs fail to explain why these specific funds best illustrate the Focus Funds' performance. Tellingly, Plaintiffs offer only conclusory statements regarding the appropriateness of using their comparator funds to assess the Focus Funds' performance. *Id.* Their failure to explain why the funds are comparable to the Focus Funds is alone sufficient to dismiss Plaintiffs' claims. *See Patterson v. Morgan Stanley*, No. 16-CV-6568 (RJS), 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019) (dismissing a claim based on conclusory allegations that a fund "did not perform as well as a supposedly comparable investment" that lacked "detail as to the extent of the investment's shortcomings or why the [] Fund is a comparable investment"); *Cho v. Prudential Ins. Co. of America*, No. 19-19886, 2021 WL 4438186, at *8–9 (D.N.J. Sept. 27, 2021) (finding that plaintiff failed to provide a meaningful benchmark by identifying "one cheaper fund sharing some alleged similarities with the challenged fund"); *Forman v. TriHealth, Inc.*, No. 1:10-cv-613, 2021 WL 4346764, at *7 (S.D. Ohio Sept. 24, 2021) (dismissing claims where plaintiffs identified several comparator funds but "offer[ed] no further information to permit the Court to conclude that the funds were, in fact similar enough to permit an 'apples-to-apples' comparison"); *Tobias v. NVIDIA Corp.*, 2021 WL 4148706, at *13 (N.D. Cal. Sept. 13, 2021)

---

[11] *See* FAC ¶ 136 n.49 (citing Morningstar's summary of the Northern Trust Focus 2045 Fund, filed in *Allegretti v. Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 43 ECF pg. 28 (N.D. Ill. Dec. 6, 2019) (listing 181 target date funds in Morningstar's category)).

("[S]imply labeling funds as 'comparable' or 'materially similar is insufficient to establish that those funds are meaningful benchmarks against which to compare the performance of the challenged funds").

Plaintiffs' efforts to measure the Focus Funds' performance against irrelevant indices also is insufficient to state a claim. *See Meiners* 898 F.3d at 823; *Anderson*, 2021 WL 229235 at *9. Plaintiffs point to the Focus Funds' performance compared to three market indices (Morningstar LifeTime Moderate Index, S&P Target Date Index, and Dow Jones U.S. Target Index),[12] but indices are not investments. *See* FAC ¶ 136(iv)–(vi) (referring to each of the three indices as a "benchmark"). As with the comparator funds, Plaintiffs offer no explanation why those indices are appropriate points of comparison for the Focus Funds.

Plaintiffs also assert that "[t]he underperformance of the Focus Funds was public knowledge." FAC ¶ 166. This contention is in direct tension with Plaintiffs' statement that "[p]ublic information is not as readily available" for CITs like the Focus Funds. *Id.* ¶ 126 n.42. Nevertheless, Plaintiffs contend that "Defendants had access to the performance history of relevant comparator funds and indexes" and "the views of fund analysis organizations like Morningstar." *Id.* ¶ 166. Plaintiffs do not explain how these resources would have led the Committee to conclude that the Focus Funds were imprudent investments in 2016. In fact, an examination of the performance information available in 2016, as alleged by Plaintiffs, shows that the Focus Funds were adequately performing and tracking their benchmark when they were selected for inclusion in the Plan's investment lineup. *Id.* ¶¶ 139–47, Tables 1–9 (showing the Focus Funds' performance from 2014 to 2016).

---

[12] Plaintiffs, without explanation, abandoned their comparisons of the Focus Funds to the MSCI ACWI IMI Index. *Compare* Consolidated Complaint ¶127 *with* FAC ¶ 136.

Even taking into consideration Plaintiffs' adjusted line-up of comparator funds, the Plan's target date funds outperformed these alternatives under certain market conditions.[13]  And even assuming, *arguendo*, Defendants would have been able to predict the Focus Funds' future performance at the time of selection in 2016, it is not "necessarily sufficient to show that better investment opportunities were available at the time of the relevant decisions."  *St. Vincent*, 712 F.3d at 718.  A "fiduciary is not required to select the best performing fund" but instead must "discharge their duties with care, skill prudence, and diligence *under the circumstances then prevailing*" when making decisions.  *Wilcox*, 2019 WL 132281 at *11 (quoting *Meiners*, 898 F.3d at 823) (emphasis added).  Therefore, Plaintiffs' allegations regarding investment performance are precisely the type of hindsight second-guessing that courts routinely dismiss as insufficient to state a claim.  *See, e.g., Patterson*, 2019 WL 4934834 at *11 (dismissing underperformance allegations as improperly hindsight-based and noting that "[d]ata compiled [during the year the complaint was filed] would not have been known to the fiduciaries earlier in the class period"); *Wehner v. Genentech, Inc.*, No. 20-cv-06894, 2021 WL 507599, at *9 (N.D. Cal. Feb. 9, 2021) (dismissing plaintiff's "hindsight assessment" of "underperformance . . . based on annual returns over three- and five-year periods").

---

[13] *See*, *e.g.*, FAC ¶ 139 (Table 1 showing the Northern Trust Focus 2015 Fund outperforming comparators in 2015, 2016, 2017, 2018 and 2019); *id.* ¶ 140 (Table 2 showing the Northern Trust Focus 2020 Fund outperforming comparators in 2015, 2017, 2018 and 2019); *id.* ¶ 141 (Table 3 showing the Northern Trust 2025 Fund outperforming comparators in 2015, 2017, 2018, 2019 and 2020); *id.* ¶ 142 (Table 4 showing the Northern Trust Focus 2030 Fund outperforming comparators in 2015, 2017, 2018, 2019, and 2020); *id.* ¶ 143 (Table 5 showing the Northern Trust Focus 2035 Fund outperforming comparators in 2015, 2016, 2017, 2018, and 2019); *id.* ¶ 144 (Table 6 showing the Northern Trust Focus 2040 Fund outperforming comparators in 2016, 2017, 2018 and 2019); *id.* at ¶ 145 (Table 7 showing the Northern Trust Focus 2045 Fund outperforming comparators in 2016, 2017, and 2018); *id.* at ¶ 146  (Table 8 showing the Northern Trust Focus 2050 Fund outperforming comparators in 2016, 2017, and 2018); *id.* ¶ 147 (Table 9 showing the  Northern Trust Focus 2055 Fund outperforming comparators in 2015, 2016, 2017, and 2018).

Finally, in the previous versions of their Complaint, Plaintiffs failed to address the cost of the Focus Funds. Confronted with a need to do so, in their First Amended Complaint, Plaintiffs attempt a type of sleight of hand that misleads the Court as to the true cost of the Focus Funds. The Focus Funds were very low cost, with an asset-based investment management fee of just 7 basis points (0.07%). Plaintiffs attempt to obscure this low cost by adding the 15 basis point R&A Fee and, thereafter, claiming that the Focus Funds had a 0.22% expense ratio, instead of a .07% expense ratio. FAC ¶ 153. Then, when Plaintiffs compare the Focus Fund to their alternatives, Plaintiffs conveniently fail to add the 15 basis point R&A Fee to the comparator funds' expense ratios. *Id.* In doing so, Plaintiffs attempt to deceive the Court into believing that "the Focus funds were not materially less expensive than the Comparator Funds." *Id.* In reality, Plaintiffs' First Amended Complaint proves the Focus Funds' fees were lower than the investment management fees charged by Plaintiffs' alternatives.

While Plaintiffs have made clear that they do not agree with the Plan fiduciaries' decisions, Plaintiffs have not alleged a basis for plausibly concluding that the selection of the Focus Funds exceeded the range of discretion afforded by ERISA to fiduciaries charged with "balancing . . . competing interests under conditions of uncertainty." *Armstrong v. Lasalle Bank Nat. Ass'n*, 446 F.3d 728, 733 (7th Cir. 2006); *see also Ganton Techs v. Nat'l Indus Grp. Pension Plan,* 76 F.3d 462, 468 (2d Cir. 1996) ("[T]rustees maintain the broad discretion to act in the best interest of all participants."); *Birse*, 2020 WL 1062902 at *3–4 (granting summary judgment to defendants because the fiduciary, in selecting an investment option that would "protect against downside risk," "analyzed the purpose the Fund would serve, how it would accomplish that purpose, and the Fund's strategic place within the overall portfolio of the Plan"). Plaintiffs allege no facts establishing that, in 2016, a prudent fiduciary could not have reasonably

decided to use the Focus Funds.  Accordingly, Plaintiffs have failed to allege a plausible claim that the selection of the Focus Funds' investment was imprudent, and therefore that claim should be dismissed.

> **B.**      **Plaintiffs Fail To Plead Facts Supporting A Claim That, After 2017, Defendants Were Imprudent In Monitoring And Retaining The Focus Funds.**

Plaintiffs also suggest that the Court can infer imprudence from the Plan's retention of the Focus Funds.  FAC ¶ 176.  The First Amended Complaint asserts that because the Focus Funds' performance trailed behind Plaintiffs' handpicked alternatives in certain years, the Court should infer that the Committee failed to employ a prudent process to monitor and replace the Focus Funds.  *Id.* ¶¶ 176–77.

> *i.      Defendants did not act imprudently by retaining the Focus Funds.*

For the same reasons that Plaintiffs' claims regarding the initial selection of the Focus Funds are inadequate, Plaintiffs' hindsight-based claims regarding the retention of the Focus Funds after 2017 are similarly insufficient to state a claim for breach of fiduciary duty.  As discussed above, Plaintiffs' claims rest on the Focus Funds' alleged performance relative to comparator funds' aggregate yearly returns.  *See* FAC ¶¶ 139–47.  These annual comparisons prove nothing because each target date fund sets its own allocations of assets based on its investment strategy.  *See* "Target Date Retirement Funds—Tips for ERISA Plan Fiduciaries," U.S. Dep't of Labor, at 1*; see also supra* at 25–28 (discussing inadequacy of hindsight-based allegations); *see also Patterson*, 2019 WL 4934834 at *10 (noting that "average annual returns" and allegations regarding "cumulative performance" were "unavailable to fiduciaries" during the relevant period, and therefore insufficient to state a claim); *St. Vincent*, 712 F.3d at 716 ("We

judge a fiduciary's actions based on information available to the fiduciary at the time of each investment decision, and not from the vantage point of hindsight.").

Moreover, even as the annual returns alleged in the First Amended Complaint demonstrate, the Focus Funds delivered billions of dollars in *positive* investment returns over the relevant period. This is not a case where the investment options at issue had significant negative returns or where the participants lost the principal amount of their investments. To the contrary, the investment performance of the Focus Funds frequently exceeded the performance of Plaintiffs' own comparators in certain market conditions. *See supra* at 28 n.13 (discussing that Plaintiffs' allegations, FAC ¶¶ 139–47, show that the Focus Funds outperformed Plaintiffs' alleged comparators during several years).

Plaintiffs' prudence claims also fail because Plaintiffs' First Amended Complaint does not identify a specific point in time during the class period that the Focus Funds purportedly became an imprudent investment. Plaintiffs merely suggest that at some undetermined point in time after adding the Focus Funds to the investment line up in 2017, the Funds became imprudent and should have been removed from the Plan. At most, Plaintiffs point to MorningStar's reports about the Focus Funds' performance in 2019 and 2020 lagging behind other funds MorningStar groups together in the same category. FAC ¶ 150 n.123, ¶ 151 n.124. Plaintiffs also rely on tables created for the Focus Funds' 2018 and 2019 performance based on 1- and 5-year annual average returns. FAC ¶¶ 155–56. Even accepting Plaintiffs' allegations about the Funds' performance as true, two years of alleged underperformance is not a justified reason to remove a fund from a plan. Indeed, courts agree that allegations of short-term underperformance do not support a breach of the duty of prudence. Rather, "a fiduciary may— and often does—retain investments through a period of underperformance as part of a long-range

investment strategy."  *White I*, 2016 WL 4502808 at *17 (defendant did not breach fiduciary duties by retaining the same mutual funds in 401(k) plan lineup even though those funds lost money over a three-year period as it can be reasonable to "stay with . . . mutual funds even during years of lower performance") (citing *Jenkins*, 444 F.3d at 926); *see also Wehner*, 2021 WL 507599 at *9 ("There is nothing presumptively imprudent about a retirement plan retaining investments 'through periods of underperformance as part of a long-range investment strategy.'") (citing *White v. Chevron Corp.*, No. 16-cv-0793, 2017 WL 2352137, at *20 (N.D. Cal. May 31, 2017)), *aff'd*, 752 F. App'x 453 (9th Cir. 2018) ("*White II*")); *Wildman v. Am. Century Servs., LLC*, 362 F.Supp.3d 685, 707 (W.D. Mo. 2019) (holding that fiduciary did not breach duty of prudence where fiduciary "was hesitant to remove a fund simply because it had not performed well in the short term") (citing *White I*, 2016 WL 4502808 at *17); *Dorman v. Charles Schwab Corp.*, 2019 WL 580785, at *6 (N.D. Cal. Feb. 8, 2019) (stating that three to five years is a "considered relatively short period[] of underperformance").

Similarly, allegations that the Focus Funds did not track their benchmarks *exactly* is patently insufficient to state a claim.  *See Patterson*, 2019 WL 4934834 at *10 (holding that while some courts recognize "that allegations of consistent, ten-year underperformance may support a duty of prudence claim," the underperformance must be substantial, and underperformance "of less than one percentage point is certainly insubstantial" and insufficient to state a claim); *see also Meiners*, 898 F.3d at 823; *St. Vincent*, 712 F.3d at 716; *Wilcox*, 2019 WL 132281 at *11.

ii.   *Plaintiffs' First Amended Complaint Establishes that Defendants Had a Sufficient Process for Monitoring the Focus Funds.*

Undermining Plaintiffs' theory that Defendants did not follow an appropriate process to monitor the Plan's investments, Plaintiffs concede in the First Amended Complaint that

Defendants in fact implemented a process for monitoring the Focus Funds. Specifically, Plaintiffs admit that "Defendants established their own internal benchmark for each of the Focus Funds," showing that the Plan's fiduciaries chose a monitoring standard in compliance with their duties under ERISA. FAC ¶¶ 154, 159. And, after regularly monitoring and reviewing the Plan's investment lineup in light of those standards, the Plan's investment options were modified in 2021, which including replacement of the Focus Funds. *See* Prame Decl., Ex. L, 2021 Annual Fee Disclosure, at 4–5.

Having conceded that Defendants developed and used an internal benchmark to monitor the Focus Funds' performance, Plaintiffs resort to attacks against the benchmark itself. Plaintiffs allege that Defendants' internal benchmark is not appropriate and instead Defendants were required under a Department of Labor regulation to use a "broad-based securities market index" as a benchmark. FAC ¶ 160–61, citing 29 C.F.R. § 2550.404a-5. The regulation cited by Plaintiffs has no bearing whatsoever on what a plan fiduciary uses as a benchmark for the purposes of evaluating the prudence of an investment option. The DOL regulation instead address what types of information need to be provided to participants in 401(k) plans, and, in that regard, the DOL decided that that broad market indices could be of use to participants because they are readily accessible, "recognizable" and "understandable" to an average participant. *See Preamble*, 75 Fed. Reg. 64,916 (Oct. 20, 2010). The regulation does not require plan fiduciaries to use such market indices as benchmarks in making investment decisions and the regulation otherwise has no bearing on the process fiduciaries are to follow in monitoring investments.[14]

---

[14] An internal, composite benchmark can better reflect a fund's investment strategy. As such, it can provide plan fiduciaries with a better estimation of the Funds' actual performance compared to anticipated experience. *See Wehner*, 2021 WL 2417098 at *7 (disregarding plaintiff's attacks on defendant's use of custom benchmarks).

In addition to using an internal benchmark and making decisions based on that benchmark, the broader array of investment options available to Plan participants underscores that the Defendants managed the Plan in compliance with ERISA.  The variety of options Defendants made available indicate that, rather than abdicating their duties, the Committee actively monitored and, at times, changed the Plan's investment line-up.  In addition to the Focus Funds, the Plan offered six other investment options with low expense ratios of 1 bps (0.01%) to 45 bps (0.45%), which regularly outperformed their selected benchmarks.[15]  The Plan's other investment options, and access to a brokerage window, offered participants many avenues for investing their Plan accounts, not only in terms of fee variability but also in terms of asset class, risk profile, and investment goals, which supports the conclusion that the fiduciaries had complied with their duties under ERISA.[16]  *See Hecker v. Deere & Co*., 556 F.3d 575, 586 (7th Cir. 2009) (dismissing prudence claims where facts supported conclusion that fiduciaries included a "sufficient mix of investments" in plan); *White I*, 2016 WL 4502808 at *11 (dismissing prudence claims where "Plan fiduciaries provided a diverse mix of investment options and expense ratios for participants"); *see also Loomis v. Exelon Corp*., 658 F.3d 667, 672–74 (7th Cir. 2011) (same); *Martin v. CareerBuilder, LLC*, No. 19-CV-6463, 2020 WL 3578022, at *6 (N.D. Ill. July 1, 2020) (same).

---

[15] *See, e.g.,* Prame Decl., Ex. G, 2017 Annual Fee Disclosure, at 5.  As noted in the Disclosures and discussed previously, *supra* at 16, a 15 basis point fee (0.15%) was added to the expense ratio of each investment so that the Plan participant paid his or her portion of the recordkeeping and other administrative fees.

[16] Prame Decl., Ex. G, 2017 Annual Fee Disclosure, at 5 (showing that the Plan offered a stable value fund, a fixed income index fund, a real return fund, a U.S. equity large cap index fund, a U.S. equity mid/small cap index fund, and an international equity index fund).

Because Plaintiffs have failed to plead any facts supporting an inference that the Committee breached its fiduciary duty of prudence after the Focus Funded were added to the Plan, their claims regarding the retention of the Focus Funds should be dismissed.

## IV.   Plaintiffs' Claims Regarding Failure to Monitor Fiduciaries Fail.

Plaintiffs also allege that Defendants breached their duty to monitor the Plan's fiduciaries.  FAC ¶¶ 199–206, 218–25.  As an initial matter, Plaintiffs' duty to monitor claims fail because they have not alleged a plausible claim for an underlying breach of fiduciary duty. "A failure to monitor claim is derivative in nature and is premised on an earlier breach of a fiduciary duty." *Scalia v. WPN Corp.*, 417 F.Supp.3d 658, 669 (W.D. Pa. 2019).  "Where a claim is predicated on the existence of an underlying breach of fiduciary duty, the claims rise and fall together." *Russell v. Harman Intern. Indus., Inc.*, 945 F.Supp.2d 68, 72 n.2 (D.D.C. 2013). Accordingly, because Plaintiffs' breach of fiduciary duty claims fail, their duty to monitor claims fail as well. *See supra* at 15–34.

Second, even if Plaintiffs had sufficiently alleged an underlying breach of fiduciary duty, Plaintiffs' monitoring claim is illogical.  Counts II and IV of the First Amended Complaint name both the Red Cross and the Committee.  FAC ¶¶ 199–206, 218–25.  Specifically, Plaintiffs allege that "[e]ach Benefit Plan Committee member likewise had a duty to monitor the performance of each other member of the Benefit Plan Committee and had a responsibility to monitor each individual to whom it delegated any fiduciary responsibility." *Id.* ¶¶ 201, 220.  The Committee, however, cannot monitor itself.  Further, the Individual Committee Members are not fiduciaries and, therefore, cannot have a duty to monitor. *See supra* at 13–15.

Third, Plaintiffs' duty to monitor allegations lack factual support and are entirely conclusory.  Plaintiffs state only that Defendants failed to "monitor their appointees, to evaluate

their performance, or to have a system in place for doing so," "monitor their appointees'

fiduciary process," "ensure that the monitored fiduciaries considered the availability of

alternative recordkeeping and administrative service providers" or "better performing target date

funds," and "remove appointees whose performance was inadequate."  FAC ¶¶ 204, 224.

Plaintiffs fail to allege any facts about what the Defendants' monitoring processes were, let alone

why they were deficient or what monitoring procedures should have been in place.  *See Harmon*

*v. FMC Corp.*, No. 16-6073, 2018 WL 1366621, at *5 (E.D. Pa. Mar. 16, 2018) (holding that a

complaint "falls short" because "[i]t offers no direct allegations of flaws in Defendants'

process"); *Romero v. Nokia, Inc.*, No. 12-cv-6260, 2013 WL 5692324, at *5 (N.D. Cal. Oct. 15,

2013) (dismissing duty to monitor claim where plaintiff did not "present any specific facts

regarding the monitoring process or how it was deficient"); *In re Nokia ERISA Litig.*, No. 10-cv-

3306, 2011 WL 7310321, at *5 (S.D.N.Y. Sept. 6, 2011), *aff'd*, *Majad ex rel. Nokia Ret. Sav.*

*and Inv. Plan v. Nokia, Inc.*, 528 Fed. App'x 52 (2d Cir. 2013) (dismissing duty to monitor claim

where the complaint did not "allege any specific factual basis to support Plaintiffs' conclusory

allegation of a lack of legally sufficient monitoring by Defendants").  Therefore, Plaintiffs' duty

to monitor claims in Counts II and IV should be dismissed.

## V.     Plaintiffs Lack Article III Standing.

It is axiomatic that "[t]o satisfy the Article III case or controversy requirement, a litigant

must have suffered some actual injury that can be redressed by a favorable judicial decision."

*Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983).  In particular, Plaintiffs must allege

that they "*personally suffered a concrete and particularized injury* in connection with the

conduct about which [they] complain[]." *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018)

(emphasis added) (internal quotation marks and alterations omitted); *Wilcox*, 2019 WL 132281 at

*8 ("Thus for either Plaintiff to have standing to sue about their defined contribution Plan, he must show fiduciary breaches that impair his individual account's value.").

Plaintiffs have suffered no personal injury with respect to five of the Focus Funds challenged in the First Amended Complaint—the 2030, 2035, 2040, 2050, and 2060 Focus Funds—because no Plaintiff invested in any those Focus Funds.[17]  Plaintiffs therefore lack Article III standing with respect to those five funds.  *See Johnson v. Delta Air Lines, Inc*., No. 1:17-CV- 2608-TCB, 2017 WL 10378320, at *2 (N.D. Ga. Dec. 12, 2017) (holding that "Plaintiffs do not have standing" where they "have not alleged that they were invested in the criticized funds"); *Patterson*, 2019 WL 4934834 at *4–7 (agreeing with defendants' argument that "Plaintiffs lack standing to bring claims related to the seven funds in which they did not invest"); *Brown-Davis v. Walgreen Co.*, No. 1:19-CV-05392, 2020 WL 8921399, at *3 (N.D. Ill. Mar. 16, 2020) (holding that plaintiffs who had not invested in two of the funds they challenged "have [] not suffered any individualized harm as to these funds").  Thus, any claims related to the 2030, 2035, 2040, 2050, and 2060 Focus Funds Focus Funds should be dismissed.

## CONCLUSION

For the foregoing reasons, the First Amended Complaint should be dismissed in its entirety, with prejudice.

Dated:   November 4, 2021                              Respectfully submitted,

                                                   */s/ Michael J. Prame*_____
                                                 Michael J. Prame (DC Bar No. 451017)

---

[17] Prame Decl., Ex. M at 1–4 (account statement of Plaintiff Bagenstose showing investment in only the 2020 and 2025 Focus Funds); 5–6 (account statements of Plaintiff Juarbe showing investment in only the 2025 Focus Fund); 7–13 (account statements of Plaintiff Moxley, showing investment in only the 2055 Focus Fund); 14–21 (account statements of Plaintiff Richard showing investment in only the 2045 Focus Fund); 22–23 (account statements of Plaintiff Scaramuzzo showing investment in no Focus Funds); 25–29 (account statements of Plaintiff Tracy showing investment in no Focus Funds).

William J. Delany (DC Bar No. 1021954)
Elizabeth L. Woods (DC Bar No. 230453)
Rachael Hancock (admitted *pro hac vice*)
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006-5811
Tel: (202) 857-0620
E-mail: mprame@groom.com
      wdelany@groom.com
      ewoods@groom.com
      rhancock@groom.com

*Counsel for Defendants The American National Red Cross, The Benefit Plan Committee of the American Red Cross, and Individual Committee Members*

## CERTIFICATE OF SERVICE

I certify that on November 4, 2021, I filed in this action the foregoing **DEFENDANTS'**
**MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS FIRST**
**AMENDED COMPLAINT** electronically via the Court's ECF System.  Notice of this filing
will be sent in this action by operation of the Court's electronic system to all counsel of record in
the ECF System.

Respectfully Submitted,

*/s/ Michael J. Prame*_____
Michael J. Prame (DC Bar No. 451017)
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Ave., N.W.
Washington, D.C. 20006
202-861-0620 (phone)
202-659-4503 (fax)
mprame@groom.com