**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: THE AMERICAN NATIONAL RED CROSS ERISA LITIGATION | Civil Action |
| | Master File No. 1:21-cv-00541-EGS |
| This Document Relates To: All Actions | Class Action |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.  INTRODUCTION ....................................................................................................1

II.  LEGAL STANDARDS ...........................................................................................4

III.  STATEMENT OF FACTS ......................................................................................5

    A.  Overview of the Plan...................................................................................5

    B.  The Totality of the Circumstances Demonstrates that the Plan's
       Fiduciaries Failed to Administer the Plan in a Prudent Manner.....................6

        1.  Defendants Breached Their Fiduciary Duty to Minimize
           Recordkeeping and Administrative Expenses ...................................6

        2.  Defendants Breached Their Fiduciary Duties by Selecting
           and Retaining the Suite of Chronically Underperforming
           Focus Funds ....................................................................................8

IV.  ARGUMENT...........................................................................................................9

    A.  Plaintiffs Adequately Allege That the Red Cross and Individual
       Committee Members Functioned as Fiduciaries...............................................9

        1.  The Red Cross is a Fiduciary for ERISA Purposes .............................9

        2.  The Individual Committee Members are Fiduciaries for
           ERISA Purposes...................................................................................11

    B.  Plaintiffs State a Claim Regarding Unreasonably High
       Recordkeeping Fees .......................................................................................13

        1.  Claims of High Recordkeeping Fees are Routinely Upheld
           at the Pleading Stage and Allowed to Proceed to Discovery................13

        2.  The Complaint Contains Numerous Facts Illustrating that
           the Plan's Recordkeeping Fees Were Excessive ...................................14

    C.  Plaintiffs State a Claim Regarding the Underperforming Focus Funds............19

        1.  Plaintiffs Selected Appropriate Comparators to Illustrate the
           Focus Funds' Underperformance..........................................................19

i

i.   A Reasonable Basis Exists for Selecting Each
Comparator, and Courts in Other Focus Fund Cases
Have Accepted Four of Them as Comparators ......................... 20

ii.   The Issue of Whether a Comparator is an Apt Selection
is Not Suited for Resolution on a Motion to Dismiss ............... 23

iii.  Courts Commonly Accept the Use of "Indices" as
Comparators to Illustrate an Investment Fund's
Underperformance ...................................................................... 24

2.   Plaintiffs Adequately Allege Defendants' Imprudence in
Selecting the Focus Funds in 2017 ....................................................... 25

i.   Defendants Ignored Red Flags Available to Them in 2017 ........ 25

ii.   Plaintiffs Need Not Plead Details of Defendants'
Deficient Internal Processes Prior to Discovery ....................... 27

3.   Plaintiffs Adequately Allege Defendants' Imprudence in
Retaining the Focus Funds in the Plan after 2017 ................................ 28

i.   Additional Red Flags Were Available to Defendants
After They Added the Focus Funds to the Plan ......................... 28

ii.   The Isolated Instances in Which a Focus Fund Tranche
Outperformed a Given Comparator in a Given Year Do
Not Negate the Overall Trend of Underperformance ................ 32

iii.  The Low Cost of the Focus Funds Does Not Justify or
Offset Their Underperformance .................................................. 32

D.   Plaintiffs Adequately State Claims for Failure to Monitor Co-Fiduciaries ...... 35

E.   The Named Plaintiffs Have Standing Regarding All Focus Fund
Tranches in the Plan, Not Just Those in Which They Invested ........................ 37

V.   CONCLUSION ................................................................................................. 39

# TABLE OF AUTHORITIES

**Cases**

*Alas v. AT&T*,
  No. 17-cv-08106, 2019 WL 1744847 (C.D. Cal. Feb. 25, 2019) ............................................. 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................................. 4

*In re Biogen, Inc. ERISA Litig*.,
  No. 20-cv-11325, 2021 WL 3116331 (D. Mass. July 22, 2021) ............................................ 26

*Blackmon v. Zachary Holdings, Inc*.,
  No. 15-cv-00988, 2021 WL 2190907 (W.D. Tex. Apr. 22, 2021) .......................................... 17

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) .................................................................................................... 5

*Brotherston v. Putnam Invs., LLC*,
  907 F.3d 17 (1st Cir. 2018) .............................................................................................. 20, 25

*Brown-Davis v. Walgreen Co.*,
  No. 19-cv-05392, 2020 WL 8921399 (N.D. Ill. Mar. 16, 2020) ....................................... *passim*

*Chao v. Trust Fund Advisors*,
  No. 02-cv-00559, 2004 WL 444029 (D.D.C. Jan. 20, 2004) ................................................. 2, 5

*Chesemore v. Alliance Holdings, Inc*.,
  886 F. Supp. 2d 1007 (W.D. Wis. 2012) ................................................................................ 30

*Clark v. Duke Univ*.,
  No. 16-cv-01044, 2018 WL 1801946 (M.D.N.C. Apr. 13, 2018) .......................................... 38

*Cryer v. Franklin Templeton Resources, Inc*.,
  No. 16-cv-04265, 2017 WL 4023149 (N.D. Cal. July 26, 2017) ........................................... 38

*Cunningham v. Cornell Univ*.,
  No. 16-cv-06525, 2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) ...................................... 11, 24

*Cutrone v. The Allstate Corp*.,
  No. 20-cv-06463, 2021 WL 4439415 (N.D. Ill. Sept. 28, 2021) ...................................... *passim*

*Davis v. Magna Int'l of Am., Inc.*,
  No. 20-cv-11060, 2021 WL 1212579 (E.D. Mich. March 31, 2021) ................................. 13, 17

*Dearing v. IQIVIA, Inc.*,
 No. 20-cv-00574, 2021 WL 4291171 (M.D.N.C. Sept. 21, 2021)............................................ 36

*Donovan v. Bierwirth*,
 680 F.2d 263 (2d Cir. 1982) .................................................................................................. 2

*Falberg v. Goldman Sachs Grp., Inc.*,
 No. 19-cv-09910, 2020 WL 3893285 (S.D.N.Y. July 9, 2020) ................................................ 38

*George v. Kraft Foods Global, Inc.*,
 641 F.3d 786 (7th Cir. 2011).................................................................................................. 16

*Henderson v. Emory Univ.*,
 252 F. Supp. 3d 1344 (N.D. Ga. 2017) .................................................................................. 24

*International Controls Corp. v. Vesco*,
 556 F.2d 665 (2d Cir.1977)..................................................................................................... 15

*Johnson v. Delta Air Lines, Inc.*,
 No. 17-cv-02608, 2017 WL 10378320 (N.D. Ga. Dec. 12 ...................................................... 39

*Johnson v. PNC Financial Servs. Group, Inc.*,
 No. 20-cv-01493, 2021 WL 3417843 (W.D. Pa. Aug. 3, 2021) .............................................. 18

*Jones v. Coca-Cola Consolidated, Inc.*,
 No. 20-cv-00654, 2021 WL 1226551 (W.D.N.C. March 31, 2021) ........................................ 36

*Karg v. Transamerica Corp.*,
 No. 18-cv-00134, 2019 WL 3938471 (N.D. Iowa Aug. 20, 2019) .................................... 27, 32

*Kendall v. Pharm. Prod. Dev., LLC*,
 No. 20-cv-00071, 2021 WL 1231415 (E.D.N.C. Mar. 31, 2021) ............................................ 36

*Krueger v. Ameriprise Financial, Inc.*,
 No. 11-cv-02781, 2012 WL 5873825 (D. Minn. Nov. 20, 2020) ............................................ 17

*Kruger v. Novant Health, Inc.*,
 131 F. Supp. 3d 470 (M.D.N.C. 2015)......................................................................... 14, 17, 36

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
 323 F.R.D. 145 (S.D.N.Y. 2017) ............................................................................................ 38

*McCool v. AHS Mgmt. Co., Inc.*,
 No. 19-cv-01158, 2021 WL 826756 (M.D. Tenn. Mar. 4, 2021) ....................................... 13, 36

*McDonald v. Jones,*
   No. 16-cv-01346, 2017 WL 372101 (E.D. Mo. Jan. 26, 2017) .......................................... 37-38

*McGowan v. Barnabas Health, Inc.,*
   No. 20-cv-13119, 2021 WL 1399870 (D.N.J. Apr. 13, 2021) ................................................. 37

*Medina v. Catholic Health Initiatives,*
   No. 13-cv-01249, 2014 WL 4852272 (D. Colo. Sept. 30, 2014)............................................ 12

*In re Medstar ERISA Litig.,*
   No. 20-cv-01984, 2021 WL 391701 (D. Md. Feb. 4, 2021) ................................................... 36

*Miller v. AutoZone, Inc.,*
   No. 19-cv-02779, 2020 WL 6479564 (W.D. Tenn. Sept. 18, 2020)................................... 13, 26

*Munro v. Univ. of Southern Cal.,*
   No. 16-cv-06191, 2019 WL 4543115 (C.D. Cal. Aug. 27, 2019)....................................... 13, 35

*Nicolas v. Trustees of Princeton Univ.,*
   No. 17-cv-03695, 2017 WL 4455897 (D.N.J. Sept. 25, 2017) ............................................... 24

*Parmer v. Land O'Lakes, Inc.,*
   518 F. Supp. 3d 1293 (D. Minn. 2021) ................................................................................. 13

*Patterson v. Morgan Stanley,*
   No. 16-cv-06568, 2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ............................................. 26

*Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.,*
   712 F.3d 705 (2d Cir. 2013)............................................................................................... 5, 8

*Peterson v. Ins. Servs. Off., Inc.,*
   No. 20-cv-13223, 2021 WL 1382168 (D.N.J. Apr. 13, 2021) ............................................... 16

*Rohan v. Saint Luke's Health System, Inc.,*
   No. 20-cv-00179, 2020 WL 8410451 (W.D. Mo. June 22, 2020) .......................................... 14

*Roman v. Nat'l Reconnaissance Office,*
   952 F. Supp. 2d 159 (D.D.C. 2013) ...................................................................................... 4

*Sacerdote v. New York Univ.,*
   No. 16-cv-06284, 2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017)...................................... 16, 24

*Sacerdote v. New York Univ.,*
   328 F. Supp. 3d 273 (S.D.N.Y. 2018).................................................................................. 31

*Sacerdote v. New York Univ.*,
   9 F.4th 95 (2d Cir. 2021) ........................................................................ 32

*Saunders v. Medical Faculty Assoc.*,
   No. 08-cv-02034, 2009 WL 10737104 (D.D.C. June 9, 2009) .................. 4

*Savage v. Sutherland Glob. Servs., Inc.*,
   521 F. Supp. 3d 308 (W.D.N.Y. 2021) .................................................. 10

*Sherrill v. Federal-Mogul Corp. Ret. Programs Comm.*,
   413 F. Supp. 2d 842 (E.D. Mich. 2006) ................................................ 12

*Short v. Brown Univ.*,
   320 F. Supp. 3d 363 (D.R.I. 2018) ................................................. 13, 23

*Sweda v. Univ. of Pennsylvania*,
   923 F.3d 320 (3d Cir. 2019) ............................................... 5, 13, 30

*Tibble v. Edison Int'l*,
   135 S. Ct. 1823 (2015) ..................................................... 5, 28

*Tracey v. Mass. Inst. of Tech.*,
   No. 16-cv-11620, 2017 WL 4478239 (D. Mass. Oct. 4, 2017) ............... 36

*Tussey v. ABB, Inc.*,
   No. 06-cv-04305, 2007 WL 4289694 (W.D. Mo. Dec. 3, 2007) ............. 38

*Vellali v. Yale Univ.*,
   308 F. Supp. 3d 673 (D. Conn. 2018) ................................... 19, 23, 25

*Wehner v. Genentech, Inc.*,
   No. 20-cv-06894, 2021 WL 2417098 (N.D. Cal. June 14, 2021) ...... 15, 27

*Wilcox v. Georgetown Univ.*,
   No. 18-cv-00422, 2019 WL 132281 (D.D.C. Jan. 8, 2019) ................... 19

*Young v. GM Inv. Mgmt.*,
   *Grp.*, 325 F. App'x 31 (2d Cir. 2009) .................................... 18

**Statutes**

29 U.S.C. § 1002(21)(A) .......................................................... 9, 12

29 U.S.C. § 1104(a)(1) ................................................................ 30

29 U.S.C. § 1109(a) ..................................................................... 12

29 U.S.C § 1132(a)(2) ................................................................................................................. 38

**Regulations**

75 Fed. Reg. 64910-01 ............................................................................................................... 31

## I.      INTRODUCTION

This case arises from two distinct types of wrongdoing by Defendants. Both are actionable based on well-pled facts set forth in the First Amended Consolidated Class Action Complaint ("Complaint") (ECF No. 26) and a large body of case law addressing nearly identical ERISA claims in similar cases.

First, in violation of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), Defendants failed to reasonably control the recordkeeping fees imposed on the American Red Cross Savings Plan ("Plan") and passed on to all Plan participants. The Plan's fees were excessive relative to rates charged in comparable 401(k) plans offered by other plan sponsors with similar numbers of participants and similar levels of assets under management. The fees were also excessive based on a study of average recordkeeping fees and case law regarding reasonable rates for recordkeeping fees.

Second, in violation of their fiduciary duties under ERISA, Defendants engaged in the imprudent selection and retention of a suite of over $368 million in poorly performing target date investment funds called the Northern Trust Focus Funds ("Focus Funds"). The Focus Funds suffered from chronic underperformance relative to comparable target date funds and benchmark indexes, both before and after Defendants added them to the Plan's investment lineup in 2017. Given the material underperformance, a prudent fiduciary would not have added the Focus Funds to the Plan's lineup in 2017, or would have promptly removed them thereafter and replaced them with better-performing investment alternatives. The Focus Funds are the default investment selection for Red Cross employees who do not affirmatively select other investments for their 401(k) accounts. In other words, employees are automatically assigned to the Focus Funds unless they choose other investments from the Plan's lineup. The Plan has invested over $368 million in

Focus Funds, representing 30% of the Plan's $1.2 billion in assets under management.

Plan participants lost tens of millions of dollars in their investment accounts during the Class Period (March 2, 2015 to present) due to the excessive recordkeeping fees and underperforming Focus Funds. Those losses will continue to compound over time because the Plan's reduced asset base will forgo the benefit of compounded earnings.

The Plan is a "defined contribution" plan. Defined contribution plans have largely replaced the traditional "defined benefit" pension plans that were commonplace in the past. A key difference between the two types of plans is that in defined benefit plans, the employer's assets are at risk. The employer is responsible for funding the pension plan to satisfy pre-determined commitment amounts to employees, and the employer bears all investment risk. Conversely, in a defined contribution plan (like the Plan here), the employees bear all investment risk. They are not guaranteed a specific amount at retirement. They will receive the amount of their original contributions, plus or minus market gains and losses, and minus fees. Because employers do not bear the investment risk in defined contribution plans, they have less incentive to closely monitor fees and fund performance. Thus, ERISA fiduciary duty obligations have emerged as a critical tool to protect participants in 401(k) defined contribution plans.

ERISA imposes strict duties on retirement plan fiduciaries that are the "'highest known to the law.'" *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982); *Chao v. Trust Fund Advisors*, No. 02-cv-00559, 2004 WL 444029, at *2 (D.D.C. Jan. 20, 2004). As a remedial statute, ERISA is liberally construed in favor of plan participants. Against this backdrop, there is an extensive body of case law establishing ERISA's liberal pleading regime, which recognizes that ERISA plaintiffs rarely have access pre-suit to the internal details of the defendants' fiduciary processes.

Defendants' motion to dismiss ("Motion") (ECF No. 28) advances a host of arguments that courts have repeatedly rejected in similar cases. Most notably, two courts in ERISA class actions have addressed identical claims involving the underperforming Focus Funds. In both cases, the courts upheld the plan participants' allegations that the Focus Funds materially underperformed relative to comparators and that the defendants must face claims for breach of fiduciary duty in selecting and retaining the Focus Funds. *See Brown-Davis v. Walgreen Co.*, No. 19-cv-05392, 2020 WL 8921399, at *1 (N.D. Ill. Mar. 16, 2020) (denying motion to dismiss where the plaintiffs "rest their claims on the . . . poor performance of . . . [the] [Focus] Funds . . . relative to two benchmark indexes . . . and three comparator target date funds"); *Cutrone v. The Allstate Corp.*, No. 20-cv-06463, 2021 WL 4439415, at *3, 7-8 (N.D. Ill. Sept. 28, 2021) (denying motion to dismiss where the Focus Funds "underperformed compared to benchmark indexes and like target date funds"). No other Focus Fund cases have reached contrary decisions.[1]

Defendants' Motion is replete with narrow arguments that, at most, attempt to chip away at the margins of Plaintiffs' claims and do not provide a basis for dismissal of the Complaint. For example, Defendants' argument that certain defendants are not fiduciaries for ERISA purposes fails in light of provisions in Plan documents indicating they are fiduciaries and case law upholding similar allegations of fiduciary status at the pleading stage. Defendants' challenge to the claim for failure to monitor co-fiduciaries fails because that claim is derivative of the underlying breach of fiduciary duty claims and courts in ERISA cases routinely uphold failure to monitor claims where the underlying breach of fiduciary duty claims are upheld. Finally, contrary to Defendants' argument, plaintiffs who invested in the Focus Funds have standing to

---

[1] Two other Focus Fund cases are pending but have not yet reached decisions on the motions to dismiss. *See Ford v. Takeda Pharmaceuticals U.S.A., Inc.*, No. 21-cv-10090 (D. Ma.); *Conlon v. The Northern Trust Co. et al.*, No. 21-cv-02940 (N.D. Ill.).

pursue claims on behalf of holders of all tranches of the Focus Funds, not just the ones in which the plaintiffs invested. This standing conclusion was reached in *Allstate* and a long line of analogous cases.

Finally, Plaintiffs are cognizant that the Red Cross is a charitable organization pursuing a critical humanitarian mission. However, the Red Cross' employees, who are the lifeblood of furthering its mission, are entitled to protections under ERISA. This lawsuit aims to protect those employees' rights, not interfere with the Red Cross' important mission.

For these reasons and others discussed below, Defendants' motion to dismiss should be denied in its entirety.[2]

## II.    LEGAL STANDARDS

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "When evaluating a motion to dismiss for failure to state a claim, the Court must . . . draw all reasonable inferences in favor of the plaintiff." *Roman v. Nat'l Reconnaissance Office*, 952 F. Supp. 2d 159, 163 (D.D.C. 2013) (Sullivan, J.). When "determining whether to dismiss a claim under Rule 12(b)(6), 'the Court is able to only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters which the Court may take judicial notice.'" *Saunders v. Medical*

---

[2] The Court has not ruled on any prior versions of the Complaint. Contrary to Defendants' assertion in its Motion, Plaintiffs have not already had "four bites at the apple." (Defs.' Brf. at 1.) The first two Complaints in this matter were filed by separate plaintiffs and counsel teams before the cases were consolidated. The plaintiffs then filed a Consolidated Complaint to promote efficiency by consolidating those two actions. (ECF No. 20.) Defendants responded by filing a motion to dismiss. (ECF No. 23.) Plaintiffs then filed a First Amended Complaint (ECF No. 26) in lieu of an opposition to the motion to dismiss as encouraged by the Court's Standing Order (ECF No. 8 at § 8(a)). Defendants responded by filing the instant Motion. Thus, this Motion presents the Court with its first opportunity to evaluate the merits of the case.

*Faculty Assoc.*, No. 08-cv-02034, 2009 WL 10737104, at *1 (D.D.C. June 9, 2009) (citation omitted).

ERISA's duty of prudence applies to both the initial selection of an investment and the continuous monitoring of investments to remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828-29 (2015). "ERISA requires that employee benefit plans, and their beneficiaries, are entitled to maximum protection." *Chao v. Trust Advisors*, No. 02-cv-00559, 2004 WL 444029, at *1 (D.D.C. Jan. 20, 2004). In ERISA actions, plaintiffs "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009). Accordingly, plaintiffs may allege a breach of the fiduciary duty of prudence with circumstantial facts as Plaintiffs have done here. *See, e.g., Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.,* 712 F.3d 705, 718 (2d Cir. 2013).

Further, at the motion to dismiss stage, a "complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594; *see also Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 331 (3d Cir. 2019) ("we employ a holistic approach, considering all of [the plaintiff's] well-pleaded factual allegations including the . . . reasonableness of fees, selection and retention of investment options, and practices of similarly situated fiduciaries").

## III.   STATEMENT OF FACTS

### A.   Overview of the Plan

As of December 31, 2019 (the most recent year for which information was publicly available when the Complaint was filed), the Plan had over $1.2 billion in assets under management and 22,455 participants with account balances. (Compl. ¶ 43.)

B.      **The Totality of the Circumstances Demonstrates that the Plan's Fiduciaries Failed to Administer the Plan in a Prudent Manner**

Measured by several different metrics, Defendants breached the duties they owed to the Plan and its participants throughout the Class Period.

1.      **Defendants Breached Their Fiduciary Duty to Minimize Recordkeeping and Administrative Expenses**

Plan fiduciaries must consider the reasonableness of any expense ratio or administrative fee when selecting an investment option or administrative service provider. (Compl. ¶ 60.) Likewise, Plan fiduciaries must be continually mindful of the performance and cost of plan operations to avoid undue risk to plan participants' savings and to ensure that any fees paid are reasonable compensation for the services provided. *Id.* ¶ 65. Large institutional investors such as the Plan are able to command low pricing of third party services due to the size of their investments and plan membership. Large plans can receive low-cost administrative services with the same or similar levels of service as higher priced services due to economies of scale. *Id.* ¶ 63.

The market for recordkeeping services is highly competitive, particularly for a plan with a large number of participants and a high dollar amount of assets under management. *Id.* ¶ 73. Recordkeepers for larger defined contribution plans like the Plan experience certain economies of scale that lead to a reduction in the per-participant cost as the number of participants increases. *Id.* ¶ 76. As such, as a plan's number of participants increases, the plan's per-participant recordkeeping fees should decrease. *Id.* ¶¶ 77-78.

The most effective way to determine the true market price of recordkeeping and administrative ("R&A") services is to engage in a request for proposal ("RFP") process every several years to obtain and compare the plan's fees to those offered by comparable recordkeepers. *Id.* ¶¶ 80-82. At all times during the Class Period, Defendants knew they must regularly monitor

the Plan's recordkeeping and administrative fees and that they should regularly solicit

competitive bids from service providers to avoid paying unreasonably high R&A fees. *Id.* ¶ 87.

The Plan switched its recordkeeper in mid-2017. *Id.* ¶ 88. However, the Plan's per-

participant recordkeeping and administrative fee, which averaged $42 per participant throughout

the Class Period, did not decrease until 2020:

| Year | R&A Fees Per Participant[3] | Participants | Total R&A Fees |
|---|---|---|---|
| 2015 | **$42.91** | 25,136 | $1,078,586 |
| 2016 | **$44.27** | 23,689 | $1,048,712 |
| 2017 | **$45.00** | 24,133 | $1,085,985 |
| 2018 | **$45.00** | 23,127 | $1,040,715 |
| 2019 | **$45.00** | 22,455 | $1,010,475 |
| 2020 | **$31.50** | Unknown | Unknown |
| Avg. of Above | **$42.28** | | |

Compl. ¶ 91 (citing sources). The Plan's per-participant R&A fees during the Class Period were

materially higher than R&A fees paid by comparable plans. *Id.* ¶¶ 93-97. At all times during the

Class Period, Defendants knew or should have known that plans of similar size and type as the

Plan were paying comparatively lower amounts for R&A fees. *Id.* ¶ 92.

Defendants failed to negotiate a reduced per-participant recordkeeping fee until January

1, 2020, when the fee belatedly decreased from $45 per participant to $31.50. *Id.* ¶ 98.

Defendants' failure to timely secure reasonable pricing for R&A services cost the Plan and its

---

[3] Defendants criticize Plaintiffs for lowering their calculation of the Plan's recordkeeping fees in successive versions of the Complaint. (Defs.' Brf. at 1.) Defendants fail to mention that Plaintiffs' initial complaints were based on Defendants' then-operative Form 5500 filings with the Department of Labor. Defendants subsequently determined that those Form 5500s contained incorrect recordkeeping information, which Plaintiffs were unaware of at the time. After Plaintiffs filed their initial complaints, Defendants informed Class Counsel of the errors in the Form 5500s and the Red Cross filed amended Form 5500s for the years 2015 through 2019. Plaintiffs then used the amended figures in the Consolidated Complaint. Thus, the reason the recordkeeping fee calculations dropped sharply from the initial complaints to the Consolidated Complaint was because Plaintiffs had to adjust for Defendants' incorrect data.

participants hundreds of thousands of dollars per year in lost retirement savings and lost investment opportunities. *Id*. ¶ 102. Those losses will be compounded over time, resulting in further losses going forward. *Id*. ¶¶ 100, 102.[4]

### 2.   Defendants Breached Their Fiduciary Duties by Selecting and Retaining the Suite of Chronically Underperforming Focus Funds

In 2017, Defendants selected and retained the Northern Trust Focus Fund target date funds as investment options. *Id*. ¶ 129. The Focus Funds comprised 30.5% of the Plan's total assets under management as of December 31, 2017, and they are the only target date investment options in the Plan. *Id*. ¶¶ 130-31. Both before and after Defendants added the Focus Funds to the Plan's lineup of investments in 2017, the Focus Funds materially underperformed relative to industry-accepted benchmarks. *Id*. ¶¶ 135-53. The Focus Fund's underperformance began at least as early as 2014, three years before Defendants selected them for inclusion in the Plan. *Id*. ¶ 165. The Focus Funds also underperformed relative to Defendants' own internal custom benchmarks. *Id*. ¶¶ 155-57. Defendants' selection of the Focus Funds and failure to adequately monitor the Focus Funds' performance relative to peer target date funds and indices caused Plan participants to sustain substantial losses, which will continue to be compounded over time due to the lost opportunity for compounded earnings. *Id*. ¶¶ 177-78.

---

[4] Defendants assert that Plan participants did not necessarily pay the full $45 or $31.50 contractual recordkeeping fee because the Plan charged participants 15 basis points for recordkeeping, trustee, legal, audit, and other expenses and those basis points were insufficient to cover the full amount of the expenses. (Defs.' Brf. at 16-17.) This is a red herring because, among other things, it is not known whether the shortfall was material and/or whether it existed in each year during the Class Period. Nor is it known how much of the shortfall was allocated specifically to *recordkeeping* fees as opposed to trustee, legal, audit, and other fees. Those issues will be subject to discovery as the case moves forward. For purposes of the motion to dismiss, inferences on this issue must be resolved in favor of Plaintiffs.

## IV.    ARGUMENT

### A.    Plaintiffs Adequately Allege That the Red Cross and Individual Committee Members Functioned as Fiduciaries

ERISA states that a "person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). Plaintiffs allege sufficient facts at the pleading stage, prior to discovery, to show that the Red Cross and individual members of the Benefit Plan Committee ("Committee") meet this definition.

### 1.    The Red Cross is a Fiduciary for ERISA Purposes

The Plan expressly assigns substantive duties to the Red Cross. For example, the Plan states that the Committee "shall . . . ensure that the Employer [Red Cross] has established and implemented procedures for the payment of reasonable administrative expenses from the assets of the Plan."[5] Thus, the Red Cross has discretionary authority or responsibility in the administration of the Plan.

Further, the Plan expressly states that the Committee may delegate substantive tasks to the Red Cross' management team and other employees, who shall then become fiduciaries. Specifically, the Plan states:

- The Benefit Plan Committee may "delegate . . . to a designated member of Employer [Red Cross] management" the duties to "monitor the performance of Investment Options in relation to benchmarks [and] the reasonableness of fees and expenses."[6]

- "The Benefit Plan Committee may, in its discretion, . . . delegate certain of its duties

---

[5] Compl. ¶ 27(e), quoting First Amendment to Am. Red Cross Savings Plan, Sept. 25, 2019, at pg. 2-3 (ECF No. 28-3).

[6] Compl. ¶ 27(b), quoting First Amendment to Am. Red Cross Savings Plan, Sept. 25, 2019, at pg. 4-5 (ECF No. 28-3).

and responsibilities to designated members of Employer [Red Cross] management."[7]

- The Benefit Plan Committee "may . . . delegate its duties and responsibilities to any other persons, who shall be fiduciaries with respect to the Plan."[8]

The Plan includes several other similar provisions as quoted in the Complaint. (Compl. ¶ 27.) It is highly likely that the Committee did in fact delegate key functions to Red Cross management and other employees, making them fiduciaries. That is because the Committee is "composed of [just] three members . . . : (A) the Chief Financial Officer of the [Red Cross], . . . , (B) the Chief Human Resources Officer of the [Red Cross], . . . and (C) the General Counsel of the [Red Cross] . . . ."[9] Those individuals are high-level executives who have many other corporate duties to attend to beyond their role as administrators of the Plan. They presumably delegated many of their Plan-related duties to others at the Red Cross. The extent of that delegation will be the subject of discovery. For current purposes, Plaintiffs are entitled to a reasonable inference that the three Committee members delegated at least some of their relevant duties to the Red Cross. *See, e.g., Savage v. Sutherland Glob. Servs., Inc.*, 521 F. Supp. 3d 308, 319 (W.D.N.Y. 2021) ("[I]t may come to light that Clearview delegated its responsibilities to other defendants or non-parties. As explained above, 'ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.' . . . [D]ismissal is not required at this stage of the litigation."); *Allstate*, 2021 WL 4439415, at *8 ("Discovery may reveal that neither committee had a role in the decisionmaking process at the center of plaintiffs' allegations, but the complaint tells a plausible story implicating each committee.").

---

[7] Compl. ¶ 27(a), quoting First Amendment to Am. Red Cross Savings Plan, Sept. 25, 2019, at pg. 5 (ECF No. 28-3).

[8] Compl. ¶ 27(c), quoting Am. Red Cross Savings Plan, Jan. 1, 2017, at § 9.1(c) (ECF No. 28-2).

[9] Compl. ¶ 32, quoting Benefit Plan Committee Charter at § II (ECF No. 28-5).

Moreover, text of the Plan presumes that the Red Cross is a fiduciary for ERISA purposes. In a section of the Plan titled "Fiduciary Responsibilities," the Plan refers to the "Employer [Red Cross], the Administrator, the Benefit Plan Investment Committee, the Trustee, [and] any other Plan fiduciary."[10] Use of the word "other" implies that the Red Cross is a fiduciary. (Compl. ¶ 28.) Plaintiffs are entitled to this reasonable inference at the pleading stage.

Defendants point out that the Committee is a "named fiduciary" within the Plan, which Defendants read to mean the Red Cross cannot also be a fiduciary. (Defs.' Brf. at 12.) However, the Plan does not state there can be *only* one fiduciary. Indeed, as noted above, the Plan states that the Committee may delegate its duties to any other persons, who shall then become fiduciaries. ERISA cases routinely involve more than one set of defendants that served in a fiduciary role, including the corporation itself (like the Red Cross here). *See, e.g.*, *Allstate*, 2021 WL 4439415, at *1, 9 (upholding claims against multiple sets of defendants including Allstate and several committees); *Cunningham v. Cornell Univ.*, No. 16-cv-06525, 2017 WL 4358769, at *7 (S.D.N.Y. Sept. 29, 2017) (upholding ERISA claims against "Cornell University, The Retirement Plan Oversight Committee, [and individual defendant] Mary G. Opperman").

### 2. The Individual Committee Members are Fiduciaries for ERISA Purposes

Defendants argue that the Committee "acts as a whole" and can only face liability as a Committee versus on an individual member-by-member basis. (Defs.' Brf. at 14.) This argument is meritless in light of text in the Plan itself, statutory provisions in ERISA, and case law.

---

[10] *See* Am. Red Cross Savings Plan, Jan. 1, 2017, at § 5.5 (ECF No. 28-2); Compl. ¶ 28.

Specifically, the Plan states that Committee members can in fact be liable in their individual capacities:

> [A] member of the . . . Committee [may] be liable for the wrongful or negligent conduct of any other such member [of the Committee] or any other person . . . having fiduciary responsibilities with respect to the Plan [if] he . . . (ii) . . . fail[s] to act solely in the interests of Participants and beneficiaries or to exercise the care, skill, prudence and diligence under the circumstances prevailing from time to time that a prudent man acting in a like capacity and familiar with such matters would exercise, ha[ving] enabled [another] fiduciary to commit a breach of his obligation, or (iii) he has knowledge of a breach by the other fiduciary and does not make reasonable efforts under the circumstances to remedy it.[11]

Similarly, ERISA expressly provides for liability in an individual capacity. *See* 29 U.S.C. § 1109(a) ("Any person who is a fiduciary with respect to a plan who breaches any of the . . . duties imposed upon fiduciaries . . . shall be *personally liable* to make good to such plan any losses to the plan resulting from each such breach.") (emphasis added). Further, numerous ERISA cases have held that committee members can be held liable in their individual capacities. *See, e.g., Medina v. Catholic Health Initiatives*, No. 13-cv-01249, 2014 WL 4852272, at \*3 (D. Colo. Sept. 30, 2014) ("[T]he allegations . . . are sufficient . . . to assert that the individual defendants, as members of their respective committees, possessed the type of discretionary authority sufficient to make them functional fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A)(iii). . . . [A] committee can act, or fail to act, only through the actions or omissions of its individual constituent members."); *Sherrill v. Federal-Mogul Corp. Ret. Programs Comm.*, 413 F. Supp. 2d 842, 846 (E.D. Mich. 2006) (upholding ERISA claims against "individual members of the Retirement Committee" and several members of the Pension Committee in their individual capacities).

The cases Defendants cite do not establish a rule that committee members cannot face

---

[11] *See* First Amendment to Am. Red Cross Savings Plan, Sept. 25, 2019, at pg. 7 (ECF No. 28-3).

liability in their individual capacities. (Defs.' Brf. at 14-15.) Rather, those cases simply hold that the facts as pled did not establish a basis for individual liability. *Munro v. Univ. of Southern Cal.*, No. 16-cv-06191, 2019 WL 4543115, at \*5 (C.D. Cal. Aug. 27, 2019); *Alas v. AT&T*, No. 17-cv-08106, 2019 WL 1744847, at \*4-5 (C.D. Cal. Feb. 25, 2019). That is not the case here, where the Plan assigns substantive tasks to Committee members and provides for their individual liability.

**B.     Plaintiffs State a Claim Regarding Unreasonably High Recordkeeping Fees**

**1.     Claims of High Recordkeeping Fees are Routinely Upheld at the Pleading Stage and Allowed to Proceed to Discovery**

"Many allegations concerning fiduciary conduct, such as reasonableness of 'compensation for services' are 'inherently factual question[s]' for which neither ERISA nor the Department of Labor give specific guidance." *Sweda*, 923 F.3d at 329. Courts in ERISA cases routinely uphold claims regarding unreasonably high recordkeeping fees where an initial showing of high fees is set forth in the complaint based on liberal notice pleading standards. *See, e.g., Davis v. Magna Int'l of Am., Inc.*, No. 20-cv-11060, 2021 WL 1212579, at \*11 (E.D. Mich. March 31, 2021) (upholding allegations that plan fiduciaries overpaid for recordkeeping fees, stating: "'Defendants may ultimately defeat this claim of unreasonable administrative fees by showing that the fees were reasonable and not excessive, but the Court cannot engage in such factual speculation at this stage of the litigation'") (citation omitted); *McCool v. AHS Mgmt. Co., Inc.*, No. 19-cv-01158, 2021 WL 826756, at \*5 (M.D. Tenn. Mar. 4, 2021) (same, noting that the "'question [of] whether it was imprudent to pay a particular amount of record-keeping fees generally involves questions of fact that cannot be resolved on a motion to dismiss'") (citation omitted); *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1307-08 (D. Minn. 2021) (same in substance); *Miller v. AutoZone, Inc.*, No. 19-cv-02779, 2020 WL 6479564, at \*10 (W.D. Tenn. Sept. 18, 2020) ("the Court recognizes the need to conduct discovery on this [recordkeeping]

issue"); *Short v. Brown Univ.*, 320 F. Supp. 3d 363, 371 (D.R.I. 2018) ("'[t]he question whether it was imprudent to pay a particular amount of record-keeping fees generally involves questions of fact that cannot be resolved on a motion to dismiss'") (citation omitted); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015) ("Plaintiffs allege that the Plan's recordkeeping fees exceed a prudent amount. Whether or not those fees were actually imprudent is a question of fact and not one that can be resolved on the pleadings.").

**2.     The Complaint Contains Numerous Facts Illustrating that the Plan's Recordkeeping Fees Were Excessive**

When considering a plaintiffs' allegations of excessive recordkeeping fees, the Court should apply a "fair reading of the entire Complaint." *Rohan v. Saint Luke's Health System, Inc.*, No. 20-cv-00179, 2020 WL 8410451, at *6 (W.D. Mo. June 22, 2020). Here, Plaintiffs pled multiple examples of market comparisons and recordkeeping fee benchmarks to support the claim that the Plan's recordkeeping fees were excessive. (Compl. ¶¶ 93, 96-97.)

For example, Plaintiffs cited to the "NEPC 2019 Defined Contribution Progress Report," which consists of a survey of comparably sized retirement plans. *Id.* ¶ 96. Based on the NEPC survey, plans with over 15,000 participants paid on average $40 or less in per-participant recordkeeping, trust, and custody fees in 2019. *Id.* Defendants challenge Plaintiffs' comparison, stating that the NEPC study "shows there is a range of reasonable fees – both above and below the average – and the Plan's fees fit squarely within that range." (Defs.' Brf. at 16.) However, the Plan, which paid $45 per participant in several years and an average of $42 throughout the Class Period, had more participants (22,455 participants in 2019) than the plans studied by the NEPC survey (12,437 participants on average in the overall study, and 15,000 or more participants in

the sub-category referenced in the Complaint). *See* Compl. ¶ 96.[12] The Plan's high number of participants should have allowed Defendants to negotiate a recordkeeping fee at the low end of the range found in the NEPC study.

Further, Plaintiffs plead eighteen examples of comparably sized plans that paid less in annual per-participant recordkeeping and administrative fees than the fees paid by the Plan. *Id.* ¶ 93. Some of the comparator plans were half the size of the Plan yet still paid less in annual per-participant fees than the Plan, further demonstrating the unreasonableness of the Plan's fees. *Id.* Overall, the average fee in the sample of eighteen comparable plans was $30 in 2019. *Id.* The Plan's $45 per-participant fee in 2019 was 50% higher than that $30 average. *Id.* ¶ 94.[13]

The Complaint cites several other sources recognizing that reasonable recordkeeping rates for large plans average around $35 per participant. *See* Compl. ¶ 97, *citing Spano v. Boeing*, No. 06-cv-00743, Dkt. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert "opined that a similarly sized plan should have paid no more than $37-$42 per participant per year," and

---

[12] The NEPC report is available at https://cdn2.hubfs.net/hubfs/2529352/2019%20DC%20Plan%20and%20Fee%20Survey%20(progress%20report)/2019%20NEPC%20DC%20Plan%20Progress%20Report.pdf.

[13] Defendants criticize Plaintiffs for changing the compilation of peers in the recordkeeping fee chart in successive versions of the Complaint. (Defs.' Brf. at 1-2, 15-16, 20). However, allegations may change and be sharpened from one version of a Complaint to another. That is the point of amending a Complaint, and it is expressly encouraged by the Court. *See* Standing Order, ECF No. 8 at § 8(a) (encouraging filing of an amended complaint in response to a motion to dismiss). The most recent version of the Complaint is what controls the proceedings, and Defendants must focus on that version. *See Wehner v. Genentech, Inc.*, No. 20-cv-06894, 2021 WL 2417098, at *6 (N.D. Cal. June 14, 2021) ("That the $36 fee [the plan paid for recordkeeping services] is only one dollar higher than the $35 figure [Plaintiff] previously claimed (in the original Complaint) that . . . participants should have been paying is of no moment. Defendants are challenging the allegations in the FAC, and in the FAC, Wehner plausibly alleges that $30 [not $35 from the prior Complaint] is a reasonable fee that the . . . Plan could have and should have charged for the services rendered."); *International Controls Corp. v. Vesco*, 556 F.2d 665, 668-69 (2d Cir.1977) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.") (collecting cases).

defendant's consultant "confirmed a market benchmark range of $30.42 - $45.42 per participant"; also noting that defendant obtained a fee rate of $32 after the class period); *Boeing*, Dkt. 562-2, at 2 (Jan 29, 2016) (declaration stating that Boeing's 401(k) recordkeeping fees were $18 per participant for 2015 and $32 for each of several prior years); *George v. Kraft Foods Global, Inc*., 641 F.3d 786, 798 (7th Cir. 2011) (plaintiffs' expert "opined that a reasonable fee for the kind of recordkeeping services the Plan needed would have been between $20 and $27 per participant per year, rather than the $43 to $65 the Plan paid"); *Gordon v. Mass Mutual*, No. 13-cv-30184, Dkt. 107-2, at ¶ 10.4 (D. Mass. June 15, 2016) (401(k) fee settlement committing plan to pay "no more than $35 per participant for standard recordkeeping services"). Other cases are in accord. *See, e.g., Peterson v. Ins. Servs. Off., Inc*., No. 20-cv-13223, 2021 WL 1382168, at *5 (D.N.J. Apr. 13, 2021) ("Plaintiffs sufficiently allege a plausible breach of fiduciary duty claim. For example, Plaintiffs assert that recordkeeping rates for large plans average about $35 per participant while the Plan's recordkeeping fees averaged over $89 per participant . . . ."); *Sacerdote v. New York Univ*., No. 16-cv-06284, 2017 WL 3701482, at *9 (S.D.N.Y. Aug. 25, 2017) ("Plaintiffs allege that '[e]xperts in the recordkeeping industry' determined that the 'market rate' for administrative fees for plans like those at issue in this case was $35 per participant, and that the Plans' recordkeeping fees far exceeded that amount. Thus, the 'excessive recordkeeping fees' claim is sufficient to support Count III.").

Defendants object to Plaintiffs' use of "average" comparator fees because "by definition, one-half of 401(k) plans would be operating [above the average] in violation of ERISA." (Defs.' Brf. at 18.) This argument misses the point of Plaintiffs' Complaint. Plaintiffs do not argue that all fees that exceed the average by any amount are unreasonable. Rather, Plaintiffs argue that

Defendants' $42.28 average recordkeeping fee from 2015 to 2020 (and $45 in several years) is high enough above the comparator average to warrant a breach of fiduciary duty claim.

Defendants' argument that Plaintiffs failed to plead facts concerning the scope of recordkeeping services received by the Plan (Defs.' Brf. at 16, 21) is factually wrong and in any event has been consistently rejected by courts as a basis for dismissal of the claim. The Complaint specifically alleges that the Plan's recordkeeping services consisted of a standard suite of services, not a robust or gold-standard suite warranting an above-market price. (Compl. ¶ 99.) The Complaint quoted Plan documents stating that the "'[f]ees paid to the recordkeeper . . . cover expenses for things like keeping data on participants, communication materials, Internet services, and assisting participants with transactions," as well as "'daily plan processing, coordination of disbursements with [the] trustee, production of participant account statements, and customer call center services.'" *Id*. ¶ 99 (citing sources). These are garden variety recordkeeping services that did not warrant the bloated recordkeeping rates agreed to by Defendants. *Id*. ¶ 99. In any event, courts have rejected the argument that insufficient allegations about the scope of recordkeeping services received should result in dismissal of the recordkeeping claims. *See, e.g.*, *Novant Health*, 131 F. Supp. 3d at 479 ("While Defendants claim that Plaintiffs have not alleged facts regarding . . . the services provided, or how the fees charged to the Plan were excessive in light of those services, this court finds that those are the types of facts warranting discovery, and, therefore, dismissal at this stage is not appropriate"); *Krueger v. Ameriprise Financial, Inc.*, No. 11-cv-02781, 2012 WL 5873825, at *20 (D. Minn. Nov. 20, 2020) (same); *Blackmon v. Zachary Holdings, Inc.*, No. 15-cv-00988, 2021 WL 2190907, at *7 (W.D. Tex. Apr. 22, 2021) ("[T]he Court finds that, at this stage, Plaintiffs need not allege why the fees were not justified by the services provided when considering the Plan as

a whole."); *Magna*, 2021 WL 1212579, at *10 ("at this stage Plaintiffs need not allege why the fees were not justified by the services provided when considering the plan as a whole").

Defendants cite *Johnson v. PNC Financial Servs. Group, Inc.*, No. 20-cv-01493, 2021 WL 3417843, at *4-6 (W.D. Pa. Aug. 3, 2021) for its holding that recordkeeping fees of $51-$57 per participant did not give rise to a breach of fiduciary duty claim. (Defs.' Brf. at 21.) However, *PNC* is distinguishable on several grounds. *First*, the recordkeeping fees in *PNC* declined steadily throughout class period, creating an inference that the defendants prudently monitored the fees. *See PNC* at *4 ("the fact that the Plan's recordkeeping fees trend downward for the period at issue points in the direction of prudence rather than imprudence"). Here, in contrast, the recordkeeping fees increased or stayed the same each year during Class Period except for 2020, when the fees were belatedly reduced. (Compl. ¶ 91.) *Second*, the plaintiffs in *PNC* compared the fees paid by the plan to fees paid by "much smaller plans – with just 100 participants and $5 million in assets," where the PNC plan had "66,000 participants and assets of nearly $5.7 billion." *PNC* at *1-2. Thus, the plaintiffs' comparison was an apples-to-oranges comparison. Here, in contrast, the Complaint compares the Plan's fees to fees paid by plans of similar size. (Compl. ¶¶ 93, 96.) *Third*, the plaintiffs in PNC failed to provide "detail about the Plan's fee structure and the services received in exchange for those fees." *PNC* at *4. Here, in contrast, the Complaint quotes Plan documents describing the scope of recordkeeping services received, which were generic services that did not warrant the bloated recordkeeping rates. (Compl. ¶ 99.)[14]

---

[14] Defendants also cite *Young v. GM Inv. Mgmt. Grp.*, 325 F. App'x 31, 33 (2d Cir. 2009) for its holding that the plaintiffs "fail[ed] to allege that the fees were excessive relative to the services rendered." (Defs.' Brf. at 21). However, *GM* is distinguishable because the plaintiffs there did not provide details about the specific services obtained, and the plaintiffs provided "no facts concerning other factors relevant to determining whether a fee is excessive under the circumstances." *Id*. at 33. Here, in contrast, the Complaint specifies the scope of the Plan's recordkeeping services and provides comparisons to peer plans, an industry survey, and reasonable

The Plan's fiduciaries failed to take advantage of the economies of scale by negotiating lower per-participant recordkeeping and administrative fees. It strains credulity to assume that the Plan's above-market fees were justified throughout the Class Period. Plaintiffs are entitled to the reasonable inference that the Plan's recordkeeping and administrative fees were unreasonably high at this stage of the proceedings. Discovery on these issues is needed to assess Defendants' fiduciary process.

The unreasonably high recordkeeping fees led to damages in the form of reduced account balances and diminished investment returns. *See, e.g., Vellali v. Yale Univ*., 308 F. Supp. 3d 673, 678 (D. Conn. 2018) ("The process of . . . negotiating service fees can materially affect an employee's retirement income because every dollar spent on . . . recordkeeping . . . is a dollar that is not contributing to increasing the amount of the employee's retirement savings. Over time, excessive service fees can erode an employee's retirement savings to the tune of tens or hundreds of thousands of dollars.").

### C.   Plaintiffs State a Claim Regarding the Underperforming Focus Funds

#### 1.   Plaintiffs Selected Appropriate Comparators to Illustrate the Focus Funds' Underperformance

Defendants challenge Plaintiffs' selection of the three target date funds and three indices used as comparators ("Comparators") for the Focus Funds. (Defs.' Brf. at 26-27.) Defendants' arguments fail for several reasons.

---

recordkeeping rates noted in case law. Defendants also cite *Wilcox v. Georgetown Univ.*, No. 18-cv-00422, 2019 WL 132281, at *13 (D.D.C. Jan. 8, 2019) for the court's rejection of the plaintiffs' claim that the plan's recordkeeping fees were too high. (Defs.' Brf. at 18.) However, *Georgetown* is distinguishable because "Plaintiffs provide no factual support at all for their assertion that the Plans should pay only $35/year per participant in recordkeeping fees." *Georgetown*, 2019 WL 132281, at *12. Here, the Complaint contains abundant support for the comparator figures.

i.     **A Reasonable Basis Exists for Selecting Each Comparator, and Courts in Other Focus Fund Cases Have Accepted Four of Them as Comparators**

Contrary to Defendants' argument, the Complaint does in fact discuss why each Comparator is a sensible selection. Also, importantly, the courts in *Allstate* and *Walgreen* accepted four of these Comparators for purposes of evaluating the Focus Funds. Each Comparator is addressed below.

Vanguard Target Date Funds. The Complaint states the following:

> [T]he Vanguard Target Date Funds pursue the same investment objectives as the . . . Focus Funds, invest primarily in equity (stock) and fixed income (bond) securities as do the Focus Funds, invest in both U.S. and foreign securities as do the Focus Funds, . . . and are available to all large retirement plans including the Plan. [Also,] Morningstar placed the Vanguard Target Date Funds in the same Morningstar Category as the Northern Trust Focus Funds.

(Compl. ¶ 136(i).) Morningstar is an industry leader in providing investment analysis of target date funds and similar investments. Morningstar Categories are peer groupings based on similarities among the funds in each Morningstar category.[15] The fact that Morningstar placed the Focus Funds and Vanguard Target Date Funds in the same Morningstar Category illustrates that they shared many core similarities, making them reasonable candidates for comparison to one other. *See generally Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 32 (1st Cir. 2018) (expert selected as a benchmark a "Vanguard index fund that belonged to the same Morningstar category as the Putnam fund").

---

[15] Morningstar describes its Morningstar Categories as follows: "A Morningstar Category is assigned by placing funds [*e.g.*, the Focus Funds, Vanguard Target Date Funds, etc.] into peer groups based on their underlying holdings. The underlying securities in each portfolio are the primary factor in [Morningstar's] analysis . . . . Funds are placed in a category based on their portfolio statistics and compositions over the past three years. Analysis of performance and other indicative facts are also considered." (Compl. ¶ 136(i) n.49.)

<u>American Funds Target Date Funds</u>. The Complaint states:

> The American Funds Target Date Funds pursue the same investment objectives as the . . . Focus Funds, invest primarily in equity (stock) and fixed income (bond) securities as do the Focus Funds, invest in both U.S. and foreign securities as do the Focus Funds, utilize a 'Through' glide path as do the Focus Funds, . . . and are available to all large retirement plans including the Plan.  [Also,] Morningstar placed the American Funds Target Date Funds in the same Morningstar Category as the Northern Trust Focus Funds.

(Compl. ¶ 136(ii).) Notably, the *Allstate* court accepted the plaintiffs' selection of the American Funds Target Date Funds as a comparator to the Focus Funds. *See Allstate*, 2021 WL 4439415, at *3 (noting that the Focus Funds "underperformed compared to . . . like target date funds [including the American Funds Target Date Funds]").[16]

<u>Fidelity's FIAM Blend Target Date Comingled Pool Funds</u>. The Complaint states:

> The FIAM Blend Target Date Comingled Pool funds are Fidelity funds that pursue the same investment objectives as the . . . Focus Funds, invest primarily in equity (stock) and fixed income (bond) securities as do the Focus Funds, invest in both U.S. and foreign securities as do the Focus Funds, . . . and are available to all large retirement plans including the Plan. [Also,] Morningstar placed the FIAM Blend Target Date Comingled Pool funds in the same Morningstar Category as the Northern Trust Focus Funds.

(Compl. ¶ 136(iii).) The *Walgreen* court accepted the plaintiffs' selection of the FIAM Blend Target Date Comingled Pool funds as a comparator to the Focus Funds. *See Walgreen*, 2020 WL 8921399, at *1 ("Plaintiffs rest their claims on the allegedly persistent poor performance of [the Focus] Funds . . . relative to . . . comparator target-date funds [including Fidelity].").[17]

---

[16] The *Allstate* court did not expressly name the comparator funds in its order. However, the Complaint in *Allstate* set forth the American Funds Target Date Funds as one of seven comparators to the Focus Funds. *See Cutrone v. The Allstate Corp*., No. 20-cv-06463 (N.D. Ill.), Amend. Class Action Compl. dated March 22, 2021 at ¶¶ 62, 65-124 (Dkt. 20).

[17] The *Walgreen* court did not name the specific Fidelity fund in its order. However, the Complaint in *Walgreen* specified that it was the "FIAM Blend Target Date" fund, which is the same fund Plaintiffs use here. *See Brown-Davis v. Walgreen Co.,* No. 19-cv-05392 (N.D. Ill.), Class Action Compl. dated Aug. 9, 2019 at ¶¶ 52, 54-111 (Dkt. 1).

Morningstar Lifetime Moderate Index. The Complaint states:

> Morningstar uses the Morningstar Lifetime Moderate Index as the primary
> benchmark index for the . . . Focus Funds. The Morningstar Lifetime Moderate
> Index represents a portfolio of global equities, bonds, and other securities with a
> moderate risk profile.

(Compl. ¶ 136(iv).) Given that Morningstar itself uses this index as the primary benchmark for

the Focus Funds, it is clearly appropriate for Plaintiffs to use it as a Comparator here. Also, the

*Walgreen* court accepted the plaintiffs' selection of this index as a comparator to the Focus

Funds. *See Walgreen*, 2020 WL 8921399, at *1 (plaintiffs compared the Focus Funds to

"benchmark indexes [including] the . . . Morningstar Lifetime Moderate Index").

S&P Target Date Index. The Complaint states:

> The S&P Target Date Index is a prominent and widely-accepted target date
> benchmark for 'Through' target date funds [like the Focus Funds]. It provides
> exposure to equities, bonds, and other asset classes. The S&P Target Date Index is
> used as the primary benchmark for many target date funds throughout the industry.
> At least one large holder of . . . Focus Funds [Walgreen] uses the S&P Target Date
> Index as the benchmark index for the Focus Funds held in its 401(k) plan.

(Compl. ¶ 136(v).) The courts in both *Walgreen* and *Allstate* accepted the plaintiffs' selection of

the S&P Target Date Index as a comparator to the Focus Funds. *See Walgreen*, 2020 WL

8921399, at *1 (plaintiffs compared the Focus Funds to "benchmark indexes [including] the S&P

Target Date Index"); *Allstate*, 2021 WL 4439415, at *3 (the Focus Funds "underperformed

compared to benchmark indexes [including the S&P Target Date Index]").[18]

Dow Jones U.S. Target Date Index. The Complaint states:

> The Dow Jones U.S. Target Date Index is a prominent industry-accepted target
> date benchmark widely used by and specifically developed for target date funds.
> It reflects exposure to a collection of stocks, bonds, and cash-like securities and is

---

[18] The *Allstate* court did not name the comparator indexes in its order. However, the Complaint
in *Allstate* set forth the S&P Target Date Index as one of seven comparators to the Focus Funds.
*See Cutrone v. The Allstate Corp.*, No. 20-cv-06463 (N.D. Ill.), Amend. Class Action Compl.
dated March 22, 2021 at ¶¶ 62, 65-124 (Dkt. 20).

commonly used by defined contribution retirement plans.

(Compl. ¶ 136(vi).) This index is specifically geared toward target date funds and is a logical

comparator for the Focus Funds. Plaintiffs in the pending *Northern Trust* ERISA class action

regarding the Focus Funds utilized this index as a comparator to the Focus Funds.[19]

In sum, Plaintiffs selected appropriate Comparators with a reasonable basis for being

used here. They are not cherry-picked funds lacking a rational connection to the Focus Funds, as

Defendants summarily argue. (Defs.' Brf. at 26-27.)

Defendants also criticize Plaintiffs for revising the lineup of Comparators in successive

versions of the Complaint. (Defs.' Brf. at 1-2.) However, allegations may change and be

sharpened from one version of a Complaint to another. Indeed, that is the point of amending a

complaint, as discussed *supra*. The most recent version of the Complaint is what controls the

proceedings and the instant Motion.

### ii. The Issue of Whether a Comparator is an Apt Selection is Not Suited for Resolution on a Motion to Dismiss

Even *if* Defendants had raised colorable challenges to each Comparator (they do not), a

long line of ERISA cases holds that the issue of whether a comparator is a suitable benchmark is

generally not suitable for resolution on a motion to dismiss. *See, e.g.*, *Yale Univ.*, 308 F. Supp. 3d

at 687-88 ("The defendants also argue that the stock indexes the plaintiffs used to benchmark the

TIAA-CREF investments are not the proper ones to measure whether the two investments

underperformed. This point is not appropriately addressed at the motion to dismiss stage.");

*Brown Univ.*, 320 F. Supp. 3d at 372 ("To the extent [Defendant] . . . presents different

---

[19] *See Conlon v. The Northern Trust Co. et al.*, No. 21-cv-02940 (N.D. Ill.), Amend. Class
Action Compl. dated Oct. 22, 2021 at ¶¶ 39, 43, 46-105 (Dkt. 25). The motion to dismiss has not
yet been decided.

benchmarks to measure the Plans' performance, it raises factual issues that cannot be decided at the pleading stage."); *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1352 (N.D. Ga. 2017) ("[T]he parties disagree as to what the correct benchmark is for the CREF Stock Account. The proper benchmark can be more appropriately determined on summary judgment."); *Cornell Univ.*, 2017 WL 4358769, at *7 ("[D]efendants' argument that plaintiffs used inappropriate benchmarks to assess the performance of the challenged options raises factual questions that are not properly addressed on a motion to dismiss."); *Nicolas v. Trustees of Princeton Univ.*, No. 17-cv-03695, 2017 WL 4455897, at *5 (D.N.J. Sept. 25, 2017) ("Defendant raises factual questions about whether the alternative funds Plaintiff suggests . . . are apt comparisons – and, therefore, whether the underperformance Plaintiff depicts is an accurate portrait. Such questions do not warrant dismissal . . . ."); *Sacerdote*, 2017 WL 3701482, at *10 ("Defendant's assertion that plaintiffs 'use patently inappropriate benchmarks over jury-rigged performance periods' raises factual questions that are not appropriately addressed at this time.").

Plaintiffs make a strong showing that their Comparators are apt selections, which is sufficient for purposes of the motion to dismiss. The Comparators will be tested during expert discovery.

### iii.   Courts Commonly Accept the Use of "Indices" as Comparators to Illustrate an Investment Fund's Underperformance

Defendants argue that Plaintiffs' three indices (the Morningstar Lifetime Moderate Index, S&P Target Date Index, and Dow Jones U.S. Target Date Index) should not be used as comparators because "indices are not investments." (Defs.' Brf. at 27.) However, many courts have accepted indices as comparators to illustrate an investment's underperformance. For example, as noted above, the *Walgreen* and *Allstate* courts accepted the plaintiffs' use of indices to illustrate the Focus Funds' underperformance. *See Walgreen,* 2020 WL 8921399, at *1

24

(accepting the use of "two benchmark indexes"); *Allstate*, 2021 WL 4439415, at *3 (accepting the use of "benchmark indexes"). Courts in other ERISA cases have reached the same conclusion. *See, e.g., Yale Univ.*, 308 F. Supp. 3d at 687-88 (accepting use of "stock indexes the plaintiffs used to benchmark the TIAA–CREF investments"); *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 34 (1st Cir. 2018) ("it is reasonable to compare the actual returns on that portfolio to the returns that would have been generated by a portfolio of benchmark funds *or indexes*") (emphasis added). Thus, the Complaint's three indices may serve as Comparators.

### 2. Plaintiffs Adequately Allege Defendants' Imprudence in Selecting the Focus Funds in 2017

#### i. Defendants Ignored Red Flags Available to Them in 2017

Defendants incorrectly assert that Plaintiffs have not identified "any 'red flags' or other facts in existence when the Plan fiduciaries decided to add the Focus Funds to the Plan's investment lineup beginning in 2017." (Defs.' Brf. at 22.) The Complaint does indeed allege abundant facts that were available to Defendants when they selected the Focus Funds in 2017. These facts illustrate that Defendants acted imprudently based on information available to them at the time of their decision-making, not based on hindsight thereafter.

Specifically, the Complaint includes detailed charts indicating that the Focus Funds consistently and materially underperformed relative to the Comparators in 2014, 2015, and 2016, which were the three years preceding Defendants' decision to add the Focus Funds to the Plan. (Compl. ¶¶ 139-47.) The data in the charts was available to Defendants at the time of their decision-making in 2017, not in hindsight thereafter. (Compl. ¶¶ 138, 166.) The charts illustrate that the Focus Funds underperformed the compilation of Comparators by approximately 2%, on average, in 2014, 2015, and 2016. (Compl. ¶¶ 139-47.) The underperformance was as high as 3.75% for certain Focus Fund tranches. *See* Compl. ¶¶ 144-45 (Focus 2040 Fund and Focus 2045

Fund underperformed the Comparator compilation by 3.75% in 2014). This overall level of underperformance is material for purposes of the motion to dismiss. *See Miller v. AutoZone, Inc*., No. 19-cv-02779, 2020 WL 6479564, at *5-7 (W.D. Tenn. Sept. 18, 2020) (2.20% underperformance was sufficient at motion to dismiss stage); *In re Biogen, Inc. ERISA Litig*., No. 20-cv-11325, 2021 WL 3116331, at *3, 7 (D. Mass. July 22, 2021) (2.3% underperformance of Mainstay fund was sufficient at motion to dismiss stage).[20]

The chronic underperformance was a key fact that should have alerted Defendants to the weaknesses of the Focus Funds at the time of their selection. *See Allstate*, 2021 WL 4439415, at *3 (defendants "chose the suite of [Focus Funds] for the plan in 2011, when the . . . funds had a thin (and poor) investment track record [relative to comparators]"); *Walgreen*, 2020 WL 8921399, at *1-3 ("Plaintiffs base these claims on both the Defendants' 'initial selection and subsequent retention of the [Focus] Funds despite the Funds' woeful underperformance [relative to comparators]'").

Another red flag available to Defendants in 2017 was the lack of interest in the Focus Funds by other 401(k) plan administrators. The Focus Funds were unpopular niche funds, not mainstream funds commonly selected for inclusion in 401(k) plans. Only twenty-eight entities nationwide held the Focus Funds in their retirement plans in 2016. (Compl. ¶ 168.) This was public information, readily available to Defendants at the time of their decision making. *Id*. In contrast, there were 571,841 401(k)-type plans in the United States at that time. *Id*. Thus, less

---

[20] Defendants cite *Patterson v. Morgan Stanley*, No. 16-cv-06568, 2019 WL 4934834, *10 (S.D.N.Y. Oct. 7, 2019) for the proposition that the underperformance must be "substantial" and that a "difference of 'less than one percentage point is certainly insubstantial.'" (Defs.' Brf. at 32.) However, *Morgan Stanley* is distinguishable because the underperformance there was just 0.74%, whereas it was approximately 2% on average here. Notably, the *Walgreen* court declined to follow *Morgan Stanley* due to this distinction. *See Walgreen*, 2020 WL 8921399, at *2.

than one one-hundredth of a percent of all 401(k) plans nationwide selected the Focus Funds for

inclusion in their suite of investment choices. The narrow acceptance of the Focus Funds was a

fact that should have alerted Defendants to a need for heightened skepticism.

> ### ii.    Plaintiffs Need Not Plead Details of Defendants' Deficient Internal Processes Prior to Discovery

At this early stage of the proceedings, prior to discovery, Plaintiffs need not plead

specifics about Defendants' internal decision making and deficient processes in selecting the

Focus Funds. A long line of ERISA cases has so held. *See, e.g., Walgreen*, 2020 WL 8921399, at

*2 ("Defendants cite no binding case law that requires Plaintiffs to plead allegations as to

Defendants' [internal] conduct or process. As Plaintiffs point out, they need not 'describe

directly the ways in which [Defendants] breached their fiduciary duties' but can 'plead facts

indirectly showing unlawful behavior.'"); *Allstate*, 2021 WL 4439415, at *8 ("Although

plaintiffs do not allege specifics of the Allstate defendants' decision-making processes with

respect to the plan, 'no such precision [is] essential . . . [and it is] enough to allege facts from

which a factfinder could infer that the process was inadequate.'") (citation omitted); *Karg v.

Transamerica Corp.*, No. 18-cv-00134, 2019 WL 3938471, at *5 (N.D. Iowa Aug. 20, 2019)

("ERISA plaintiffs . . . 'generally lack the inside information necessary to make out their

[imprudence] claims in detail unless and until discovery commences.' . . .  An ERISA claim

alleging an imprudent investment process can survive a motion to dismiss '[e]ven when the

alleged facts do not 'directly address the process by which the Plan was managed,' because a

court can infer a flawed process from circumstantial factual allegations."); *Wehner v. Genentech,

Inc.*, No. 20-cv-06894, 2021 WL 2417098, at *4 (N.D. Cal. June 14, 2021) (same).

Evidence of underperformance alone can suffice to plead imprudence. *See Transamerica*,

2019 WL 3938471, at *6 ("Defendants argue in their reply that plaintiffs must plead 'both

underperformance in comparison to a meaningful benchmark and circumstantial allegations establishing a flawed fiduciary process.' . . . Defendants misconstrue *Meiners*. In *Meiners*, the Eighth Circuit found that underperformance in comparison to a meaningful benchmark is itself circumstantial evidence of a flawed fiduciary process, not a separate requirement as defendants claim."). Here, the overall breadth and depth of the Focus Funds' underperformance raises a strong inference that Defendants' selection and monitoring processes were tainted by a failure of competency or effort.

### 3. Plaintiffs Adequately Allege Defendants' Imprudence in Retaining the Focus Funds in the Plan after 2017

The Supreme Court has held that a "fiduciary is required to conduct a regular review of its investment" and has a "continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1827-28. The Complaint alleges sufficient facts indicating that Defendants breached these fiduciary duties.

### i. Additional Red Flags Were Available to Defendants After They Added the Focus Funds to the Plan

Defendants' imprudence continued throughout the Class Period by retaining the Focus Funds in the Plan for years after their initial inclusion despite their continuing underperformance. The charts in the Complaint illustrate that the Focus Funds continued to materially underperform relative to the Comparators in 2017, 2018, 2019, and 2020. (Compl. ¶¶ 139-47.) The Focus Funds underperformed the compilation of Comparators by approximately 1.5%, on average, in 2017 through 2020. (Compl. ¶¶ 139-47.) The underperformance was nearly as high as 5% for certain Focus Fund tranches during that period. *See* Compl. ¶¶ 146-47 (Focus 2050 Fund and Focus 2055 Fund underperformed Comparator compilation by 4.94% and 4.91%, respectively, in 2020). The data in the charts was available to Defendants each year, not merely in hindsight.

(Compl. ¶¶ 138, 166.) The consistent underperformance was a red flag that should have alerted Defendants to the fact that the Focus Funds were imprudent investments.

Notably, Morningstar concluded that the Focus Funds performed worse than the vast majority of all other target date funds in the same Morningstar Category. For example, as of May 31, 2019, the Focus 2045 Fund performed worse than 78% and 95% of all other funds in its Morningstar Category for the prior 3-year and 5-year periods, respectively. (Compl. ¶ 150.) Most of the other Focus Fund tranches performed just as poorly. *Id*. Morningstar also assigned an "Overall Morningstar Rating" of just two stars out of a possible five stars (based on performance) for the Focus 2045 Fund, and likely other tranches as well. (Compl. ¶ 151.) Defendants had access to these Morningstar conclusions in 2019 and beyond. (Compl. ¶ 166.)

Among the handful of entities that held the Focus Funds in their retirement plans in 2016, many shed the Focus Funds from their plans in the years that followed. By 2019, only sixteen entities held the Focus Funds in their retirement plans, representing a sharp reduction from the twenty-eight entities in 2016 noted above. (Compl. ¶ 169.) The shedding of the Focus Funds by other entities was public information available to Defendants each year, not merely in hindsight. (Compl. ¶ 168.) Despite this additional fact, Defendants continued to retain the Focus Funds year after year.

Participants in at least four other 401(k) plans have filed ERISA class actions against their plan sponsors for breach of fiduciary duty in selecting and retaining the Focus Funds: *Allstate*, *Walgreen*, *Takeda Pharmaceuticals*, and *Northern Trust*. (Compl. ¶ 174.) The first of those cases was filed on August 9, 2019, which was public information available to Defendants in real time. These cases, two of which have survived motions to dismiss (*Allstate* and *Walgreen*), lend further weight to the notion that the Focus Funds were imprudent investments.

They were yet another red flag available to Defendants, which should have prompted heightened scrutiny in Defendants' decision to continue retaining the Focus Funds year after year.

As noted above, the Committee is comprised of just three individuals – the Red Cross' Chief Financial Officer, Chief Human Resources Officer, and General Counsel. Those high-level executives were preoccupied by their many other corporate duties such that they were unable to devote sufficient attention to monitoring the Focus Funds and responding to the mounting red flags. (Compl. ¶ 175.) For ERISA purposes, the Committee members are held to a standard of care of an investment professional, not a busy executive with competing commitments. *See* 29 U.S.C. § 1104(a)(1) ("A fiduciary shall discharge his duties with respect to a plan . . . with the care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."); *Sweda v. Univ. of Penn.*, 923 F.3d 320, 329 (3d Cir. 2019) ("A[n] [ERISA] fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field."); *Chesemore v. Alliance Holdings, Inc.*, 886 F. Supp. 2d 1007, 1041 (W.D. Wis. 2012) (ERISA fiduciaries must "act in good faith as an objectively prudent fiduciary would act, not simply as a prudent layperson would act"). The Complaint makes a sufficient showing that Defendants breached that standard of care.

Defendants argue that they engaged in a prudent process, noting that they used their own internal benchmark to assess the Focus Funds' performance. (Defs.' Brf. at 33.) However, the Focus Funds persistently underperformed relative to even that custom benchmark. (Compl. ¶¶ 155-57.) Further, Defendants do not define or describe the components of their custom benchmark, either in Plan documents or elsewhere. (Compl. ¶ 159.) Plaintiffs are left to guess what the benchmark consists of, how it was created, and other details of its composition. The use

of custom benchmarks is disfavored when presenting comparative results to plan participants. *See Sacerdote v. New York Univ*., 328 F. Supp. 3d 273, 316 n.120 (S.D.N.Y. 2018) ("Department of Labor Regulations do not permit the use of . . . customized benchmarks in the 404a5 disclosures [to plan participants]."); *accord* 75 Fed. Reg. 64910-01 at pg. 64916-17 (Department of Labor implementation guidance stating: "Some commenters suggested permitting composite or customized benchmarks [in disclosures to plan participants]. . . .  However, benchmarks are more likely to be helpful when they are not subject to manipulation . . . ."). Notably, the *Walgreen* court declined the defendants' invitation to use their own custom benchmark to justify the Focus Funds' performance. *See Walgreen*, 2020 WL 8921399, at *2 (declining to consider an internal "custom benchmark" used by defendants). Given the lack of information provided by Defendants about their custom benchmark, and the judicial resistance to such custom benchmarks, Defendants cannot use their benchmark to argue that the Focus Funds performed well in comparison and that Defendants conducted a proper monitoring process.

Lastly, as the Second Circuit recently recognized: "While the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ*., 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original). Here, Plaintiffs have plausibly alleged that Defendants did not employ the appropriate methods to monitor the Focus Funds.

      **ii.**      **The Isolated Instances in Which a Focus Fund Tranche Outperformed a Given Comparator in a Given Year Do Not Negate the Overall Trend of Underperformance**

Defendants argue that certain Focus Fund tranches outperformed certain individual Comparators in certain years. (Defs.' Brf. at 28 n.13; 31.) However, those occurrences are isolated instances. (Compl. ¶¶ 139-47.) In the vast majority of instances, the Focus Funds underperformed each individual Comparator in each year during the seven-year period analyzed in the Complaint. *Id*. More importantly, when analyzing the average of all Comparators in each year, the Focus Funds underperformed that average in all but one instance during the seven-year period. *Id*. The single exception is the Focus 2035 Fund, which outperformed the Comparator average by a *de minimis* 0.15% in 2017. (Compl. ¶ 143.)

Courts have expressly rejected Defendants' argument that isolated incidents of outperformance negate an overall trend of underperformance. For example, in *Transamerica*, 2019 WL 3938471, at *7, the court stated:

> Defendants point out that the challenged funds outperformed their respective benchmarks and the comparator funds in one or more years during the putative class period. Despite outperforming the relevant benchmark or comparator funds in certain years within the period, each of the challenged funds failed to outperform the comparable funds or the relevant benchmark over the relevant period as a whole. Whether good performance for one or more years during a period of otherwise poor performance is proof of prudent conduct is a factual issue that is not appropriate for the Court to resolve at this stage.

Here, when viewed "as a whole," the Focus Funds consistently and materially underperformed the Comparators.

      **iii.**     **The Low Cost of the Focus Funds Does Not Justify or Offset Their Underperformance**

Defendants assert that the Focus Funds' fees were low-cost relative to the three target date fund Comparators, implying that the low cost justifies or offsets the Focus Funds'

underperformance. (Defs.' Brf. at 29.) Defendants' argument fails for multiple reasons.

*First*, it is unclear whether the Focus Funds' fees were in fact lower than the three Comparators. Defendants argue that the relevant fee for comparison purposes is the Focus Funds' 0.07% "investment management fee," not the 0.22% fee that combines the 0.07% investment management fee with the 0.15% fee for administrative expenses. (Defs.' Brf. at 29.) But this method of comparison is unworkable because the Comparator funds do not specify what portion of their overall fee constitutes "investment management fees" versus administrative or other fees. Therefore an apples-to-apples comparison of "investment management blends" between the Focus Funds and Comparator funds cannot be made.

To illustrate, the Vanguard Target Retirement Fund imposed an overall fee of 0.12% to 0.16% from 2016 to 2020. (Compl. ¶ 153.) Vanguard described the fee as "Acquired Fund Fees and Expenses."[21] Vanguard did not specify what portion of that fee, if any, pertained to "investment management fees" versus administrative or other fees. Similarly, the American Funds Target Date Funds imposed an overall fee of 0.30% to 0.46% from 2016 to 2020. (Compl. ¶ 153.) American Funds described the fee as a "Net Effective Expense Ratio," which was a combination of "Acquired Underlying Fund Fees and Expenses" and "Other Expenses."[22] American Funds did not specify what portion of those fees, if any, pertained to "investment management fees" versus administrative or other fees.[23] Similarly, the FIAM Blend Target Date

---

[21] *See* Vanguard Target Retirement Funds Prospectus Supplement dated Feb. 17, 2021, at pp. 8, 14, 20, 26, 32, 38, 44, 50, 56, 62, 68, 94-104, *available at* https://advisors.vanguard.com/pub/Pdf/p308.pdf (last visited Nov. 9, 2021).

[22] *See* American Funds Target Date Retirement Series Prospectus dated Jan. 1, 2021, at pp. 1, 7, 13, 19, 26, 32, 38, 44, 51, 58, 65 (share class R-6), *available at* https://www.capital group.com/individual/pdf/shareholder/mfgeprx-850-tdrsp.pdf (last visited Nov. 9, 2021).

[23] American Funds disclosed that the "Other Expenses" included "custodial, legal and transfer agent (and, if applicable, subtransfer agent/recordkeeping) payments and various other expenses." *See* American Funds Target Date Retirement Series Prospectus dated Jan. 1, 2021, at

Commingled Pool funds imposed an overall fee of 0.26% in 2020 (the only year for which expense information is publicly available). (Compl. ¶ 153.) FIAM described the fee as an "Exp Ratio," and did not specify what portion of the fee, if any, pertained to "investment management fees" versus administrative or other fees.[24]

Defendants disingenuously assert that Plaintiffs engaged in "sleight of hand" in the Complaint when Plaintiffs used the Focus Funds' 0.22% total fee rather than the 0.07% "investment management fee" to compare the Focus Funds' costs to the Comparators' costs. (Defs.' Brf. at 29.) Plaintiffs certainly did not resort to such trickery. The Complaint clearly stated that the "expense ratio for the Focus Funds was .22% (.07% investment management fee plus .15% administrative fee)." (Compl. ¶ 153.) Thus the Complaint was transparent regarding which Focus Fund fees Plaintiffs were using for comparison purposes. The Complaint then compared the Focus Funds' overall 0.22% expense ratio to the overall expense ratio of the Comparators to achieve an apples-to-apples comparison. (Compl. ¶ 153.) When making the fee comparisons, Plaintiffs used the Focus Funds' 0.22% fee by necessity. A comparison using just the Focus Funds' 0.07% "investment management fee" would have yielded flawed results because the Comparators' fees included more than just "investment management fees."

*Second*, even *if* the Comparators' fees represented solely "investment management fees" (they do not), the difference between the 0.07% Focus Fund fee and the Comparators' fees would be immaterial. To illustrate, the Plan holds $368 million in aggregate Focus Funds. (Compl. ¶ 132.) Applying the Plan's 0.07% investment management fee to the $368 million

p. 108, *available at* https://www.capitalgroup.com/individual/pdf/shareholder/mfgeprx-850-tdrsp.pdf (last visited Nov. 9, 2021). Thus as least some of the overall fee was in fact unrelated to investment management fees, which precisely illustrates Plaintiffs' point.

[24] *See* FIAM Blend Target Date Commingled Pool summary sheets at the various URLs cited in Plaintiffs' Complaint at ¶ 153 n. 128.

Focus Fund balance results in an annual fee of $245,000. In comparison, the average total fee of

the Vanguard Target Retirement Funds (0.12% to 0.16%), American Funds Target Date Funds

(0.30% to 0.46%), and FIAM Blend Target Date Commingled Pool funds (0.26%) is 0.26%.

Applying that 0.26% average fee to the $368 million Focus Fund balance results in an annual fee

of $956,800. The difference between the $245,000 Focus Fund fee and $956,800 Comparator fee

is just $699,000. That figure is immaterial relative to the estimated $5.5 million in annual

underperformance losses of the Focus Funds. (Compl. ¶ 149.) Thus, the cost savings from the

Focus Funds' low fees would not come close to offsetting the Focus Funds' underperformance.

In sum, Plaintiffs adequately allege a breach of fiduciary duty claim regarding the

underperforming Focus Funds.

### D.     Plaintiffs Adequately State Claims for Failure to Monitor Co-Fiduciaries

Counts II and IV of the Complaint assert claims for failure to monitor co-fiduciaries.

ERISA claims for failure to monitor co-fiduciaries are derivative of the underlying breach of

fiduciary duty claims and generally rise or fall with the underlying claims. *See, e.g., Walgreen*,

2020 WL 8921399, at *4 ("Because Count I survives the motion to dismiss, Count II for failure

to monitor also survives, as it is 'derivative of Plaintiffs' fiduciary breach claim.'") (citation

omitted); *Munro v. Univ. of S. California*, No. 16-cv-06191, 2019 WL 4543115, at *4 (C.D. Cal.

Aug. 27, 2019) ("The parties agree that Plaintiffs' seventh claim [for breach of the duty to

monitor fiduciaries] is derivative of Plaintiffs' claims for breach of fiduciary duty. As Plaintiffs'

claims for breach of the duty of prudence have survived the Motion to Dismiss, the Court denies

Defendants' Motion as to Plaintiff's seventh claim."). The Defendants agree with this concept.

*See* Defs.' Brf. at 35 ("'[a] failure to monitor claim is derivative in nature'"; "'the claims rise and

fall together'") (citation omitted). Here, the underlying breach of fiduciary duty claims survive

for the reasons discussed above, thus the claims for failure to monitor should also survive.

In *McCool*, the court upheld a failure to monitor claim based on facts and allegations similar to those alleged here. The court held: "An appointing fiduciary has an ongoing fiduciary duty to monitor its fiduciary appointees. . . .  Plaintiffs' allegation that the Board of Directors failed to take any action to monitor the Committee Defendants is sufficient to state a claim for breach of the duty to monitor under a notice pleading standard." *McCool*, 2021 WL 826756, at *5. Other courts in cases with similar facts routinely reach the same conclusion. *See, e.g., Jones v. Coca-Cola Consolidated, Inc.*, No. 20-cv-00654, 2021 WL 1226551, at *5 (W.D.N.C. March 31, 2021) ("'an analysis of the precise contours of the defendants' duty to monitor . . . is premature'") (citation omitted); *Kendall v. Pharm. Prod. Dev., LLC*, No. 20-cv-00071, 2021 WL 1231415, at *12 (E.D.N.C. Mar. 31, 2021) ("in light of this court's conclusion that a portion of the prudence claim survives for now, plaintiffs have alleged a plausible claim for breach of the duty to monitor"); *In re Medstar ERISA Litig.*, No. 20-cv-01984, 2021 WL 391701, at *7 (D. Md. Feb. 4, 2021) ("As the Plaintiffs' allegations . . . are sufficient to make a plausible claim that Defendants breached their fiduciary duties, such allegations also implicate their duty to monitor."); *Dearing v. IQIVIA, Inc.*, No. 20-cv-00574, 2021 WL 4291171, at *5 (M.D.N.C. Sept. 21, 2021) (upholding failure to monitor claim); *Tracey v. Mass. Inst. of Tech.*, No. 16-cv-11620, 2017 WL 4478239, at *4 (D. Mass. Oct. 4, 2017) (same); *Novant Health*, 131 F. Supp. 3d at 480 (same). Likewise, Plaintiffs' Complaint contains similar allegations against Defendants for failure to monitor their co-fiduciaries. (Compl. ¶¶ 200-06, 219-25.) Those claims should be upheld.

The cases Defendant cite are distinguishable because in each case the underlying breach of fiduciary claim was dismissed, necessitating dismissal of the derivative failure to monitor claim. (Defs.' Brf. at 36) (citing *FMC*, *Nokia*, and *In re Nokia*).

### E.     The Named Plaintiffs Have Standing Regarding All Focus Fund Tranches in the Plan, Not Just Those in Which They Invested

Defendants argue that Plaintiffs' standing should be limited to only the Focus Funds in which the named Plaintiffs invested, specifically the 2020, 2025, 2045, and 2055 Focus Funds. (Defs.' Brf. at 37 n.17.) Defendants are incorrect in light of a long line of case law on point.

Most notably, the *Allstate* court considered and rejected the same argument and held that the plaintiffs had standing to pursue claims on behalf of the entire suite of Focus Funds:

> [Defendants] argue that plaintiffs lack Article III standing to "bring claims related to the six [Focus Funds] in which they did not invest" because "[p]laintiffs cannot plead facts establishing injury" as to those funds. . . .  In other words, plaintiffs have standing to bring their Count I claims, but only as to the [Focus Funds] in which they invested. . . .
>
> In my view, Article III does not provide a basis to edit the details of a fiduciary-breach claim when each plaintiff has sufficiently alleged standing as to that claim. The standing inquiry is about whether a plaintiff brings a real dispute to court. Defendants do not contest that plaintiffs have done so. Once that threshold is crossed, the proper scope of plaintiffs' claims become a matter for the merits, not whether there's a case or controversy. Plaintiffs allege breaches of duty that harmed them, and that opens the courthouse door. . . .  Here, that the breaches of duty may have impaired the value of other [Focus Funds] does not mean that the plaintiffs have no stake in the duty breach – they do, because they were allegedly harmed by the same breach. **And where the alleged conduct involved the selection of the full suite of [Focus Funds] and plaintiffs allege a concrete injury from that selection, there is no jurisdictional problem in having a court resolve the controversy over all of the funds' losses**.
>
> . . . .  [B]ecause each plaintiff here has alleged Article III standing, they may seek relief on behalf of the plan or other participants, even when relief sweeps beyond their own injury.

*Allstate*, 2021 WL 4439415, at *5-6 (emphasis added).

Courts in analogous cases have reached similar conclusions. *See McGowan v. Barnabas Health, Inc.*, No. 20-cv-13119, 2021 WL 1399870, at *4 (D.N.J. Apr. 13, 2021) ("Courts . . . have generally rejected the argument that a plaintiff's ERISA challenge must be confined to the individual funds in which he or she invested."); *McDonald v. Jones*, No. 16-cv-01346, 2017 WL

372101, at *2 (E.D. Mo. Jan. 26, 2017) ("Defendants argue that McDonald does not have standing to challenge the Defendants' duties regarding the Plan funds in which she did not personally invest. However, in addition to bringing claims on her own behalf, McDonald is seeking relief on behalf of the Plan. In a suit brought pursuant to 29 U.S.C § 1132(a)(2), a plan participant may seek recovery for the plan even where the participant did not personally invest in every one of the funds that caused an injury to the plan."); *Falberg v. Goldman Sachs Grp., Inc*., No. 19-cv-09910, 2020 WL 3893285, at *7 (S.D.N.Y. July 9, 2020) ("Defendants argue that because Plaintiff has only invested in three of the five proprietary funds at issue, he cannot establish any injury with regards to the two remaining funds. Defendants further contend that Plaintiff lacks class standing because his claims will have to be proven fund by fund, showing that they do not implicate the same concerns. Neither argument prevails."); *Clark v. Duke Univ*., No. 16-cv-01044, 2018 WL 1801946, at *4 (M.D.N.C. Apr. 13, 2018) (same in substance); *Leber v. Citigroup 401(k) Plan Inv. Comm*., 323 F.R.D. 145, 155 (S.D.N.Y. 2017) (same in substance); *Cryer v. Franklin Templeton Resources, Inc*., No. 16-cv-04265, 2017 WL 4023149, at *4 (N.D. Cal. July 26, 2017) (same in substance); *Tussey v. ABB, Inc*., No. 06-cv-04305, 2007 WL 4289694, at *2 (W.D. Mo. Dec. 3, 2007) (same in substance).

The cases Defendants cite for their position are unpersuasive. (Defs.' Brf. at 37.) Specifically, the standing holding in *Walgreen* was expressly analyzed and rejected in *Allstate*. *See Allstate*, 2021 WL 4439415, at *5 (rejecting *Walgreen's* holding that plaintiffs lacked standing to bring claims for Focus Funds in which they did not invest). The standing holding in *Patterson* has been rejected and classified as an "outlier." *See Goldman Sachs*, 2020 WL 3893285, at *8 ("*Patterson* is an outlier; the majority of courts considering similar cases both in this district and elsewhere are consistent with *Leber* [which upheld standing for funds in which

the plaintiffs did not invest].”). Finally, the standing holding in *Johnson v. Delta Air Lines, Inc*., No. 17-cv-02608, 2017 WL 10378320, at *2 (N.D. Ga. Dec. 12, 2017) is of limited value because it is unclear whether the plaintiff invested in any funds at issue in the case.

## V.    CONCLUSION

Plaintiffs request that the Court deny Defendants' Motion to Dismiss in full. To the extent the Court holds that any of the claims are insufficiently pled, Plaintiffs respectfully request the right to amend the Complaint.

Dated: January 3, 2022                    Respectfully submitted,

                                          /s/  Daniel J. Walker
                                          Daniel J. Walker (DC Bar No. 219439)
                                          **BERGER MONTAGUE PC**
                                          2001 Pennsylvania Ave., NW, Suite 300
                                          Washington, DC 20006
                                          Tel: (202) 559-9745
                                          Email: dwalker@bm.net

                                          Todd Collins (Admitted Pro Hac Vice)
                                          Jon Lambiras (Admitted Pro Hac Vice)
                                          **BERGER MONTAGUE PC**
                                          1818 Market St., Suite 3600
                                          Philadelphia, PA 19103
                                          Tel: (215) 875-3000
                                          Email: tcollins@bm.net
                                          Email: jlambiras@bm.net

                                          Mark K. Gyandoh (Admitted Pro Hac Vice)
                                          Gabrielle Kelerchian (Admitted Pro Hac Vice)
                                          **CAPOZZI ADLER, P.C.**
                                          312 Old Lancaster Road
                                          Merion Station, PA 19066
                                          Tel: (610) 890-0200
                                          Email: markg@capozziadler.com
                                          Email: gabriellek@capozziadler.com

                                          Donald R. Reavey
                                          **CAPOZZI ADLER, P.C.**
                                          2933 North Front Street

Harrisburg, PA 17110
Tel: (717) 233-4101
Email: donr@capozziadler.com

*Interim Co-Lead Class Counsel*


Eric Lechtzin (PA Bar No. 62096)
**EDELSON LECHTZIN LLP**
3 Terry Drive, Suite 205
Newtown, PA 18940
Tel: (215) 867-2399
Email: elechtzin@edelson-law.com

*Interim Class Counsel Executive Committee Chair*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 3, 2022, I electronically filed a copy of the attached document with the Clerk of Court using the CM/ECF system, which will send a notification to all counsel of record in this Action.

<u>/s/    Daniel J. Walker              </u>